**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **AISE CANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: CV-07-900-WKW** |
| | ) | |
| **LANSING BUILDING PRODUCTS,** | ) | |
| **INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SUPPLEMENT TO MOTION TO SET ASIDE DEFAULT AND REPLY TO PLAINTIFF'S RESPONSE TO MOTION

I.    The Legal Standard

As a preliminary matter, Lansing Building Products, Inc. brings to the court's attention the legal standard to be used in assessing whether to set aside defaults as stated by on Federal court in Alabama. That court stated:

> that defaults are seen with disfavor because of the strong policy of determining cases on their merits."
> Florida Physician's Ins. Co. v. Ehlers, 8 F.3d 780, 783 (11th Cir.1993); see also In re Worldwide Web Systems, Inc., 328 F.3d 1291, 1295 (11th Cir.2003) (similar). In that regard, the Eleventh Circuit has recognized that "a technical error or a slight mistake by a party's attorney should not

deprive the party of an opportunity to present the merits of his claim." Ehlers, 8 F.3d at 783 (citation omitted). Indeed, "[d]efaults are reserved for rare occasions and when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." Canfield v. VSH Restaurant Corp., 162 F.R.D. 431, 434 (N.D.N.Y.1995); see also McGarey v. York County, 233 F.R.D. 220, 222 (D.Me.2006) (rule governing defaults "is tempered by the philosophy that actions should ordinarily be resolved on their merits") (citation omitted); McMillen v. J.C. Penney Co., 205 F.R.D. 557, 558 (D.Nev.2002) ("Because defaults are generally disfavored, courts resolve such motions so as to encourage a decision on the merits.").

Bearing the disfavored status of defaults in mind, the Court turns to Rule 55(c), Fed.R.Civ.P., which provides that "[f]or good cause shown the court may set aside an entry of default." Id.[FN1] In

determining whether the requisite good cause exists, courts balance an array of factors, including principally whether the default was willful, whether setting aside the default would prejudice the plaintiff, and whether the defendant had a meritorious defense. See, e.g., Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951 (11th Cir.1996); Hinson v. Webster Industries, 240 F.R.D. 687, 690 (M.D.Ala.2007) (although "good cause" for Rule 55(c) is not captured by a precise formula, courts consider, among other things, whether default was culpable or willful which entails evaluating the plausibility of the defaulting party's excuse, whether setting aside the default would prejudice the other side, whether the defaulting party presents a meritorious defense, and whether the defaulting party acted promptly to correct default); see generally KPS & Associates, Inc. v. Designs By FMC, Inc., 318 F.3d 1, 12 (1st

Cir.2003) (relevant factors include willfulness of default, prejudice to adversary if default is set aside, existence of meritorious defense, movant's explanation for default, parties' good faith, amount of money involved, and timing of motion to set aside default). The "good cause" analysis is not susceptible to a precise formula, but is necessarily a flexible inquiry based on the particular circumstances in a given case. See Com pania Interamericana, 88 F.3d at 951. Accordingly, no talismanic significance is accorded any of these factors; rather, the overarching question is whether circumstances exist that warrant a finding of good cause to set aside the Clerk's Entry of Default against defendants. Id. ("Whatever factors are employed, the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of 'good cause' to set aside a default.").

Kilbride v. Vrondran, 2007 U.S. Dist. LEXIS 70262 (U.S.D.C., So. Dist. Ala). No default judgment has entered in this case. "This is potentially significant, inasmuch as "[t]he excusable neglect standard that courts apply in setting aside a default judgment is more rigorous than the good cause standard that is utilized in setting aside an entry of default." E.E.O.C. v. Mike Smith Pontiac GMC, Inc., 896 F.2d 524, 528 (11th Cir.1990).

II.    Lansing Building Products Was Neither Willful Nor Culpable.

In supplement to Lansing Building Product's request that the Court set aside the clerk's entry of default and in reply to the plaintiff's response thereto, Lansing Building Products submits the Declaration of Lynn Whyte, which is attached hereto. In that declaration, Mr. Whyte, Lansing Building Product's general counsel, establishes that Lansing Building Products was neither willful nor culpable with regard to responding to the Summons and Complaint in that he notified Lansing Building Products' employment insurance carrier of the suit the day after the company was served. This conduct demonstrates that Lansing Building Products did not act willfully or culpably as a matter of law. Jones v. Harrell, 858 F.2d 667 (11th Cir. 1988) (giving Complaint to father to, in turn, give to insurance carrier sufficient showing to set aside default entry).

III.    <u>Lansing Building Products Has A Meritorious Defense.</u>

Moreover, the company's position statement and response to the plaintiff's Charge of Discrimination demonstrates that it has a meritorious defense to the plaintiff's claims, including a statute-of-limitations defense.

IV.    <u>Cannon Has Not Been Prejudiced.</u>

Finally, the plaintiff has failed to prove how she will be prejudiced within the meaning of Rule 55(c) if the clerk's entry of default were to be set aside. ("Having to try a case on the merits is not, without more, sufficient prejudice," where plaintiffs ability to pursue her claim is not hindered); <u>Capital Yacht Club v. Vessel AVIVA</u>, 228 F.R.D. 389, 394 (D.D.C. 2005) ("delay and legal costs are part and parcel of litigation and typically do not constitute prejudice for the purposes of Rule 55(c)"); <u>see</u> generally <u>Thompson v. American Home Assurance Co.</u>, 95 F.3d 429, 433-34 (6th Cir. 1996) (to be deemed prejudicial, setting aside of default must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion). Any delay in resolution of these proceedings attributable to the default is minor, inasmuch as defendants appeared less than two months after process was served on them. This relatively brief delay does not amount to legally cognizable prejudice, either. <u>See</u> <u>Burrell v. Henderson</u>, 434 F.3d 826, 835 (6th Cir. 2006) (delay in

adjudicating plaintiff's claim, without more, is not sufficient prejudice under Rule 55.)  Hence, the absence of any cognizable prejudice to Kilbride is another factor favoring the granting of relief requested by defendants.

Wherefore, Lansing Building Products requests that the Court set aside the clerk's entry of default and proceed to trial on the merits.


/s/ William K. Hancock
William K. Hancock
Ray A. Carle
Attorneys for Lansing Building Products


OF COUNSEL:
ADAMS AND REESE LLP
2100 3rd Avenue North
Suite 1100
Birmingham, AL 35203
Telephone: (205) 250-5000
Facsimile: (205) 250-5034


## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 10th day of December, 2007, served a true and correct copy of the above and foregoing document on all counsel and parties of record, by electronically filing this document through the Middle District's electronic filing system which will send notification of such filing to the following:

Deborah M. Nickson
2820 Fairlane Drive, Suite A-10
Montgomery, AL 36116


712081-1

/s/ William K. Hancock
OF COUNSEL

712081-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

AISE CANNON,                          )
                                      )
    Plaintiff,                     )
                                      )
v.                                    )    Civil Action No.: CV-07-900-WKW
                                      )
LANSING BUILDING PRODUCTS,            )
INC.                                  )
                                      )
    Defendant.                     )

## DECLARATION OF LYNN WHYTE

My name is Lynn Whyte, and I make this declaration based on personal knowledge. I serve as General Counsel for Lansing Building Products, Inc. Lansing Building Products was served with a copy of the summons and complaint in the above-styled civil action by certified mail on October 10, 2007 through CT Corporation. On October 11, 2007, I forwarded the complaint to claims counsel at Zurich North America using an e-mail address that I had successfully used to communicate with Zurich during the pendency of the plaintiff's EEOC investigation.

Lansing Building Products believes that it has a meritorious defense to the plaintiff's claims, including a clear statute-of-limitations defense, which defenses are more particularly described and proved in the position statement filed with the EEOC in response to the plaintiff's Charge of Discrimination. I attach a copy of that EEOC position statement.

712157-1

I declare under penalty of perjury that the forgoing is true and correct, dated this the 10th day of December, 2007.

_Lynn Whyte_
Lynn Whyte

712157-1



Lansing Building Products, Inc.
8501 Sanford Drive
P.O. Box 9489
Richmond, VA 23228
(804) 266-8893
Fax: (804) 264-2124

April 30, 2007

Mr. Delner Franklin-Thomas, District Director
Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street, South
Birmington, AL 35205

Dear Mr. Franklin-Thomas:

Thank you for the opportunity to respond to Ms. Aise Cannon's EEOC complaint, dated February 1, 2007. We have responded specifically to Ms. Cannon's complaints in the attached bullet paper. In this paper, we have also provided some detail about her employment with our company.

There were witnesses to most of the events that Ms. Cannon addresses in her statement. For the most part, the employees mentioned in Ms. Cannon's statement are still employed by Lansing Building Products. In addition, many of our customers have agreed to provide additional information, if that becomes necessary.

We need to raise one issue of deep concern to us. We do not believe that Ms. Cannon's complaint was filed within the required time period. The EEOC Form 5 states "(AMENDED CHARGE-ORIGINAL CHARGE FILED JULY 26, 2006)". We requested a copy of the original charge and what we were provided was a letter, dated June 12, 2006, from Ms. Cannon to Mr. Chris Lansing which bears an EEO Received Stamp date on the upper right hand corner of "Jul 26 2006" and a letter dated July 25, 2006 to EEOC Intake which is also stamped with the "Jul 26, 2006" stamp. In our opinion, the June 12th letter did not constitute an EEOC complaint. It cited references to Title VII and then proceeded to chronologically list incidents at work which took place beginning in May 2005. However, the incidents listed did not claim specific discrimination or violations of law. Most of the complaints dealt with business practices and job frustrations. Even in the final discussion of her termination, she does not allege any discriminatory basis for her termination, but in fact describes the confrontation over the previous insubordination incident and admitted that she returned to work on the following Monday, even though she had been told she was suspended and was not to report to work. At this time, she refused to leave our branch premises, even though she was repeatedly directed to do so.

The July 25th letter to the EEOC Intake may have been the beginning of the process for filing a complaint, but it did not constitute the "filing of a complaint" as contemplated in the statute. Otherwise, a person could file a letter of dissatisfaction with the EEOC and then wait a year, two (2) years, or five (5) years before signing a formal, specific complaint document. It was not until January 7, 2007, that Ms Cannon articulated specific allegations of discrimination and signed the EEOC Form 5. January 7, 2007 was the date that she actually filed an EEOC complaint. The statute is very clear on the 180 day filing deadline and the EEOC instructions adamantly stress that a person must file his/her complaint within 180 days of the alleged discrimination. Obviously, Ms Cannon had initial contact with the EEOC in July 2006 and was aware of the requirements but simply failed to pursue the filing of a complaint within the required statutory time period. We vigorously raise this issue.

We stand ready to help in any way necessary to resolve this complaint. I will serve as our company's primary contact. I can be reached by phone at 804-266-8893, extension 70506, by cell phone at 804-212-6964, or by e-mail at m.stocks@lansingbp.com.

Sincerely,


Maurice L. Stocks
Vice President, Human Resources


Enclosure: Bullet paper

Lansing Building Products

Response to Aise Cannon's EEO Complaint, dated February 1, 2007

- Background

  - Lansing Building Products is a 52-year old company with headquarters in Richmond, Virginia. Lansing has more than 70 branches in two dozen states. Our primary products include siding, windows, gutter, decking, railing, trim coil and accessories.

  - Auburn is a small branch for Lansing Building Products. Five to seven associates generally work in this branch as compared to 12 to 20 in a typical branch. The branch routinely employs one branch manager, a branch operations manager, a warehouse manager who also was responsible for inside sales and two warehouse workers/drivers. A branch organizational chart for a typical Lansing branch and an organizational chart for the Auburn branch are at Attachment A.

  - Warehouse managers are usually hired from the local population and are generally not moved from location to location. Because warehouse managers generally have a supply chain or other non-sales background, they, as a general rule, are not promoted to branch operations manager roles, although it does happen occasionally. Our estimate is that, at any given time, less than ten percent of our branch operations managers were previously warehouse managers.

  - Warehouse managers participate in a formal training, usually involving the completion of workbooks and study guides, and attend the company's on-site training, Cougar University.

- Discussion of Issues

Key Factors Relating to this Complaint

  - Aise Cannon provided a letter of details, outlining events during her employment with Lansing Building Products, to the Birmingham EEOC office on July 26, 2006. She filed an EEO Form 5 on January 7, 2007. The EEO Form 131 Lansing received from the EEO was dated February 1, 2007.

  - Aise Cannon was hired on October 13, 2004. Since Auburn is a small branch, she was initially hired to handle both inside sales and warehouse manager responsibilities.

1

o  Ms. Cannon acknowledged reading the Associate Handbook on October 19, 2004. (Attachment B) This handbook contains the company's policy regarding harassment.

o  In addition to on-the-job training, Ms. Cannon completed Cougar University, Lansing's week-long company training program, on April 22, 2005. At Cougar University, senior leaders in the company spend a great deal of time talking about the company's mission statement and the company's desire to promote a discrimination-free environment. The mission statement also mandates that all associates, customers and suppliers be treated with respect, including respect for gender, race and ethnic group.

o  Although Ms. Cannon claimed to have had warehouse management experience, it was clear early in her tenure with Lansing that her management and customer service skills had not been developed to the point necessary to be effective in the warehouse manager's position. In addition, she was not a "hands-on" manager, preferring to give assignments to her "subordinates" and have those assignments carried out rather than participating directly in the completion of assigned tasks. In her initial interviews before being hired, she was told that, since Auburn is such a small branch, she would be required to participate in all basic warehouse responsibilities. In our small branches, the line is very thin between the roles of manager and subordinate. Only in a few large branches does the warehouse manager spend his/her time just managing.

o  Lansing has a formal disciplinary action notice process. Ms. Cannon was counseled using this process on October 19, 2005. She had written up "a return and cut a check to a customer for more than he paid for the material." In violation of company policy, Ms. Cannon refused to acknowledge receipt of this formal notice. (Attachment C)

o  Ms. Cannon was terminated on Monday, June 5, 2006. She was terminated only after she refused to leave our premises. On the previous Friday, she had, in her branch manager's (Chris Black) opinion, been inappropriately argumentative and disruptive – insubordinate -- in an open branch training meeting. Mr. Black called Ms. Cannon into his office and tried to counsel her on her behavior during the training meeting. He presented her with a disciplinary action notice, outlining his concerns, which she refused to sign (Attachment D). After seeking guidance from human resources, Mr. Black placed Ms. Cannon on suspension with pay, a not uncommon practice in our company. At that point, we were not sure we wanted to terminate Ms. Cannon. We wanted time to think about the situation and to let everything cool down. On Monday morning, Ms. Cannon came to the office and demanded to know her status. She would not accept her branch manager's direction to leave the premises and wait to be called. After conferring with corporate headquarters, Mr. Black again requested that Ms. Cannon vacate the premises. She refused. Mr. Black at that point terminated

her and told her he would call the police if she did not leave. (Termination Letter at Attachment E.)

- Mr. Black's notes regarding the June 2 meeting which led to Ms. Cannon's termination are instructive: "I held another branch meeting because things just weren't being done in a manner I felt they should have been done. Bin F [which Ms. Cannon had been directed to clean up] had still not been touched. As I attempted to talk about it, I was interjected upon by Aise. I tried to finish my sentence again but was interrupted for a second time by Aise. This occurred twice more in a matter of seconds until I raised my voice to say 'Aise, I am tired of you arguing with me every time I try to correct a problem. You are being very disrespectful. You need to be quiet and let me finish what I have to say, then you will have your turn to speak.' She continued to talk anyway and told me that Bo and Derek needed to put some stock material up and she asked me what would I rather have done, the corners straightened up, or the stock material be put in the racks. I told her that I had asked for Bin F to be put in order two days ago. I went on to tell her as I had done many times before that her attitude was very poor, and that if the confrontation and resentment of my authority did not end, she would need to look for another job. I told her I did not have a problem putting someone else in her position."

- Ms. Cannon covers the abovementioned meeting in her statement which has been provided to the EEOC. Mr. Black provides his statement at Attachment F, which also covers this meeting and other issues relating to Ms. Cannon. In addition, after the Friday meeting, Mr. Black had everyone in attendance at the meeting complete a short survey concerning his/her feelings about the meeting and Ms. Cannon's actions. These surveys are at Attachment G.

- In addition to asking the staff specifically about the meeting, we also asked each staff member to complete a short survey after we were notified that an EEO complaint had been filed. Those surveys are at Attachment H. While there is some positive feedback regarding Ms. Cannon in these surveys, the general view was that she could be difficult to get along with. Our employees did not feel Ms. Cannon had been the victim of discrimination.

- Just how far the company was willing to go to resolve this matter without firing Ms. Cannon is reflected in the way her termination was handled. Instead of terminating her outright, Mr. Black, at the direction of the Vice President for Human Resources, put her on suspension with pay, a common tool used under such circumstances, and told her she would be contacted by either him or directly by the Vice President for Human Resources. He told her not to come to work on Monday (the

following workday). This suspension was to give the company time to talk about how to handle this issue." On Monday morning, before any discussions had taken place and before we, as a company, knew where we were going with the issue, she showed up at the branch and demanded to know her status. This was in direct violation of the instruction she was given on Friday. Mr. Black told her that she was on suspension and should leave, but she refused to leave. At the direction of company leadership, he again asked her to leave, and when she refused, he told her he had no recourse but to terminate her.

- Ms. Cannon totally and deliberately provoked the confrontation that resulted in her dismissal. It had nothing to do with gender or race but everything to do with absolute insubordination. The irony is that, had she not been insubordinate, confrontational and demanding of a decision at that immediate moment, she would in all likelihood not have been terminated.

o Lansing Building Products received its first notification of a "charge of discrimination" in the package we received from the Birmingham EEOC office in mid-February, 2007. This package was referred to as an "amended charge" (July 26, 2006), but the February 1 package was the first document from the Birmingham EEOC office received by Lansing Building Products.

- If the actual, formal complaint was filed on January 7, 2007, the date that Ms. Cannon signed EEO Form 5, this would put the package well beyond the allowable period of filing for an EEO complaint. When we asked the Birmingham office for their documentation of the initial July 26, 2006, complaint referred to in the package postmarked on February 2, 2007, we were provided with a copy of a letter from Ms. Cannon to the Birmingham EEOC office. In essence, we are seeing this complaint for the first time more than eight months after Ms. Cannon was terminated, which makes it difficult to reconstruct much of the history of these events.

- We do not believe that Ms. Cannon sought the administrative remedies available to her in a timely manner and in keeping with the provisions of EEOC rules and regulations and the applicable federal statutes.

o As a company, we actively recruit minority associates. As a black female in an industry dominated by males, Ms. Cannon was a welcomed addition to our team. She was not a token. She represented the type of employee that Lansing was attempting to hire. In addition, her military experience appeared to make her especially well-suited for her inside sales/warehouse manager background.

- Within a few months of Ms. Cannon's employment with Lansing, it began to become apparent that Ms. Cannon was having difficulty in her

4

position. Company leadership, by this point, was receiving feedback from both the branch manager and the regional manager for that area. On a number of occasions before she was terminated, Ms. Cannon's performance was discussed by Lansing's executive committee. As a part of the executive committee's weekly meeting, employees in management positions at all of our branches are reviewed and discussed, for the most part, on a by-exception (having noteworthy success or trouble) basis. In those meetings, we had several discussions regarding her performance and her difficulties in the job. Because Ms. Cannon was a female and a minority, we would have been especially pleased if she succeeded, but it was clear that she was not an ideal fit for a leadership position in our industry.

- Ms. Cannon claims that she did not know that she was failing in the position. She says that she was not counseled regarding her unsatisfactory performance. Mr. Black contends he routinely counseled her on her shortcomings, which she generally refused to accept. In fact, as indicated below, on at least two occasions, Mr. Black presented her with formal counseling statements, which she refused to acknowledge. Ms. Cannon's own statement contains several references to counseling she received. From the beginning, it appeared to us that Ms. Cannon viewed any counseling, whatever its nature, as harassment, because she just simply could not accept the premise that she was not succeeding in her position. She was so sensitive that it was very difficult to talk with her. Mr. Black was always careful to have witnesses, whenever possible, when he spoke with Ms. Cannon. He also kept a record of his conversations with her regarding her performance. In fact, Ms. Cannon mentions this file in her statement. This file was stolen from a locked drawer in Mr. Black's desk. The person who stole the file had to break the lock on the desk drawer to get to it. (Attachment I)

o Ms. Cannon's difficulties in her position can be summarized under three general categories:

- Ms. Cannon did not make satisfactory progress in becoming familiar with our products and she did not take counseling regarding her deficiencies in a professional, positive manner.

- Ms. Cannon was not effective as a primary customer service representative for the company. She could be curt and did not always respond to Lansing customers in an appropriate manner.

- Ms. Cannon had an issue with her position in the "chain of command" (her words) in the branch.

5

o  .Ms. Cannon did not make satisfactory progress in becoming familiar with our products.

- We began to hear complaints from customers that Ms. Cannon was not familiar enough with our products to be helpful to customers. Even though she worked in both inside sales and the warehouse, she had difficulty identifying products and helping customers make basic decisions about the use of those products. We have collected statements from customers indicating some of their difficulties with Ms. Cannon. (Attachment J)

- Ms. Cannon never learned to order windows, a key responsibility of her inside sales job. The branch manager estimates that he or another staff member had to correct 90 percent of the window quotes prepared by Ms. Cannon.

- After Ms. Cannon was terminated, Maurice Stocks, Human Resources Vice President, interviewed a number of customers and confirmed their concerns. Some customers actually indicated they would avoid Ms. Cannon because she could be surly and difficult to deal with – and she had very poor product knowledge.

- On one occasion, John Witt, the chief operations officer of the company, was in the Auburn warehouse when Ms. Cannon asked a customer to write down the material he wanted because she was not familiar with the product he was requesting. At this time, Ms. Cannon had been an employee for more than a year. She should have been very familiar with our products by that time. Mr. Witt considered this shortcoming to be a major indicator of Ms. Cannon's weakness in the warehouse manager's position as well as an example of her unwillingness to make the effort to become familiar with our products.

o  Ms. Cannon was not effective as a primary customer service representative for the company.

- A key role for Ms. Cannon was to act as our primary contact in the warehouse with our customers. It is critical for the individual in this position to be able to handle customer service complaints without becoming discourteous and rude. We have collected several complaints from our customers regarding their difficulty in working with Ms. Cannon.

- One customer interviewed by the company's Vice President for Human Resources holds Ms. Cannon responsible for mishandling a check, which resulted in his paying twice for products. He was especially upset with her, because she, in his opinion, was unreasonable when he tried to find a

6

solution to this problem. We cannot gauge the accuracy of this customer's description of the actual facts in this episode, but we believe it does point to Ms. Cannon's general lack of sensitivity to customers and her tendency to become rigid and curt when working with customers. Our warehouse managers must be good "people" persons with the capability to take the heat out of situations with customers instead of fanning the flames.

- As an aside, the abovementioned customer indicated that he discontinued doing business with us until Ms. Cannon left the company.

o Ms. Cannon had an issue with her position in the "chain of command."

- Auburn is a small branch with only four to six employees. While there is a clear line of authority, there is very little emphasis on "chain of command." Because there are so few people to do the work, the lines of responsibility sometimes become blurred. All associates must be involved in all aspects of the branch's business for the branch to be successful. (See Attachment A.)

- Early in Ms. Cannon's tenure with Lansing, we began to hear that she was concerned about her place in the pecking order. At one point, Ms. Cannon actually disseminated an undated warehouse syllabus (Attachment K). This document included such statements as:

  • "Remember, I am not a mind reader. Also, realize that I am your Supervisor and if I ask you to do something that is apart of your MAIN job description it is in my right to do so with no questions asked."

  • "To be as TACTFUL as possible, I, Aise Cannon am your direct Supervisor, not Mike or Chris, and I do deserve and expect a level of respect, and in turn I will respect you."

  • "To conclude we are a team, but each member on the team is not equal. Remember, each one of us applied to our particular position for whatever reason, and we need learn to deal with the responsibilities that come along with our position. If you are not mature enough to deal with your responsibilities like men, and/or women, you need to reconsider your future."

- It is not difficult to see the inappropriateness of the above-mentioned document in a five to six-person branch where Ms. Cannon acts as a combined inside salesperson and warehouse manager. This document did nothing to smooth tensions. Indeed, it only created greater strife between Ms. Cannon and her subordinates.

7

- Ms. Cannon's directions to her subordinates could also be insensitive. At one point, she was asked to develop some instructions to help her staff master the cycle counting process, a key inventory process used by the company. Ms. Cannon was not keen on the task and wrote a set of brief instructions for her subordinates, William Flournoy and Steve Norris, which she entitled, "Cycle Counting 4 Dummies" (Attachment L).

- Ms. Cannon became especially sensitive when she was not selected for promotion to branch operations manager in May, 2006. A new employee, Michael Haynes, was selected for that position. Mr. Haynes had been hired as an inside salesperson, but was quickly promoted when his predecessor, Tom Cleveland, left the company. Mr. Haynes was well-known to the company. In fact, the regional manager and Birmingham branch manager had tried to hire him for a key position in Auburn a year earlier. Mr. Haynes had experience in the industry and a track record of success in sales and management.

  - Despite her feelings to the contrary, Ms. Cannon was never a serious candidate for this position. She had been only marginally successful at this point as a Lansing associate, and it was clear that her strong suit was not customer service, which was a primary part of this position. Ms. Cannon had also shown that she was ineffective and difficult to deal with as a manager. Both of her direct reports had complained to our branch manager about the favoritism she showed and about the unprofessional way she spoke to them. As explained earlier, even under the best of circumstances, it is unusual for a warehouse manager to move to branch operations manager position because of the difference in skills required.

- When Ms. Cannon did not receive the branch operations manager position, she became even more difficult to deal with. She did not react in a predictable manner to problems and issues that arose. She became very volatile and was quick to respond harshly if questioned about directions or a decision. As a result, both our managers and employees became more guarded around her, because they could not be sure of how she would react to criticism – or encouragement. Ms. Cannon sees this tendency to treat her sensitively as treating her differently than the others were treated. She sees it as a gender or race issue, but, in truth, it was much more related to their fear of upsetting her.

- During this period, according to the branch manager and to the branch operations manager, Ms. Cannon spent exorbitantly long periods of time in the branch's one bathroom. On some days, according to their

feedback, she would spend as much as two hours in the bathroom. Because of the sensitivity of the issue, the branch manager never did broach the subject with Ms. Cannon, but, in hindsight, he believes she was probably working on her personal notes in the bathroom.

- There is also evidence at this time that Ms. Cannon was using the company computer in inappropriate ways. Ms. Cannon's resume (Attachment M) was recovered from the "deleted files" folder" on the company computer by our branch manager.

o   After-Termination Investigation

- After Mr. Lansing received Ms. Cannon's statement of concerns shortly after her termination, Maurice Stocks traveled to Auburn to investigate her complaints. Mr. Stocks informally interviewed all branch workers and several Lansing customers. Additional customers were contacted by phone while several others responded to a simple questionnaire asking for feedback related to Ms. Cannon's duty performance.

- Based on the information gathered, Mr. Stocks concluded that

  - Ms. Cannon had been insubordinate in the branch training meeting on Friday, June 2, 2006. Her insubordination was both inappropriate and disruptive and resulted in a situation that Mr. Black was forced to deal with. While opinions differed about Ms. Cannon among branch associates, they all agreed that her actions in that meeting had undermined the authority of the branch manager and had made it impossible for him to conduct any meaningful business at the meeting.

  - Ms. Cannon refused to acknowledge counseling about her behavior in the meeting (refused to sign a counseling form) and continued to be argumentative in meetings with the branch manager and other branch members.

  - A number of customers had difficulty in working with Ms. Cannon. In a small branch, the number of key customers will generally be no greater than 20. Five disgruntled customers can make a big difference in the success of the branch.

- On July 7, 2006, Chris Lansing, CEO of Lansing Building Products, responded to Ms. Cannon indicating that we had investigated her allegations and we found that we were justified in terminating her (Attachment N).

  Discussion of Specific Charges Included in EEOC Form 5

9

o "Shortly after I was hired, Chris Back [sic], Branch Manager, made it clear that I was not wanted there."

- Mr. Black realized shortly after he became branch manager that he had some issues with Ms. Cannon. He had numerous conversations with Mr. Stocks and others at corporate headquarters to find ways to motivate Ms. Cannon and make her more satisfied with her position.

o "I was only allowed to give instructions to the Black employee. . . . I also complained that I was not allowed to supervise the white subordinate." (Race)

- This complaint is a mystery to us. Most of the management issues in this branch were not race or gender-related issues. They were issues involved in managing a very small work area. With only six or less people – three supervisors and three or less inside sales and warehouse workers – it is extremely difficult to maintain absolutely clear chains of command.

- Ms. Cannon comes from a military environment. She knows that the Private may be busy completing tasks for the First Sergeant, but s/he must act if the Commander asks her/him to do something else.

- Mr. Stocks interviewed all the employees of our Auburn branch during his visit in late June, 2006. No other associate felt that the issues between Ms. Cannon and her subordinates were racially or gender-involved. Ms. Cannon wanted everything – all information and instruction -- to go through her and that just could not happen in a small branch. She could not handle it when a more senior supervisor changed a priority or task.

- Until the filing of this complaint, the company had no knowledge whatsoever of any concern on the part of Ms. Cannon regarding this issue, nor any opportunity to work with Ms. Cannon or her supervisors regarding any gender or racial issues, if they existed.

o "I was the first and only Black Female, Manager, in the position and I was reminded of that on more than one occasion."

- Without any specific mandate beyond wanting to "do the right thing," Lansing Building Products has made a concerted effort to build its diversity in all positions.

- Lansing has had other female warehouse managers and currently has several female branch managers. We were pleased and proud to have Ms. Cannon as an associate, because she was another example of the

diversity we sought, but she was not a token. We had no quotas or goals to meet. We hired her because we thought she was qualified for the position. As an aside, females in our organization have been promoted from secretary to executive vice president and from entry-level outside sales to senior vice president. These individuals were also promoted on merit, not on a quota system.

o "I complained about being disrespected and was told on a regular basis that I worked with "Red Necks" and that I needed to be "thick skinned."

- At Lansing, we have succeeded as an independent in an industry dominated by public companies. We think our strategic edge is our dedication to giving our customers the best possible customer service. We do not like to put people in categories but, as a general rule, our customers – construction workers and builders – are a rougher group than might be found in our industries, and we sometimes need to be a little thick-skinned. However, even under this intense commitment to customer service, we do not allow our employees to be submitted to discrimination. Our managers are under strict guidance to ask customers who are repeatedly inappropriate to leave our premises. In one case, we actually asked a customer conducting thousands of dollars of business with us not to return, because his comments about our people were inappropriate and discriminatory. This customer threatened to ruin our business, but, in the end, we think doing the right thing actually helped our business.

- Mr. Black, the Auburn branch manager, can only remember using the words "Red Neck" in front of Ms. Cannon on one occasion. On that occasion, early in her employment with Lansing, he was trying to explain that the company deals with a pretty unique group of individuals who come from a variety of backgrounds. She would not be expected to tolerate inappropriate or personally abusive remarks, but she might hear some things that would be mildly offensive to her. Mr. Black regrets the use of the term, "Red Neck," but he contends that he absolutely did not mean to imply that Ms. Cannon needed to put up with inappropriate behavior on the part of any customer.

- We did receive reports, as we investigated Ms. Cannon's allegations, that some of our customers did not want to work with Ms. Cannon. They were not concerned about her gender or race but about her lack of knowledge regarding our products as well as her general coolness. According to feedback, she could be extremely curt.

o "I was terminated while in a meeting which included Chris Black, Branch Manager, Michael Haynes, Supervisor, Willie Flournoy and Derek Ellis, both Warehouse Associates. I was verbally attacked by Chris Black, after I

11

complained of disparate treatment as it related to being allowed to supervise without interference and being respected as a manager. I also complained that I was not allowed to supervise my White subordinate. Chris then stated that I could be replaced anytime and that as a matter of fact, I can just go find another job."

- This account baffles us. In fact, Ms. Cannon's own details of this account in her statement refute this allegation, as she says she came into the branch on Monday after being told not to. From Mr. Black's point of view, the confrontation Ms. Cannon describes never took place. This characterization also makes it sound like the decision to terminate Ms. Cannon was a spur-of-the-moment action. The decision to terminate Ms. Cannon came after a four-day ordeal with numerous phone calls between Mr. Black and members of the Lansing leadership team. Most of our energy during this period was to find a way to cool things off so that a decision was not made in the heat of the moment.

- Mr. Black had never been involved in such a high profile issue and wanted higher headquarters guidance before he took any action. He did not make the decision to suspend her independently. After conferring with corporate headquarters, it seemed to be the best course of action because it would allow everyone time to cool off and make a reasoned decision.

- Ms. Cannon was terminated only after she refused to accept her suspension and leave our branch premises on Monday morning, June 5, 2006.

- Summary

  o This is another case where good human relations have been confused with race and gender relations.

    - Ms. Cannon sees her experience at Lansing in terms of her race and her gender. We see it in terms of her ability to relate to her subordinates and to our customers.

    - Ms. subordinates indicated that she could be a difficult boss and over-reacted when one of her superiors went directly to one of her subordinates.

    - Some Lansing customers felt that she did not know enough about our product line and could be difficult to deal with.

    - Ms. Cannon's lengthy package provided to the company in June, 2006, is another good example. This package contains more than a dozen pages

of narrative relating to specific events that she purports to present as harassment. Many of these reported exchanges are unfortunate, and we would like to have had the opportunity to deal with them. (Some were actually personal conversations, which she overheard.) However, the incidents she outlines generally do not appear to us to constitute harassment.

o   The building products business is a tough business -- but we do not let that be an excuse for discrimination or harassment.

   ▪   We are sensitive to – and concerned about -- the fact that our less sophisticated customers in any of our branches can sometimes get close to the line. As a result, we try to prepare all of our employees, even our corporate employees, male and female, to expect this behavior and to deal with it appropriately. This is simply a fact of life. However, we do not, and will not, condone or allow seriously improper behavior from our customers. When our customers have crossed the line in the past, we have dealt with those situations in a firm and direct manner, despite the possible adverse financial consequences to the company.

   ▪   Ms. Cannon seems to think that even talking about this issue constitutes discrimination. Apparently, she took conversations to try to help her better understand our customer base and be able to more effectively deal with them as a personal insult or as harassment. Similarly, she apparently took personal attempts of other employees to establish rapport with her as a form of harassment.

o   There are some troubling inconsistencies.

   ▪   Ms. Cannon's allegations appear to be internally inconsistent. At one point, she says she was not allowed to supervise white employees, but she then says, "I told them [employees] to fix Bin F before I went for training. I told him to put away the returns first" in another part of her statement.

   ▪   In Ms. Cannon's statement of discrimination, she says she was fired at a meeting on Friday, but then she says she returned to work on Monday and demanded to know her status.

   ▪   At one point in her extended statement, Ms. Cannon says that when she worked in the warehouse, there were no problems, which contradicts her assertion that she was being discriminated against all the time.

   ▪   Ms. Cannon implies that she was hired to be a manager and should not have been expected to do manual labor in the warehouse. All of our warehouse managers, with the exception of approximately a half dozen

13

managers in our largest branches, work beside their subordinates in the warehouse. They are not full-time managers. With margins of only three to four percent, all employees, including branch managers and branch operations managers must do what is necessary to get the job done, including working in the warehouse or making deliveries. Vice presidents have even gone out on trucks to make deliveries.

o  If Ms. Cannon had been experiencing such strong discrimination, why did she not make a bigger issue of this discrimination within the company *while* she was an employee?

   ▪  To the best of our knowledge, Ms. Cannon never discussed any concerns regarding discrimination or harassment with a corporate officer or senior corporate staff member.

   ▪  In a review of her company file, there is one exchange with the company's former Human Resources Manager, dealing with Ms. Cannon's job responsibilities (Attachment O). Ms. Cindy Williams, Lansing's former Human Resource Manager, had apparently sent Ms. Cannon a job description. In the exchange, there is no indication that this is any specific concern beyond a general discontent with her job duties. Ms. Cannon made no charge of harassment or discrimination in the material, but simply seemed to be trying to negotiate her job responsibilities.

   ▪  In Ms. Cannon's personal statement, she indicates that she talked with another corporate staff member, a mid-level operations employee, Nikki Stone, during the events that led up to her termination. After she was suspended on Friday, June 2, Ms. Cannon called Maurice Stocks, Vice President for Human Resources. He recounted that he had, to that point, been talking with Mr. Black, the branch manager and had been giving advice on how to handle the situation in general. He said he could not comment on the specifics of the situation, because he was not fully informed about everything that was going on. The question of discrimination or harassment was not raised in either discussion.

   ▪  If Ms. Cannon believed she was terminated because of discrimination, or if she had been experiencing harassment, why did she not bring it up to anyone before she was terminated?

o  Where is the proof?

   ▪  All that we have seen so far from Ms. Cannon is a personal statement of events. On the company's behalf, we have similar statements, not only from our branch manager, but from customers and other employees. Even though the branch manager's informal file regarding Ms. Cannon

14

was stolen, we still have two counseling statements corroborating his
displeasure with her performance.

- Most events outlined by Ms. Cannon also had other witnesses. We have
  contacted those witnesses and have satisfied ourselves that her
  conclusions are incorrect.

○ Our company has established methods of dealing with harassment of any kind.
Associates are encouraged to contact anyone in their chain of command,
including company officers, to report any kind of harassment. Before the events
which began on June 2, 2006, Ms. Cannon never officially reported or sought
any sort of remedy through these channels.

# Typical Branch Organizational Structure



Branch Manager

Branch Ops Mgr

Warehouse Mgr

0–4 Inside Sales

0-15 Warehouse Associates/Drivers

- The average branch has 8 – 12 associates
- Staffing is seasonal but our largest branches can have 30 associates during peak periods
- Management positions generally do not vary based on the size of the branch - branch manager, branch operations manager and warehouse manager
- Staffing generally increases with profitability



Auburn Branch Organizational Structure

Branch Manager

Branch Ops Mgr

Warehouse Mgr/ Inside Sales

2 Warehouse Associates/Drivers

- In 2005 and 2006, Auburn was a new branch with minimal manning
- Ms. Cannon was hired as warehouse manager and inside sales
- Because of the small size, chains of command and authority were and still are very difficult to strictly adhere to



# Ted Lansing Corporate Associate Handbook
## SIGNATURE FORM

Please take time to read and familiarize yourself with the Handbook (Revised 2002). If you have any questions, please contact Human Resources in Corporate for assistance. The bottom half of this page must be signed, detached and given to your manager within one week after you receive the Handbook.

---

**ASSOCIATE ACKNOWLEDGEMENT**

I have read the Ted Lansing Corporation Associate Handbook (revision 2002) and agree that it is my responsibility to abide by the rules and procedures outlined therein. I acknowledge that my employment is terminable at will, and that neither the Handbook nor any oral representations constitute a contract of employment for a definite period of time with Ted Lansing Corporation. I also acknowledge that the Company reserves the right to depart from or change the policies and procedures stated in the Handbook at any time and without notice.

_Aise MeKe Cannon_
Associate Name (Please print)

_Aise M. Cannon_
Associate Signature

_10 - 19 - 2004_
Date

1

# Lansing
## BUILDING PRODUCTS

FILE COPY

## Disciplinary Action Notice

Associate: _Aise Cannon_                    Notice Date: _10/19/05_

Branch: _64 AUBN_                    Position: _Warehouse Mgr / Inside Sales_

Action: _Keyed return + cut check incorrectly_

Reason for disciplinary action: (Be as specific as possible and include dates)
_On 10/18/05, Aise Cannon wrote up a return and cut a check to a customer for far more than what he paid for the material. The customer's name is Michael Hall and the customer # is 10000013587._

Other comments:
_I have continuously stressed in branch meetings to research the material being brought back before issuing credit to a customer. I have specifically gone over more than one isolated incident done by Aise that was virtually identical. Basically, I have come to the conclusion that saying "Don't let it happen again" just isn't effective._

Time-table for improving conduct – defined by management (if applicable):
_immediately – I expect for this not to happen again._

Supervisor/Manager Signature _Chris Black / Michael Wynne_ Date _10/19/05_

Associate response or comments:

Associate Signature* _Aise refused to sign - 10/19/05 CB_ _Chris Black / Michael Wynne_ Date _10/20/05_
(*Associate's signature acknowledges receipt of this notice but not necessarily agreement with all of the above statements.)

**Orginial: Send to Human Resources**                    Copy: Keep at Branch

# Lansing
## BUILDING PRODUCTS

## Disciplinary Action Notice

Associate: _Aise Cannon_       Notice Date: _6/2/06_

Branch: _64 Aubn_       Position: _Warehouse Mgr/Inside Sales_

Action: _Write-up_

Reason for disciplinary action: (Be as specific as possible and include dates)

_On 6/2/06, I held a branch meeting @ 6:30 A.M. to go over some issues that needed to be corrected immediately within this branch. Before I could finish speaking about the first issue, I was interrupted by Aise. I continued to try and finish but was repeatedly interjected upon and cut off by Aise. I had to ask her to let me finish 4 times until she would stop arguing with me and stop being insubordinate._

Other comments:

Time-table for improving conduct – defined by management (if applicable):

_Immediately — this will not happen again._

Supervisor/Manager Signature _Chris Black_       Date _6/2/06_

Associate response or comments:

Associate Signature* _Aise refused to sign_       Date _6/2/06_
(*Associate's signature acknowledges receipt of this notice but not necessarily agreement with all of the above statements.)

**Orginial: Send to Human Resources**       Copy: Keep at Branch

_* I asked her "Do you disagree with the above reason for disciplinary action, and she said "No, I'm just not going to sign."_

June 5, 2006

Ms. Aise Cannon
P. O. Box 1831
Opelika, Alabama 36801

Dear Aise:

As you requested, this letter is to inform you that you are terminated, effective
immediately, from Lansing Building Products.  Our decision to terminate you is based on
numerous complaints from our customers and associates as well as your difficulty in
learning our products and following corporate procedures.  However, the specific catalyst
for this action was your disruptive and unprofessional behavior at a branch meeting on
Friday, 2 June, and your unwillingness to follow my instructions on Monday, 6 June.

We appreciate your service to Lansing Building Products, and we wish you every success
in your future employment.

Sincerely,


Chris Black
Branch Manager

*Chris Black*

I would like to start by saying the allegations made by Aise Cannon are so far from the truth that I am truly hurt and astounded. Her letter to you, Chris, is full of blatant lies and fairy tale stories. I would like to comment on everything that was included in her letter and tell you the real story, although I know you are aware of many of the problems we had with Aise, as I have spoken with you, John Witt and John Reagan about the situation. I had a file with very detailed documentation of the problems we were having with Aise and also my counsel to her in effort to correct the problems, but as you know, the lock was picked on the drawer in my desk and that file alone was stolen. Also, I would like to officially welcome any inquisition to any employee, vendor rep or customer of this branch on their opinion of Aise's customer service skills, product knowledge, insolence and biased demeanor.

When Aise started with the company, she was told that Lansing Building Products encourages promotions from within if you show enthusiasm to learn the business and put forth a first-rate effort. Aise did not do this. She did not perform her duties well. She lacked the drive and good attitude required to advance within this company. Her sentiment was that everyone was out to get her. It was obvious that Aise struggled immensely with industry knowledge and also with accepting constructive criticism from myself.

**In May 2005**, Tom Cleveland resigned from his position as the Branch Operations Manager. At the time, Mike Haynes was about to start as Inside Sales Rep. Aise's job performance was less than mediocre, and she had been counseled by myself on numerous occasions as to what was expected of her. The criticism that I gave to her was taken in a resentful manner, as was it always. In particular, she was counseled at branch meetings, as was everyone who worked here. Mike was a customer of mine for nearly a year and a half before he began to work for LBP. I knew that Mike was far more qualified than Aise to be a BOM, as he had eight years of experience working in customer service and operations in this very industry. He knew the business better than anyone else that I knew. Mike Turek and Elliot Pike, whose opinion I highly value, also counseled me in hiring Mike Haynes over Aise Cannon. They knew both employees and made adamant expression that Mike should be moved into the BOM position. Mike Turek and Elliot Pike knew Mike Haynes as a long-time customer and had offered him the BOM position before anyone else was hired for the Auburn Branch. Aise resented my decision to offer Mike the BOM position, and anything I asked her to do after that, the ill will remained and reflected in her performance, as stated by Aise on June 2, 2006 during our afternoon meeting. Since Mike became BOM, Aise has held a personal grudge against me.

**On May 31, 2005**, Aise came into my office and shut the door behind her. I immediately felt uncomfortable because I don't like for the door to be closed without a witness. Aise asked me why she was not promoted to BOM. I must admit I felt backed into a corner. Ultimately it is my decision to hire/fire for this branch. I shouldn't have to justify my decision to my subordinates. I went on to tell her that Mike was made BOM instead of her because of his extensive tenure and knowledge of the industry. Contrary to what Aise feels, the BOM position was not rightfully hers. The best person for the job

1

deserves the position and that was my perspective. Having a good person in place for
BOM is crucial for the branch's success. Aise was fully aware that she lacked the
personal skills and product knowledge required to be in such a position, as I had pointed
these issues out to her numerous times. In a conversation I had with Mike Turek soon
after Aise was hired, we had discussed that if she developed the skills needed, she may
one day be promoted to BOM. Aise was given ample opportunity to prove herself to
advance to BOM, but failed to meet the qualifications. It became evident after she started
work at LBP that she was not progressing as she should. In reference to Aise's statement
*"According to the handbook, 'We believe that the best way to handle any
misunderstanding is to communicate honestly about it as soon as it happens, '"* I
reviewed any issues that needed to be corrected at every branch meeting with her and
everyone else, and that can be confirmed by any employee of this branch. Also in
reference to Aise's statement, I never said *"I have been meaning to discuss this with
you..."* I simply explained the necessary skills required of her, and that she lacked the
development of those skills thus far. In response to Aise's statement *"He continued to
say, "and, Aise you know we are dealing with 'RED NECKS' (my definition—white
southern males) and you should know how they are. This is why Mike is in the position
because he has better customer service skills, and if you were in that position, they, 'the
RED NECKS' would look at me like I was crazy, "* that is a blatant lie and a harsh
allegation. That was completely fabricated by Aise, and I never said that. I did however,
in a previous conversation, tell her not to be discouraged by red necks who made
comments directed at her that were out of line. I informed her to let me know of any
situation of that nature, and I would resolve it to the best of my ability. I also told her
that I had limited control over what these customers might say to her until I was made
aware of the incident. I would like to add that I undoubtedly never insinuated that since
she could not appease red necks that she could not now nor ever advance in this
company. As a matter of fact, on numerous occasions I tried to offer guidance as to how
she could improve her performance and in turn, advance within this company. Lastly, I
question "Why is Aise so adamantly referencing herself as being black and female if she
is offended by people discussing or even alluding to race or gender?" This brings me to
the fact that I have employees and customers who have expressed that they feel she is
partial to her own race.

**On July 26, 2005,** Steven Norris came into my office and closed the door. Once
again I felt uneasy because there was no witness. Steven expressed his discord with Aise.
He told me that she favors Bo over him. He said Aise hands down tasks for him to
complete in the warehouse and has no problem telling him what to do "which is not a
problem" he said, but she is either intimidated or "buddy-buddy" with Bo because she
does not show the same display of authority to him (Derek has told me the same thing).
As I walked out of my office and into the warehouse, I saw Aise standing at the back of
the Atrium truck watching Mike struggle as he unloaded each individual window. She
put forth no effort whatsoever to help him. There were numerous windows that were
small enough for a child to carry (about 1-6x1-6) and I told Aise she needed to physically
help with the windows rather than just stand there. She grabbed one window with one
hand and peevishly moved it about 2-3 feet. Her defense would be "I was checking
windows off," but every other person in this branch checks off on the paperwork and

2

offloads windows simultaneously. If I could get Aise to pull her weight, she would not experience a fraction of the problems that she encounters in the warehouse. The problem is that she resents any advice I give to her.

**On July 27, 2005,** in an effort to be proactive and resolve the situation, I called a meeting for just managers (Aise, Mike and myself) for the days end.   Aise, Mike and myself had a short meeting after work.  I explained to Mike and Aise (in an attempt not to single anyone out) that everyone in the branch must physically help when needed, that we could not show favorites and that I would not tolerate anything less.  I also explained to Aise that I had received six complaints about her for the month of July.  Yet again, I tried to give her constructive criticism to alleviate future complaints.

Regarding Aise's comments on **October 14, 2004,** Aise cannot grasp the concept that we must _minimize_ overtime whenever it is feasible.  There are some days when we have numerous deliveries lined up for the upcoming business day.  In those situations, it is better to pay out a small amount of overtime in order to get returns and inventory put up, orders pulled, etc. so that we can be as productive as possible the next day.  Better yet, if Aise would put forth an effort to put up returns/stock material, and help pull orders, we would not have to pay out nearly as much overtime.  Aise lacks the insight to make the logical decision of what would be best for the circumstances at hand.

**On July28, 2005,** I called Bo and Steven into my office.  They were both very disgruntled after the talk Aise had with them.  I told them that I was aware that she lacked tact when correcting them and that she called them "immature."  In effort to keep the guys from just throwing in the towel and quitting on me, I informed them that I was well aware of the problems being caused by Aise and that I was keeping documentation of it. I asked them just to do their job to the best of their ability, and I would see to it that things would work out so that they were not being mistreated.  In reference to the excerpt, _"...and that he was keeping a file on me, and it was locked up in his file cabinet drawer attached to his desk. He told them that he was afraid to fire me because I might file a discrimination suit,"_ that again is not the truth.  No one had any way of knowing where Aise's file was, unless they were rummaging through my desk.  On top of that, as stated earlier, the lock on my drawer had been tampered with.  I question how Aise knew so much about where confidential information was located in my desk.  I also never said that I was afraid to fire Aise because she might file a discrimination suit.  This only leads me to believe that Aise has had this planned for many months and has been taunting me to fire her in hopes that she would receive a settlement.  It is unmistakable that she left me no other choice but to terminate her from her position on the morning of June 5, 2006.

**On October 26, 2005,** some returns were on the dock and needed to be put back up into the racks.  They sat there for much of the day, as everyone worked around them. Aise was Warehouse Manager.  It was her responsibility to see to it that returns get put up as soon as possible, whether she put them up, or a warehouse associate put them up.  This was just another example providing evidence that Aise felt she was above putting returns in their place.  In response to her comment, _" Better yet, why didn't Chris go out and get sales?  Why did he just sit around and harass me all day?  After all, he needed to do his_

3

*Job go and get new sales. Chris is the troublemaker,"* I feel that my sales have been more than sufficient, and I think that any logical minded person would agree. This is proven by my track record of 150% of quota for the year and still growing-a record year. Also, my job is not limited to just going out and getting sales. I am the Branch Manager, which means it is my responsibility to *manage* this branch, and see to it that we are operating as efficiently as possible. Aise's claim of harassment was my effort in counseling her as to what she needed to do to improve her job performance. Yet again, this demonstrates her resentment of my authority over her. Lastly, if I am the troublemaker, then why is there perfect harmony in our branch now that she is gone? Also, why are we tracking a record month for June of '06?

**In November 2005,** a customer, Johnny Bailey with Metal Roofing wanted to return 66 cartons of Nailite Natural Cedar Hand Split Shake because he had mistakenly ordered it instead of Royal Natural Cedar Hand Split Shake. As a favor to the customer, I told him we would pick the material up and get him what he needed. I explained to him that we would hold it in our warehouse for him to get it off the job site and credit his account for the material on the day we sent the Royal Shake out to him, so that it would be a wash. Johnny can confirm this.

**On February 24, 2006,** I asked Derek to key a window order. I had been training him on window knowledge and he was learning quickly. He had been employed with LBP for less than four months and knew more about windows than Aise had learned in a year and four months. Mike or myself had to go back and correct about 90% of the window quotes Aise keyed in before we could place the order. This became very irritating and required time from us that really needed to be put towards other duties. Because I trusted Derek's window quoting skills better than Aise's, I asked him to do it so that we would not have to go back and recreate the quote. Aise resented this, but it allowed us to operate much more proficiently and in turn, provide better customer service.

**On May 30, 2006,** I found out that Aise, Bo and Derek came in at 6:30 a.m. for a branch meeting. I mistakenly thought that it was understood by everyone that we would not have a meeting on this morning. I was out in the field doing a door take-off at 6:00 a.m., and had I known they were coming in for a meeting, I would have put something together and come in to meet with them, and done the take-off afterwards. Aise felt that this was *"very unprofessional"* and I apologized for my lack of communication. What I couldn't understand was why Aise was so disgruntled about coming in at 6:30, as she should come in every morning at that time to get a jump on the cycle count. Derek and Bo did not illustrate any bitterness to me, but I apologized to them as well. It seems that in many cases, Aise has a double standard. I thought it was "very unprofessional" when I planned a Christmas party for the branch at a local restaurant, and everyone at the branch assured me they would be there (including Aise), and Aise did not show up after I went out and bought a Christmas gift for her. I never received an apology or an explanation from Aise.

4

**On May 31, 2006,** I conducted a branch meeting and took everyone out into the warehouse to review some things that I wanted completed. Bin F was a wreck and I explained that I wanted it straightened up so that it was more presentable and also to simplify the cycle count for Aise. She argued and said that she told everyone that Bin F needed to be straightened up before she left for military leave, but she never told me. I said, "In any case, this needs to be put in order." What Aise said about my comments on sending Gadsden transfers was misconstrued. I told everyone at the branch that any other branch that consistently helps us out should have priority over Gadsden because they continuously fail us regarding transfers. I wouldn't want to drop the ball for Birmingham or Atlanta (very helpful branches for example) because we put first priority on Gadsden and couldn't get material out in time for a branch that often helps us. Later that day, Aise tried to run a check through the machine and it told her to call the authorization center. Aise stated, *"Chris responded by saying, 'go on and tender the order because Mike was not going to deposit the check until the next day anyway.'"* That is completely untrue, and Mike can confirm that. I told her to go ahead and run the check because if the check was bad, we had a week to cancel the door order and we would know if the check was bad before that cut-off arrived. The check was good by the way. (Sometimes I wonder about that check machine.)

**On June 1, 2006,** I was loading up my vehicle with replacement glass and sashes to go out and perform some repairs. Derek was helping me. Mike walked out into the warehouse and I told both of them that we were having a meeting in the morning. Aise was on the phone and rather than wait for her, I asked Derek to let her know we were having a meeting in the morning. Aise was so offended by this that she called me while I was on the road to confirm the meeting.

I would like to reference Aise's statement on page 9 of her letter, *"**On June 2, 2006**, keep in mind, Chris has hired another white male perhaps the week I left for military duty."* This only reinforces Aise's apparent prejudice demeanor. I quote Aise, as stated on page 11 of her letter, *"You do not need to make reference to race when you are talking. I told him, when I talk about my friends you will never know what race they are because I don't mention race."* In my opinion, this is contradictory, and goes back to my feeling that she has a double standard.

**On June2, 2006,** I held another branch meeting because things just weren't being done in the manner I felt they should have been done. Bin F had still not been touched. As I attempted to talk about it, I was interjected upon by Aise. I tried to finish my sentence again but was interrupted for a second time by Aise. This occurred twice more in a matter of seconds until I raised my voice to say "Aise, I am tired of you arguing with me every time I try to correct a problem. You are being very disrespectful. You need to be quiet and let me finish what I have to say, then you will have your turn to speak." She continued to talk anyway and told me that Bo and Derek needed to put some stock material up and she asked me what would I rather have done, the corners straightened up, or the stock material be put in the racks. I told her that I had asked for Bin F to be put in order two days ago. I went on to tell her as I had done many times before that her attitude was very poor, and that if the confrontation and resentment of my authority did

not end, then she would need to look for another job. I told her I did not have a problem putting someone else in her position. I never said, as Aise has claimed, *"As a matter of fact, maybe you need to look for another job."* What I did say was, "If you cannot accept this, then maybe you should look for another job." Once again, Aise has reworded the conversation in her favor. What I am thankful for is that there are three witnesses who can attest to this. Aise went on to tell me that Derek was the only person that had been working in the warehouse, and that it hasn't been done yet because he hasn't gotten around to it. This is when I said what had been on my mind while she was giving me excuses of why it had not been done. I told her that it was ultimately her responsibility to keep the warehouse in order. I asked her, "What is wrong with you putting that bin in order, Aise? The corners are not heavy." She told me that she couldn't do it anyway. She said that she needed someone to help her do it. I asked her, "then why don't you ask someone to help you? Ask Mike or myself if Derek and Bo are busy." She replied, "Because you guys are too busy, and much of the time, you are gone, Chris." Yet another contradiction: page 5 of Aise's letter, *"Better yet, why didn't Chris go out and get sales? Why did he just sit around and harass me all day? After all, he needed to do his job-go out and get new sales,"* page 6, *"And frankly speaking, Chris needed something to do because he sure didn't do any sales like his job description stated."* After telling Aise that I would help her if she asked, she gave me "approval" to continue by saying "O.K., you can continue the meeting." I went on to tell Aise that since she had come back from military leave on May 30, I had already received two customer complaints about her specifically. I tried to give her guidance as I always did so that the problem may be corrected. I told her that she must improve her product knowledge because numerous customers have referred to her as "clueless" and asked me why I have her working on the counter. I did not say, *"I do not like talking to you, nor does Mike,"* as Aise has claimed. What I did tell her was that Mike and I both felt very uncomfortable approaching her and so did the majority of our customers. "She always has a chip on her shoulder," as I quote from an anonymous customer. I told her she was often very rude and had no personality, like a robot. Many of my customers have told me that. Some even told me that when they call and she answers, they ask for Mike or myself, and if we are not available, they hang up and call back later or try my cell phone. During this heated conversation, Aise interjected yet again while I was talking and proclaimed "I am a black female!" and there are three witnesses who can confirm that as well. In reference to Aise's excerpt, *"Chris then looks at a door order that I did the other day and said, 'this is wrong and common sense would have made you catch that error. I am sure Derek and Bo both know what a 6-panel provincial door is supposed to look like"* this is supplementary proof that even to this day, Aise does not know the products that we deal with on a daily basis. There is no such thing as a 6-panel provincial door. A provincial door is a 4-panel arch top. I had asked Aise and the rest of the branch to learn the different style doors numerous times and months earlier. It was only after I had warned Aise that if she didn't shape up I would have to fill her position with someone else that she made claims of racial discrimination and sexual harassment. Let me say on record that never once was any issue of sexual harassment or racial discrimination brought to my attention until June 2, 2006, the day I warned Aise to improve in certain areas or she would lose her job. In an effort to be proactive and investigate the claim of discrimination, later that day, I called all employees into my office individually (with a

witness) and asked them if they had ever been subject to racial or sexual discrimination by any associate in this branch. I also asked each of them their opinion of what had happened between Aise and myself earlier that morning. First, I called Derek in with Mike as a witness. Derek said that he had never been subject to any racial or sexual discrimination from any associate and that he thought Aise was way out of line that morning. I asked Mike the same questions and he said he had never been subject to any racial or sexual discrimination and that he thought Aise was way out of line that morning. Derek left and Bo came in next, with Mike as a witness, and Bo said he had never been subject to any racial or sexual discrimination from any associate and that he thought Aise was way out of line that morning. Then Aise came in and Bo and Mike stayed as witnesses. I chose to have Bo as an additional witness because Bo was the only employee Aise had not made allegations against. I asked Aise to give me specific examples of her claim of sexual harassment and racial discrimination. She started off by saying, "Tim Bunn called in one time to place an order and he said 'Hey baby.'" I told Aise that firstly, I had never been made aware of that, and secondly, at this point in time, I needed specific examples of discrimination/harassment from associates so that I can correct the problem in the branch if it exists. She then said I used the phrases "Good 'Ole Boys" and "Red Neck," and that she was offended by that. She also said that Mike referred to one of his friends as "black" and that she was very offended by that. She said that Derek mentioned something about Ebonics that offended her as well. I told her that she had never made me aware of anything of this nature until that day, and that it was a mistake not to let me know. I told her I have to know about these things in order to correct them. I also told her that if I had ever said anything to her that offended her, I was sorry, because she had apparently misinterpreted what was said. Mike said, "The same goes for me." I had discussed the situation with Maurice that day, and he had advised me to write Aise up for her insubordinate actions that morning. I asked him what I should do if she didn't sign and he explained to me that if she didn't sign, to put her on suspension until further notice. I told Maurice "Well I can guarantee you she will refuse to sign. She is just that defiant, not to mention, she refused to sign a previous write up form." I handed Aise a Disciplinary Action Notice (attached) and just as I had predicted, she read it and refused to sign it. I then explained to her that if she did not sign the form, she would be put on suspension from her position until HR or I contacted her. At this point, I asked Aise, "Do you disagree with what I have written as the reason for disciplinary action?" and she said "No, I'm just not going to sign it." I then said, "O.K., you are suspended from your position until further notice. Do not come in for work on Monday." I gave her a copy of the Disciplinary Action Notice and she left.

        On Monday, June 5, 2006, Aise came into my office and sat down. Maurice felt that Aise would not come in that morning, but I had a feeling that she would. She is just boldly defiant. She said, "I came in to see if I was fired or not. If I am, I want written documentation." I replied, "Aise, I told you not to come in today. I explained that you were suspended until I talk to the HR Dept. to save what we are going to do about the situation." She told me she would wait. I told her that she needed to leave. She said, "no." I then told her that if she did not leave, I would call the police to remove her from the premises. She replied, "Go ahead and call the police. I will file a report." I didn't even bother responding to that statement. I just picked up the phone and called Maurice

7

to explain to him the situation. After discussing it with Maurice, I gave Aise the termination letter she requested and she left.

In reference to the last paragraph of Aise's letter, Mike called me while I was out on the road on June 2, the same day Aise claimed she had been subject to discrimination. Mike told me that a customer (the same customer Aise was referring to) had called him and was very distraught because Aise had keyed an order incorrectly for him. The customer had placed a gutter order with Aise in linear footage, which was not uncommon, as we dealt with this very situation on a daily basis. When a customer places a gutter order in terms of linear feet, we convert that measurement to pounds. With 6" we divide by 2, and with 5" we divide by 2.65. Aise had worked here for two years and still could not comprehend this simple equation. This customer demanded that someone bring him the correct amount of coil immediately. Aise was either incapable or unwilling to drive our truck, and she didn't have a vehicle available to her during the workday as she was dropped off in the mornings and picked up in the evenings. Because of this, Mike had to deliver the material in his personal vehicle as he has done many times before. As I talked with Mike on the phone, I discovered I was in the same area Mike was driving towards to meet the customer. In an effort to apologize and appease him, I called the customer and offered to buy his lunch for his troubles. Mike, the customer and myself met in Dadeville and I loaded him up. Mike and I asked the customer if he had ever witnessed any type of discrimination in our branch and he said, "No, never from anyone who worked there." He was complaining about how Aise had "messed him up" numerous times and had cost him a lot of time and money. I then told him that I would prefer he sent any complaints to my email so that I would have documentation of it.

## Additional Points to Reference

- Every time Derek would use Aise's phone at her workstation, Aise would spray the phone with anti-bacterial spray before Derek even made it out of the room. This was very degrading to Derek. Aise often talked to Mike about how "nasty and disgusting" Derek was.
- Everyone at this branch is a team player but Aise. Everyone but Aise has stayed late numerous times to complete tasks in this branch. I can count on one hand how many times Aise has stayed late, including the times she has been here for inventory.
- The only unpaid COD that has ever left this branch without payment was handled by Aise. We never got paid for the order.
- Aise frequently ran a wire from her phone to her ear, concealed underneath her shirt, and talked on her cell phone as she was supposed to be working in the warehouse.
- Aise refused to sign two separate write-up forms at two separate times
- Aise used the company computer at Mike's workstation to create a resume for herself while she was employed here. Mike and myself saw it on the computer and printed it out. Ironically, when the file in my desk (which included a printed copy of the resume) turned up missing, the file on the computer was mysteriously deleted. Thanks to the IT Dept., we have recovered those files and I have printed a new copy of the resume.

G

*At our branch meeting on Friday, June 2, Aise Cannon commented that she had witnessed acts of discrimination in our branch. I will not tolerate a discriminatory environment, and I moved immediately to address this issue. Shortly after that meeting, I spoke personally with each of you; and your comments were very helpful. It would be very helpful now, given the fact that we have subsequently terminated Aise, for you to address the attached questions outlining your feelings about the work environment here in the branch and about Aise's contributions in particular.*

*Please feel free to add anything to questionnaire that you feel might be helpful in getting to the bottom of this issue or in improving the work environment in the branch. Please sign and date the questionnaire and return it to me by Friday of this week (June 16, 2006).*

*Thank you for your help.*

*Chris Black*

Questions for Associates at Auburn

1. What is your name? *Michael Haynes*

2. How long have you worked at the Auburn branch? *1 year*

3. What are your duties at the branch? *BOM, Daily operations*

4. In your own words, please describe Aise Cannon's leadership style and abilities.

*1) Dictator, did not lead by example.*

*2) Not easy to work with.*

*3) Distant.*

*4) Did not put any effort with manual labor.*

5. In your own words, please evaluate Aise Cannon's job knowledge including knowledge of the products and the computer systems.

*No Product knowledge!*

6. In your own words, please evaluate Aise Cannon's ability to get along with others, including subordinates, co-workers, customers, and her supervisors.

*She did not get along with anybody.*

*Would not take helpful criticism (took it personally)*

7.  How would you assess Aise Cannon's overall job performance? (Please describe or give any examples.)

*Poor:*

*1) No product knowledge*
*2) Would not help the warehouse workers with physical labor*
*3) Could not load trucks,*
*4) Had trouble managing the warehouse (wide variances with inventory)*

8.  In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated by anyone based on her racial or ethnic background.

*None that I Know of.*

9.  In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated based on her gender.

*None that I Know of.*

Please use additional paper for any answers if needed.

Take a minute and review the answers you have given above.  Please make any corrections, changes or additions that you would like. Then sign and date your statement below.

**I solemnly swear that the statements and information provided above are true and accurate to the best of my knowledge and belief.**

Signature _____          Date *6/13/06* _____

*At our branch meeting on Friday, June 2, Aise Cannon commented that she had witnessed acts of discrimination in our branch. I will not tolerate a discriminatory environment, and I moved immediately to address this issue. Shortly after that meeting, I spoke personally with each of you, and your comments were very helpful. It would be very helpful now, given the fact that we have subsequently terminated Aise, for you to address the attached questions outlining your feelings about the work environment here in the branch and about Aise's contributions in particular.*

*Please feel free to add anything to questionnaire that you feel might be helpful in getting to the bottom of this issue or in improving the work environment in the branch. Please sign and date the questionnaire and return it to me by Friday of this week (June 16, 2006).*

*Thank you for your help.*

*Chris Black*

Questions for Associates at Auburn

1. What is your name? Willie A. Flournoy

2. How long have you worked at the Auburn branch? 22 months

3. What are your duties at the branch? Driver/Warehouse

4. In your own words, please describe Aise Cannon's leadership style and abilities.

Aise leadership lacked Tact She really didn't
Know how to manage guy's as far as being
assertive.

5. In your own words, please evaluate Aise Cannon's job knowledge including knowledge of the products and the computer systems.

She had very Good Computer Skills Some
products She Knew Some She didn't

6. In your own words, please evaluate Aise Cannon's ability to get along with others, including subordinates, co-workers, customers, and her supervisors.

She was very polite in Speaking to Customers,
on the phone and Greeting Them I Think
She was confused as far as being a ware-
house Manager what Her duties were.

7. How would you assess Aise Cannon's overall job performance? (Please describe or give any examples.)

*Average I Think She was only suppose to manage a group of people and not Have to Be hands on!*

8. In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated by anyone based on her racial or ethnic background.

*Being a woman She encountered alot of harsh statements from men or should I say un professional comments from Customers.*

9. In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated based on her gender.

*Once again Just from a few guy (contractors) That come in whenever and Thinks it cute!*

Please use additional paper for any answers if needed.

Take a minute and review the answers you have given above. Please make any corrections, changes or additions that you would like. Then sign and date your statement below.

I solemnly swear that the statements and information provided above are true and accurate to the best of my knowledge and belief.

*Willie A. Flournoy*
**Signature**

*6-13-06*
**Date**

At our branch meeting on Friday, June 2, Aise Cannon commented that she had witnessed acts of discrimination in our branch. I will not tolerate a discriminatory environment, and I moved immediately to address this issue. Shortly after that meeting, I spoke personally with each of you, and your comments were very helpful. It would be very helpful now, given the fact that we have subsequently terminated Aise, for you to address the attached questions outlining your feelings about the work environment here in the branch and about Aise's contributions in particular.

Please feel free to add anything to questionnaire that you feel might be helpful in getting to the bottom of this issue or in improving the work environment in the branch. Please sign and date the questionnaire and return it to me by Friday of this week (June 16, 2006).

Thank you for your help.

*Chris Black*

Questions for Associates at Auburn

1. What is your name?

   Derek Ellis

2. How long have you worked at the Auburn branch?

   7 months.

3. What are your duties at the branch?

   Everything - Inside Sales, Warehouse, Deliveries, Placing Orders, etc.

4. In your own words, please describe Aise Cannon's leadership style and abilities.

   She liked to throw out directions of what to do and leave you. She always threatened to write me up if I did not get it all done fast enough. She only worked in the warehouse when she had to. She passed off all tickets- even light weight stuff. Unless I was to busy to get to them.

5. In your own words, please evaluate Aise Cannon's job knowledge including knowledge of the products and the computer systems.

   She knew the computers. She was not so familiar with the products, like strait lap vs. Dutch lap. She tried to be helpful with customers but always wanted everyone to talk to Mike or Chris. I always tended to go out to the warehouse and work like I was supposed to. I tended to avoid confrontation.

6. In your own words, please evaluate Aise Cannon's ability to get along with others, including subordinates, co-workers, customers, and her supervisors.

   She seemed to try to get along with certain people more than others. She often would go to lunch and leave me at the branch alone. She always wanted her stuff done first even if Chris had asked of something else to be done. She tended to be more partial to people of her own race. She was not as friendly with all customers.

7. How would you assess Aise Cannon's overall job performance? (Please describe or give any examples.)

The things she was good at she did well - others she did not so well. She liked to point out mistakes but never how good of a job was done.

8. In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated by anyone based on her racial or ethnic background.

I never really noticed anyone mistreating her. We all treat each other equally.

9. In your own words, please describe any incidents or situations where you observed Aise Cannon being mistreated based on her gender.

I never really did. Always just pulled my orders and left it at that. Was not going to ask her to help lift heavy stuff because she was a woman. So I just did my day to day duties.

Please use additional paper for any answers if needed.

Take a minute and review the answers you have given above. Please make any corrections, changes or additions that you would like. Then sign and date your statement below.

**I solemnly swear that the statements and information provided above are true and accurate to the best of my knowledge and belief.**

Derek Ellis                                    6/13/06
**Signature**                                  **Date**

*item #10* I asked each employee @ branch if they had ever encountered racial/sexual discrimination. Their responses are as follows:

**Derek — No**
  — Aise was out of line

**Mike — No, Aise was out of line**

**Bo — No**
  — Aise was out of line

**Aise —** Tim Bum — Hey Baby — Feels uncomfortable
  — Me saying Good Ole Boy's makes Aise feel like I'm saying its ok
  — Me saying redneck is annoying w/ Aise for not being promoted to BOM
  — Mike saying black friends
  — Curtis Scott King died — Mike said that's why black people stay in church too long
  — What Derek said about ebonics
  — Derek said something about his black friends that Aise would like them b/c they talked proper & weren't thugs

Dear Associate:

We need your help.  We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products.  Would you be so kind as to provide a statement addressing as many of the following questions as possible?  We also encourage you to provide any additional comments you feel are appropriate on the back of this form.  We really appreciate your assistance.

1.  Did you work directly with Aise while she was employed by Lansing Building Products?

    NO. Im from the Atlanta Branch.

2.  Was she your supervisor or a co-worker (not in your direct line of supervision)?  Please describe how you were associated with her and provide as much detail as possible about your working relationship with her (easy or difficult to get along with, friendly or stern, etc.).

    Im the loop Driver, work relation's about her job on point, product was pulled & and staged when i get to the Branch.

3.  Did you see any evidence of discrimination against Aise (racial or gender) while she was employed by Lansing?

    maybe over hear the ~~Boys~~ Guy's talking Guy talk about women or what happend over the weekend or how we Joke about something cant be your self when a female around when men can be men.

4.  How would you describe Aise's job performance?  Did she know our products?  Was she customer-oriented?  Was she friendly and courteous to customers?

    She perform like a Champ. She Knew the products very well. Customer. oriented at a high Level about Job Related
    Courteous to customers: 1) working in a man enviorment not good.
                             2) Dealing with Female problems,

5.  In your opinion, did Aise show proper respect for her superiors in the branch?

    That was a hit or miss relation, or pass by each other through out the Day. When I was there loading or unloading

__Calvin D Morton__        __Calvin D Morton__     __March 15, 07__
Associate Name              Signature               Date

Apr. 30. 2007  8:55AM    LansingBldgProd-Auburn                   No. 4293    P. 4/29

Dear Associate:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We really appreciate your assistance.

1. Did you work directly with Aise while she was employed by Lansing Building Products?  *Yes*

2. Was she your supervisor or a co-worker (not in your direct line of supervision)? Please describe how you were associated with her and provide as much detail as possible about your working relationship with her (easy or difficult to get along with, friendly or stern, etc.). *I was her supervisor. Aise was very difficult to work with. She was unfriendly and made our office a very uncomfortable work place. I felt that Aise was prejudice toward anyone who wasn't black; this included customers as well as associates.*

3. Did you see any evidence of discrimination against Aise (racial or gender) from a customer while she was employed by Lansing? *No*

4. How would you describe Aise's job performance? Did she know our products? Was she customer-oriented? Was she friendly and courteous to customers? *Aise's job performance was very poor. This was a general concensus among customers as well as her superiors. She had extreme difficulty in learning our products and did not retain what I continuously and repetatively taught her. She was not customer-oriented. She was very unfriendly, and often times made customers mad or uncomfortable. I received many customer complaints about Aise.*

5. In your opinion, did Aise show proper respect for her superiors in the branch? *Absolutely not. Aise was blatantly defiant and resented her superiors. She also resented any kind of help I tried to give her. Constructive criticism was not received well by her. She was just rude and not a pleasant person to work with.*

| | | |
|---|---|---|
| *Chris Black* | *Chris Black* | 2/22/07 |
| Associate Name | Signature | Date |

Dear Associate:

We need your help.  We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products.  Would you be so kind as to provide a statement addressing as many of the following questions as possible?  We also encourage you to provide any additional comments you feel are appropriate on the back of this form.  We really appreciate your assistance.

1. Did you work directly with Aise while she was employed by Lansing Building Products?

2. Was she your supervisor or a co-worker (not in your direct line of supervision)?  Please describe how you were associated with her and provide as much detail as possible about your working relationship with her (easy or difficult to get along with, friendly or stern, etc.).

3. Did you see any evidence of discrimination against Aise (racial or gender) *from a customer* while she was employed by Lansing?

4. How would you describe Aise's job performance?  Did she know our products?  Was she customer-oriented?  Was she friendly and courteous to customers?

5. In your opinion, did Aise show proper respect for her superiors in the branch?

---

Michael Haynes                    Michael Haynes            2/22/07

Associate Name                    Signature                 Date

1. yes
2. I was her supervisor. Aise was extremely difficult to work with. Whether we were engaged in general conversation or work related conversation, she always made me feel uncomfortable. I always felt she had a hidden agenda, and she always seemed to be attempting to "bate" me into saying something she could turn back on me. For example, she would change the TV to rap videos, then strike up a conversation about a particular video just to see if I would say something she considered " racially inappropriate."

3. NO, if anything it was the other way around. She always treated our African American customers completely different from our white customers. With our African American customers Aise was always very friendly and talkative, but when she waited on a white customer she was strictly business.

4. Overall, Aise's job performance was very poor. She had very minimal product knowledge. She just never seemed to grasp our products.      Her customer service skills needed work, too. She was cordial, but not necessarily friendly unless it was with our African American customers who, like I said before, she always laughed and joked with.

5. Absolutely not!! Aise was repeatedly defiant. She took advantage of any opportunity she saw to undermine Chris' and my authority in front of Lansing employees. For example, there have been times when Chris and I have asked a warehouse employee to help us meet a deadline. Instead of Aise supporting us in that decision, she would pull that employee to the warehouse to complete a task that could have been completed anytime. For the most part, Aise always seemed to work against us instead of with us for the betterment of the branch. She never exemplified the characteristic of being a team player. Personally, I think Aise was bitter and did what she could to hamper the branch's success when I was promoted to BOM and not her.

Michael Haynes                                2/22/07

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We really appreciate your assistance.

1. Did you work directly with Aise while she was employed by Lansing Building Products?

NO, MorE So under Her Supervison, SHe was The warehouse Manager of the Branch.

2. Was she your supervisor or a co-worker (not in your direct line of supervision)? Please describe how you were associated with her and provide as much detail as possible about your working relationship with her (easy or difficult to get along with, friendly or stern, etc.).

supervisor, we got along most of the time, over time I finally excepted, that she was a women and couldn't Lift ALOT.

3. Did you see any evidence of discrimination against Aise (racial or gender) from a customer while she was employed by Lansing?

I'am the Driver of the Branch and sometimes Guys come in flerting with her but if there were anything racial said I didn't here it.

4. How would you describe Aise's job performance? Did she know our products? Was she customer-oriented? Was she friendly and courteous to customers?

as far as Greeting people She was pleasant and There was always need for more product Knowledge in the Branch for all of us.

5. In your opinion, did Aise show proper respect for her superiors in the branch?

I Think in End she felt as Though She was passed up for the B.O.M position and after That things Keep going down hill. and Bad feelings Built up over time.

W. A. Flournoy _____ Willie A. Flournoy _____ 2-22-07
Associate Name _____ Signature _____ Date

Dear Associate:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We really appreciate your assistance.

1. Did you work directly with Aise while she was employed by Lansing Building Products?

2. Was she your supervisor or a co-worker (not in your direct line of supervision)? Please describe how you were associated with her and provide as much detail as possible about your working relationship with her (easy or difficult to get along with, friendly or stern, etc.).

3. Did you see any evidence of discrimination against Aise (racial or gender) *from a customer* while she was employed by Lansing?

4. How would you describe Aise's job performance? Did she know our products? Was she customer-oriented? Was she friendly and courteous to customers?

5. In your opinion, did Aise show proper respect for her superiors in the branch?

| Derek Ellis | Derek Ellis | 2/22/07 |
| Associate Name | Signature | Date |

1. I worked directly under Aise, she was my direct supervisor.

2. Aise was my direct supervisor. She acted as though she did not like me. If I used the phone on her desk she would pick it up with a paper towel and drench it in Lysol. If Bo and I were working in the warehouse, she would bring me tickets to pull and would stand and talk to Bo while I pulled the order. If Chris asked her to show me how to do something on the computer, she would wait until Chris left on a sales call and then tell me to go to the warehouse and she would handle it. Aise always watched me trying to break down trucks and never tried to help me break them down or unload them. She acted as though she was scared of the forklift. If you asked her for help she would say,"I am a woman I can't do that." She was extremely difficult to get along with.

3. If anything we all including the customers, went out of our way to keep Aise from doing manual labor. We always pulled the tickets, unloaded the trucks, and loaded the customers. Aise was nicer to the African American customers than she was to the other customers. Most customers were extremely nice to her and never spoke derogatorily toward her around me.

4. Aise micromanaged her work. She was always passing it off to us to keep her from doing it. She worked on what she wanted when she wanted. She sometimes told customers "I can't help you; you will have to see Mike or Chris." She could only tell you the specs out of the product guides that were as far as her product knowledge went. She ignored many customers. She would ask them three or even four times what they had just told her, as though she were not even listening to them.

5. Aise had absolutely no respect for anyone in the branch. She often interrupted Chris during branch meetings. She would interrupt saying " if you would just listen to what I have to say." She was extremely insubordinate. One meeting she tied up with Chris so much that he had to threaten to write her up to get her to get her to stop interrupting him. She always referred to the respect for superiors in the military but was always disrespectful.

_____

*Andy Ellis*                    *Derek Ellis*

                               *2/12/0-*

**Chris Black (AUBN)**

To....                waterski18@yahoo.com, crazyfrogchick12@yahoo.com

Cc....

Bcc....

  Subject:

Attachments:

Dear Maurice,

I would like to formally file a claim with you and the HR Dept. about an issue that happened in the Auburn Branch.  Recently, I noticed that the lock to a file drawer in my desk in my office had been tampered with and will not lock now.  In that drawer was some very important and private information.  After searching thoroughly through the drawer, I found that one file and one file only was missing.  The file that was missing was a file I had been keeping on an Auburn Branch employee, Aise Cannon.  This file contained nearly a year's worth of information.  The nature of the information pertained to that of numerous, problematic issues that had been discussed between Aise and myself.  These issues were explained to Aise in detail and it was made very clear to her that they were to be corrected immediately.  The file contained a detailed log, including dates, times, and witnesses, that kept track of Aise's continuous mistakes made within the branch, her poor attitude, customer complaints about her and my counsil to her in effort to correct the problems.

*Chris Black*
*Branch Manager / Sales Representative*
*Lansing Building Products / Auburn*

cell: (334) 559-5430
office: 1-866-455-6334

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact?

   *She was not a friendly person,*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with?

   *No, she didn't have the professional ability to work with people*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction?

   *Not at all*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products?

   *No.*

5. Did you personally see any evidence of racial or gender discrimination against her?

   *No*

6. Did you personally experience any evidence of her discriminating in any way against others?

   *NO*

7. Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing?

   *Not at all, at no time*

---

| Roy Little | Roy Little | 4-5-07 |
|------------|------------|--------|
| Name of Customer | Signature | Date |

| | 3430 Co. Rd.  Valley  AL  36854 |
|--|--|
| Name of Business | Address          City    State   Zip |

*Little Contractors*

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact?

   *Met with her during paying & picking -p of materials - pay she would*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with?

   *absolutely not - very rude & short w/ me*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction?

   *NO*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products?

   *I got to the point I wouldn't deal with her & would deal with another person in the office*

5. Did you personally see any evidence of racial or gender discrimination against her?

   *NO*

6. Did you personally experience any evidence of her discriminating in any way against others?

   *NO*

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing?

   *NO*

---

Paul H. Sanders      *Paul H. Sand*      4/5/07
Name of Customer      Signature      Date
     PO Box. 1473

Hunter Properties, Inc.      Auburn    AL    36831-1473
Name of Business    Address      City      State    Zip

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? *I ordere material through her. Very unprofessional.*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? *She didn't know the products as well as the other Employees. She was Helpfull to me.*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction? *NO.*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? *NO. NO.*

5. Did you personally see any evidence of racial or gender discrimination against her? *NO.*

6. Did you personally experience any evidence of her discriminating in any way against others? *NO. I thing If Anything the Male worker Did alot of the work to keep her from Having to Lift Anything Heavy.*

7. Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing? *NO.*

_____

Name of Customer *BARRY Tucker*     Signature *Barry [signature]*     Date *4-5-07*

Name of Business *B & S Gutters*   Address *680. Lever Rd. 375*  City *Valley*  State *AL*  Zip *36854*


Dear Customer.

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact?

She answered our calls. when we needed to place an order.

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with?

no

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction?

no, I would have to call ~~several~~ several times to get my quotes or bills corrected.

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products?

no, she would always let someone else call us back.

5. Did you personally see any evidence of racial or gender discrimination against her?

never

6. Did you personally experience any evidence of her discriminating in any way against others?

no

7. Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing?

no

Misha Taunton    Misha Jr    4-5-07
Name of Customer         Signature          Date

B.J. Builders, Inc.  2664 Arrowhead Rd  Alex City, AC  35010
Name of Business    Address    City    State    Zip

Received Time Apr. 5. 11:04AM

Apr. 30. 2007 9:09AM LansingbldgProd-Auburn                    No. 4293  P. 16/29



Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible. We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information if you are willing to speak with us in person. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? Sales Counter, Very cocky in the beginning. Got better towards the end.

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and pleasant to deal with? Aise was professional to deal with. However, She had very little product knowledge, and did not understand the sense of urgency that comes along with the constructs business.

3. Would you say that she generally went the extra mile to ensure customer satisfaction? There was very little about her work habits that involved going the extra mile.

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? This was a considerably weak area for Aise. I would go as far to say, that I have never encountered less product knowledge at a sales counter in any supply house.

5. Did you personally see any evidence or recall of gender discrimination against her? No, every problem I ever encountered with her was a direct result of her lack of product knowledge & her unwillingness to go the extra mile.

6. Did you personally witness any evidence of her discriminating in any way against others? No

7. Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing? No

Bryan Store
Name of Customer                    Signature                    4-5-07
                                                                 Date

Sky is the Limit Homes, LLC    11 Lee Rd 2082  Phenix City, AL 36870
Name of Business    Address    City    State    Zip

Received Time Apr. 5.  5:32PM

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1.  What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? *She was one of the inside sales reps. I dealt with.*

2.  From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? *For the most part, yes.*

3.  Would you say that she generally "went the extra mile" to ensure customer satisfaction? *I would say that she made an attempt. It was hard to get her to take responsibility for her mistakes*

4.  Was she knowledgeable of our products? Could she provide information and specifications relative to our products? *For the most part, she was. If she didn't. She would call and find out if she was questionable about products.*

5.  Did you personally see any evidence of racial or gender discrimination against her? *I never witnessed or heard of any discrimination of any kind against Aise Cannon from customers.*

6.  Did you personally experience any evidence of her discriminating in any way against others? *I never any racial or discriminating remarks from her directed toward others.*

7.  Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing? *I never witnessed any kind or heard of any discriminating comments from employees of Lansing Building Products.*

---

Jeffery W. Stevenson        Jeffery W. Stevenson        3/12/07
Name of Customer            Signature                   Date

K&B Vinyl Siding Co    1503 Gwen Mill Dr.    Opelika,    AL    36801
Name of Business       Address               City        State   Zip

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? She was pleasant

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? She was not very knowledgeable about products or special order

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction? No

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? No

5. Did you personally see any evidence of racial or gender discrimination against her? No

6. Did you personally experience any evidence of her discriminating in any way against others? No

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing? No

Lori LaPorte                    [signature]                    2-28-07
Name of Customer                Signature                      Date

Colt Ventures LLC  PO Box 793  Auburn,  AL  36831
Name of Business   Address      City     State  Zip

Dear Customer:

We need your help.  We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products.  Would you be so kind as to provide a statement addressing as many of the following questions as possible?  We also encourage you to provide any additional comments you feel are appropriate on the back of this form.  We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone.  We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products?  How would you describe that contact?

   *sales, good.*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with?

   *Yes, Yes*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction?

   *Yes,*

4. Was she knowledgeable of our products?  Could she provide information and specifications relative to our products?

   *Yes, Yes*

5. Did you personally see any evidence of racial or gender discrimination against her?

   *NO,*

6. Did you personally experience any evidence of her discriminating in any way against others?

   *NO,*

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing?

   *NO,*

---

*Douglas J Brown*          *Douglas J Brown*  3/26/07
Name of Customer               Signature                      Date

              *5068 Co Rd 65  Roanoke   AL  36274*
Name of Business      Address              City        State      Zip

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? *Place several orders for vinyl and metal products with her.*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? *No It come to the point I asked for someone else when placed orders.*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction? *NO*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? *NO*

5. Did you personally see any evidence of racial or gender discrimination against her? *NO*

6. Did you personally experience any evidence of her discriminating in any way against others? *NO*

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing? *NO*

---

Name of Customer: *Dwayne Sanford*   Signature: *Dwayne Sanford*   Date: *3-26-07*

Name of Business: *Sanford Exteriors*   Address: *393 Lewis Rd*   City: *Alex*   State: *Al*   Zip: *35010*

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact?

   Sorry. She never followed thou her job. You could ask her to call you back on work, and she never did.

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with?

   No. she always had anger on the work site.

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction?

   No.

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products?

   No. She didn't know what's what from anything.

5. Did you personally see any evidence of racial or gender discrimination against her?

   No. She just didn't do her job.

6. Did you personally experience any evidence of her discriminating in any way against others?

   No.

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing?

   No

---

| Justin Tittle | *(signature)* Just Tittle | 3/27/07 |
| Name of Customer | Signature | Date |

| Tittle Contractors | 3430 Co. Rd. 388 | Valley | Al | 36854 |
| Name of Business | Address | City | State | Zip |

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? *Only as a customer at Lansing.*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? *She was somewhat knowledgeable and easy to deal with but she was a little slow + sometimes forgetful.*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction? *No*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? *She needed improvement.*

5. Did you personally see any evidence of racial or gender discrimination against her? *NO*

6. Did you personally experience any evidence of her discriminating in any way against others? *NO*

7. Did you see any evidence of discrimination against Aise (racial or gender) *from a Lansing associate* while she was employed by Lansing? *NO*

---

Name of Customer: *Clay Cardone*

Signature:

Date: *3/26/07*

Name of Business: *CMC Siding*

Address:

City:

State:

Zip:

Dear Customer:

We need your help. We are trying to gauge the quality of Aise Cannon's work while she was employed at Lansing Building Products. Would you be so kind as to provide a statement addressing as many of the following questions as possible? We also encourage you to provide any additional comments you feel are appropriate on the back of this form. We would also appreciate your name, company affiliation and contact information, if you are willing to speak with us by phone. We really appreciate your assistance.

1. What contact did you have with Aise during her employment with Lansing Building Products? How would you describe that contact? *ORDERING OF MATERIALS, THE CONTACT WAS FINE*

2. From a customer service perspective, was she generally knowledgeable and helpful as well as easy and professional to deal with? *SHE KNEW A LITTLE BIT AND WAS DECENTLY PROF. TO DEAL WITH*

3. Would you say that she generally "went the extra mile" to ensure customer satisfaction? *She WENT AN EXTRA 1/4 OF A MILE*

4. Was she knowledgeable of our products? Could she provide information and specifications relative to our products? *NEVER REALLY HAD TO ASK ABOUT PRODUCTS*

5. Did you personally see any evidence of racial or gender discrimination against her? *NOT ONE BIT, EVERYONE TREATED HER THE SAME AS EVERYONE ELSE*

6. Did you personally experience any evidence of her discriminating in any way against others? *NOT ME*

7. Did you see any evidence of discrimination against Aise (racial or gender) from a Lansing associate while she was employed by Lansing? *NEVER*

---

*BRYAN WALKER*
Name of Customer

Signature

*3/26/07*
Date

*WALKER CONST.*
Name of Business

*711 ROSALIND ST.*
Address

*OPELIKA*
City

*AL*
State

*36801*
Zip

K

# WAREHOUSE SYLLABUS:

1. ) First, always use your chain of command when you have a problem:
   a. **Warehouse Manager/ Inside Sales – Aise Cannon – DIRECT SUPERVISOR**
   b. BOM – Mike Haynes
   c. Branch Manager – Chris Black

\*\*\* If I cannot solve your problems then you are welcome to by pass me by going to my DIRECT supervisor, Mike Haynes, and vice versa. \*\*\*

\*\*\* If you feel I am being unfair, at least let me know so that I can be aware. **REMEMBER, I AM NOT A MIND READER.** Also, realize that I am your Supervisor and if I ask you to do something that is apart of your MAIN job description it is in my right to do so with no questions asked. \*\*\*

2.) It has come to my attention that I am favoring one Associate over the other. So, in order to avoid any unfairness, starting in the month of August I am going to alternate Main job responsibilities.

**August 1-5 –** Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

**August 8-12 -** Bo will take all out of town deliveries and Steven will take all local deliveries. Steven will conduct cycle count.

**August 15-19 -** Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

**August 22-26 -** Bo will take all out of town deliveries and Steven will take all local deliveries. Steven will conduct cycle count.

**August 29-September 2 -** Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

\*\*\* The only time this will change is if one of you is off, if it will interfere with your assigned time to get off, and, or if you need help when delivering big products. \*\*\*

\*\*\* On the days that you have local deliveries you will be the one responsible to make sure that you and I conduct cycle count together. \*\*\*

**3.)** Whatever you take down put back up in the rack.

**4.) <u>NO MORE OVERTIME, REGARDLESS OF ANY FAVORS THAT NEED TO BE DONE!!!!!!!!!!!!</u>**

\*\*\* When I ask you to clock out, please clock out. If you do not clock out at your assigned time, (8 hours from when you come in), I will clock you out myself. \*\*\*

**6.)** I will give you a list of things to do in the warehouse at least once a week. Try as much as possible to work as a team so that we can get the job done, and, also try to limit the amount of complaints about who is doing more then the other. But also remember that the Warehouse Associate's job is to keep the warehouse in order!!!!!

\*\*\* Remember, I understand it gets hectic sometimes, and because we are humans we may not complete everything in a day. You are allowed to take breaks. But, monitor your time, pace yourself. If something needs to be done in the warehouse get it done before you start watching television. \*\*\*

\*\*\* **LEARN TO DIRECT YOUR PROBLEMS TO THE PERSON THAT YOU ARE HAVING THE PROBLEM WITH BECAUSE THAT IS WHERE THE TENSION AND RESENTMENT IS COMING FROM.** \*\*\*

\*\*\* To be as <u>**TACTFUL**</u> as possible, I, Aise Cannon am your direct Supervisor, not Mike or Chris, and I do deserve and expect a level of respect, and in turn I will respect you. Please, when I ask you to do something I expect it to get done without the murmurings and complaining. **If it is illegal I will not ask you to do it!!!!!** \*\*\*

\*\*\* I do appreciate you guys for the great job that you are doing!!!!!!! To conclude we are a team, but each member on the team is not equal. Remember, each one of us applied to our particular position for whatever reason, and we need to learn to deal with the responsibilities that come along with our position. If you are not mature enough to deal with your responsibilities like men, and/ or women, you need to reconsider your future. That goes with anything in life. Life is a challenge, and everyday you should tackle each challenge with an aggressive and positive attitude. If not, you are doing yourself and your customers a disservice because wherever you go you will be miserable. \*\*\*

# Thanks,
# Aise Cannon

June 5, 2006

Ms. Aise Cannon
P. O. Box 1831
Opelika, Alabama 36801

Dear Aise:

As you requested, this letter is to inform you that you are terminated, effective immediately, from Lansing Building Products. Our decision to terminate you is based on numerous complaints from our customers and associates as well as your difficulty in learning our products and following corporate procedures. However, the specific catalyst for this action was your disruptive and unprofessional behavior at a branch meeting on Friday, 2 June, and your unwillingness to follow my instructions on Monday, 6 June.

We appreciate your service to Lansing Building Products, and we wish you every success in your future employment.

Sincerely,


Chris Black
Branch Manager

*Chris Black*

# Cycle Counting 4 Dummies:

**Conducting Cycle Counts:**

**1.)** Press ESC to get computer started

**2.)** Enter Login:  initials, press enter

**3.)** Enter Password, press enter

**4.)** Enter through Company # 1, because stays the same

**5.)** Put Operator's initials on line, press enter

**6.)** Put password again, enter

**7.)** Press Caps Lock Key

**8.)** In selection box put OIPF in capital letters, press F-1

**9.)** In File to Print:  064ICEPC, press enter

**10.)**     Printer:  6416, press enter

**11.)**     Width:  80, Press F-1

**12.)** Go to the Acknowledgement printer and tear cycle counting sheet off of the computer

**13.)** Go out into the Warehouse and begin count

**14.)** Once you have completed counting return to the show room and enter the count in the computer

## Entering the Count:

*** Before entering the count, always do a quantity recalculation to make sure that what you counted will match Trend, after activity has occurred within the branch.   ***

1.) Hit F-11 (Jump)

2.) In the selection box, put ICEPQ

3.) Leave the job name blank, press enter

4.) Leave back line as no, press enter

5.) On the printer line, put printer # 6416, press enter

6.) On the options line put n for no

7.) Press F-8 to go to the option box

*** The cursor will be on #1 Warehouse, press enter

8.) Put AUBN for our warehouse, press F-1

9.) Go to the Acknowledgement printer and tear the Quantity Recalculation sheet off

*** See if anything has changed.  If a count has changed that means that you are probably going to have to recount a or some products ***

10.) Hit F-11 ( Jump)

11.) Put ICEPE in the selection box, press F-1

12.) Press F-6 Enter Count

13.) Begin entering the count according to the units Trend wants

14.) If you have to convert 8 cartons 9 pieces to squares, press F-12 (Look – Up) and put in 8 for cartons and 9 for pieces, then press enter, and it should convert your count to squares

15.) If you make a mistake while entering the count, press F-8 Review count, and put in the start # where the mistake was made like #8 and Trend will directly put the cursor on line #8 so you can correct the mistake

16.) Once you have entered the last count, press F-1 which will put you on a blank line, then press F-11 (Look-up), and put ICZPR in the selection box

17.) Leave the job name blank, press enter

18. Leave back line as no, press enter



**19.)** On the printer line, put printer # 6416, press enter

**20.)** On the options line put n for no

**21.)** Press F-8 to go to the option box

\*\*\* The cursor will be on #1 Warehouse, press enter

**22.)** Put AUBN for our warehouse, press F-1

**23.)** Go to the Acknowledgement printer and tear the Reconciliation Report sheet off, and see if there were in variances

**24.)** If there are no variances, you can automatically update the cycle count by going through **steps 1a through 8a** under Updating the Cycle count, but if there are variances then you will need to go through **steps 1b through 16b** under Updating the Cycle Count!!!!!!!!!!!!!!!!!!



**Updating the Cycle Count:**

**\*\*\* At this point, only update if there are no variances.  If there are variances than there are a few more steps you have to take before you can update and complete cycle counting \*\*\***

**1a.)** Press F-11 (Look-up) and put ICEPU in the selection box
**2a.)** Leave the job name blank, press enter
**3a.)** Leave back line as no, press enter
**4a.)** On the printer line, put printer # 6416, press enter
**5a.)** On the options line put n for no
**6a.)** Press F-8 to go to the option box
\*\*\* The cursor will be on #1 Warehouse, press enter
**7a.)** Put AUBN for our warehouse, press F-1
**8a.)** Go to the Acknowledgement printer and tear the Update Report sheet off, staple all paperwork together and file in the 2nd drawer of the file cabinet in the current month's cycle count file, then you are done with cycle counts

**\*\*\* As I said previously, if there are variances then you should follow these steps \*\*\***

**1b.)** If there are variances, then you need to research those variances by first going to F-11 (Look-up) and put ICIAP in the selection box, then press F-1
\*\*\* ICIAP is the menu that will tell you if an item has been committed, so make sure you are not counting committed material.  Really material that is committed should be out of the bin, so that mistakes will not be made. You can count reserved material \*\*\*
**2b.)** Once you research variances that way, you press F-11 (Jump)
**3b.)** You will then put ICIT in the selection box

\*\*\* ICIT is the Inquiry Control Inquiry Transaction menu. You can put in each product code that you have a discrepancy with and check to see if there may have been a bad stock adjustment, wrong amount of material returned into the warehouse, or just material returned in as something other than what it actually was. Usually there was a bad stock adjustment. Whatever the case, research and figure it out before you make a faulty conclusion. Also, note the reason as to why the variance occurred next to the product \*\*\*

**4b.)** Finally, before you update, you need to go out an recount just to make sure you did not mistakenly overlook or miscount the product

**5b.)** Once you have researched and recounted any product with a variance, you will need to press F-11 (jump), put ICEPE in the selection box, Press F-1

**6b.)** Press F-7 to Edit count

**7b.)** Put only the number of the item that had a variance, and re-enter the correct count, or if the count is the same, leave as is

**8b.)** Once you have re-entered the count for the final time, you will update

**9b.)** Press F-11 (Look-up) and put ICEPU in the selection box

**10b.)** Leave the job name blank, press enter

**11b.)** Leave back line as no, press enter

**12b.)** On the printer line, put printer # 6416, press enter

**13b.)** On the options line put n for no

**14b.)** Press F-8 to go to the option box

\*\*\* The cursor will be on #1 Warehouse, press enter

**15b.)** Put AUBN for our warehouse, press F-1

**16b.)** Go to the Acknowledgement printer and tear the Update Report sheet off, staple all paperwork together, and file in the 2nd drawer of the file cabinet in the current month's cycle count file, then you are done with cycle counts



**AISE MEKE CANNON**                     3871 ARC WAY
                                         LAWRENCEVILLE, GEORGIA 30044
                                         CELL: (334) 444-5131
                                         HOME: (404) 468-3457

---

**OBJECTIVE:**
To secure a challenging position with a dynamic organization, which will enable me to
apply my knowledge and skills to the benefit of the organization.

**EDUCATION:**
**Auburn University**
May, 2005 – Bachelor of Science, Biomedical Science, Auburn, Alabama

**EXPERIENCE:**
**Lansing Building Products**
October, 2004 – Present – Warehouse Manager/ Inside Sales

- supervises Warehouse Associates and performs duties in the receipt, inspection, storage and issuance of exterior building products and tools
- coordinates with other departments in handling purchase orders and providing service to customers - edits purchase requests; prepares purchasing and accounting paperwork such as small purchase orders and requisitions; reconciles invoices with purchase orders in preparation for payment processing - identifies and resolves potential purchasing problems; follows up to ensure timely and accurate product delivery - corresponds with suppliers for quotations; maintains contact with vendors regarding current status of purchase orders - receives incoming materials, supplies, and equipment and compares information on packing slip with purchase order to verify accuracy of shipment - inspects shipments and records damages or defects; notifies supervisor and/ or purchasing personnel of same - maintains files and records of materials, prices, inventories, and deliveries - may inventory stock on hand and initiate paperwork to purchase additional quantities when necessary
- performs front desk customer service, including receiving, date stamping and logging documents and records, directing walk in customers and providing information specific to area of assignment - receives (by telephone, fax or e-mail) orders from customers and lead times from vendors - makes quotations on standard items, writes orders, and relays pertinent order information to customers
- directly supervises the branch cycle count program to improve inventory procedures and help maintain the accuracy of computer quantities
- selects, trains, supervises, and evaluates assigned personnel
- performs a variety of other duties relative to assigned area of responsibility.

**Auburn Recruiting Station**
February, 2004 – October, 2004 -  Active Duty Service Works Recruiter (ADSW)
- assisted the Station Commander in recruiting qualified individuals for entry into the United States Army by using leadership, counseling, and motivation techniques, along with enthusiasm, integrity,  and my knowledge of Army enlistment programs to persuade the individual that the Army can meet their personal needs -  established and maintained contacts -  advertised -  conducted interviews -  evaluated applicants by administering and scoring physical examinations -  also screened test of applicants with regard to their occupational aspirations within the Army

**United States Army**
January, 2003 – November, 2003 -  Automated Logistical Specialist
- while deployed overseas in Camp Arifjan, Kuwait, experienced most facets of logistic administration:  inventory records, statistical records, material receipts, file maintenance – compiled, evaluated, and drafted statistical and operating reports in a timely manner -  working knowledge and experience in these key areas:  budgeting, data collection, warehousing, property management, working safety, organization, issuing and receiving procedures and turn-in procedures -  maintained current inventory figures by meticulously reviewing all office records, production records and purchase inventories -  maintained 100% accountability of over 47 million in property and equipment while deployed in support of Operation Enduring/ Iraqi Freedom
- interpersonal/ communication skills -  easily resolved customer inquiries and complaints with tact, patience, and sensitivity -  communicated well with diverse personalities and cultures -  calmly handled pressure/ short-fused situations

**MILITARY TRAINING:**
**108th Division (Institutional Training), Montgomery, Alabama**
October, 2005 -  Automated Logistical Specialist (92A), Instructor

**803rd Quartermaster Company, Opelika, Alabama**
May, 2004 – August, 2005 -  Retention Noncommissioned Officer

- provided career counseling to soldiers
- conducted retention and reenlistment interviews
- determined soldier's eligibility to immediately reenlist or extend
- reviewed reenlistment and extension documents for accuracy
- coordinated retention ceremonies
- briefed leaders on matters relating to retention activities

**321st Theatre Material Management Center, Baton Rouge, Louisiana**
February, 1997 – April, 2004 - Common Task Trainer/ Administrative Unit Supply Specialist

- supervised and trained soldiers to do the tasks for their skill level and below by using the soldier's Manual of Common Tasks (SMCT), military occupational specialty (MOS), specific soldier's training publications (STPs), and mission training plans (MTPs) to establish effective training plans and programs which integrate individual and collective tasks
- established and maintained stock records and other documents such as inventory, material control, accounting and supply reports - corrected error and exception documents - reviewed and verified quantities received against bills of lading, contracts, purchase requests and shipping documents - unloaded, unpacked, visually inspected, counted, segregated and stored incoming supplies and equipment - packed, crated, stenciled, weighed and banded equipment and supplies - processed requests and documents at direct support level through warehouse sectioning - processed inventories, surveys and warehouse documents - prepared, annotated and distributed shipping documents

**TRAINING:**
- Trend Training, Richmond, Virginia
- Forklift certification, Opelika, Alabama
- Duty Appointed Retention Noncommissioned Officer, (DARN), training, Ft. Benning, Gerogia
- Primary Leadership Development Course, (PLDC), Camp Shelby, Mississippi
- Standard Army Retail Supply System 2AD training, Camp Doha, Kuwait
- Standard Army Retail Supply System 2AD/2AC/2B course, Ft. Lee, Virginia
- Automated Logistical Specialist course, Ft. Lee, Virginia

- Security Clearance



8501 Sanford Drive
P.O. Box 9489
Richmond, VA 23228
(804) 266-8893
FAX: (804) 262-7554

J. CHRISTOPHER LANSING
President

COPY

July 7, 2006

Ms. Aise M. Cannon
P. O. Box 1831
Opelika, Alabama 36803

Dear Ms. Cannon:

Thank you for providing the detailed package regarding issues relating to your employment with Lansing Building Products. Because we took your input very seriously, we have just completed a thorough review of the issues you raised and of your termination. In fact, I sent our Vice President for Human Resources, Maurice Stocks, to Opelika to interview our associates at the branch as well as to look into some related customer complaints. Maurice can discuss any areas of concern in more detail, if you desire.

In our investigation, we did not find any evidence of discrimination related to your termination or in your treatment while you were an associate. You were terminated because you refused to accept a counseling form from your supervisor. This is not behavior we would expect from a supervisor in one of our branches. The counseling form allows you to state your opinion of the counseling being provided, but, as you were told, we expect you to acknowledge the counseling, even if you do not agree with it.

As an executive team, we were well aware of you, and we were hoping that you would be successful in our company. However, we were aware early in your employment with us that there were some concerns about your mastery of product knowledge and about the way that you interacted with our customers. One of our senior executives was actually present when you asked a customer to write his order down, after he repeated it twice. This is clearly not good procedure in our opinion, but we were prepared to work with you on these issues, because we felt that you could be an asset to the company.

When you refused the counseling form, we had hoped to suspend you temporarily during a "cooling off" period, so that we could discuss these issues with you in a less stressful environment. Despite being told that you were temporarily suspended, you showed up for work on the following Monday and refused to leave until you were told that you were either terminated or allowed to go to work. At that point, we had no choice but to terminate you.

Aise Cannon
July 7, 2006
Page 2

These situations are never easy, but I have tried to be candid and forthright with you.  I hope that you can understand our point of view.  If you would like to discuss any specifics, please feel free to contact Maurice here at Corporate.  You have a great deal of talent, and we wish you every success in your future endeavors.

Cordially,

LANSING BUILDING PRODUCTS

J. Christopher Lansing
President


JCL/vhr

# Lansing
## BUILDING PRODUCTS

1200 Jeter Ave Unit A • Opelika, AL • 36801 • (334) 705-6471

FACSIMILE    FAX # 804-261-6743

TO:    CINDY WILLIAMS                    REPLY TO OUR FAX
                                        (334) 705-6725
FROM:    Aise CANNON

DATE:    08-05-2005

PAGES:    7            (including this sheet)

Good Morning Cindy,
This is the information that Chris, Mike
and I discussed regarding my job duties.
Thanks, Aise

Good Morning Cindy,

I did what you suggested to me yesterday. I told Chris that I would like it if He, Mike, and I sit down together and go over my responsibilities so I can know what lane I need to drive in. So, I am sending you a copy of the job descriptions that you sent to me with a few revisions that were made by Chris on August 5, 2005. I will make a copy of the front side and the back side of the paper, which has Chris's signature. That way if it changes again next week, I have documentation, and you have documentation that it was discussed previous and signed off on.

According to Chris, everything on this paperwork is my responsibility except that I will no longer be responsible for setting up delivery routes, deciding who goes where, nor will I set up when the deliveries go out or what order they will go out. Chris has given that responsibility to Mike because he said that at most Branches the BOM takes care of that. He also thinks that Mike knows the area better. Also, on July 27, 2005 Chris, Mike, and I had a meeting after work to discuss issues that were going on at the branch. Because of these issues I decided that it was time I set some ground rules to keep down the confusion. But after yesterday, I told Chris that I figured Rule #2 on the Warehouse Syllabus is obsolete now because it is now Mike's call. Chris said that it seems to be working out, and if the guys want to continue to follow that rule it was fine with him, just as long as it continues to work out in the future. My take on it is that I wrote these rules when I thought it was my responsibility to coordinate delivery routes, etc. Since it is not my responsibility anymore, I have told the Warehouse guys that Rule #2 is at Mike's discretion. In other words it may or may not change. So, as I said before I am sending all of this information to you so that if these rules continue to change consistently I have record of it here and at the Corporate office. Now keep in mind that when Mike is not in the office, I take on his responsibilities. But, until then in order to keep mess down and respect everyone's lanes I just want to make sure that I have a guide that I can follow.

Thanks,
Aise – Auburn Branch

*[handwritten: ← 7 ladders and walkboards ←]*

*[handwritten: *2 windows in misordered windows* ← Mike Keel ←]*

*[handwritten: ① Aise Cannon ② Mike Haynes ③ Chris Black]*

## Warehouse Manager

### Reports To: Branch Operations Manager

**Position Summary:**

The primary responsibility of a Ted Lansing Corporation Warehouse Manager is enhancing branch customer service through timely and accurate inventory management. The Warehouse Manager has ultimate responsibility for supervising warehouse personnel, but delegates day to day authority to the Warehouse Supervisor or lead warehouse person. *[handwritten: Mike does part of this now, telling them who goes where, I guess I just tell them what needs to be done in the warehouse.]* The following lists the primary duties of the Warehouse Manager, to include any other duties assigned by senior management. *[handwritten: (Branch Manager- Chris Black  BOM- Mike Haynes)]*

**Inventory Management Duties and Responsibilities:**

1. **Order Management.** Ordering materials in coordination with the Branch Operations Manager. Coordinating the shipping of materials with outside freight companies. Coordinating transfers with other branches. Approving vendor billings and ensuring that the proper paperwork is processed and forwarded to Accounts Payable.

2. **Inventory Management.** Helping determine optimum stocking quantities. Working with other branch personnel to maximize inventory turns. *[handwritten: Chris, Mike and ... both of us take care of this]*

3. **Computer Maintenance.** Working to ensure the accuracy of the computer inventory counts. Completing hand tickets when necessary.

*[handwritten: Operations]* 4. **Cycle Counting.** Directly supervising the branch cycle count program to improve inventory procedures and help maintain the accuracy of computer quantities. Approving inventory adjustments upon determining appropriateness. *[handwritten: *Mike will do it gets too busy in here after hours* (Bo did not complete it on Monday. I told him to ask Steven for assistance but that did not happen; Mike said it was too busy.)]*

5. **Physical Inventory.** Preparing for and controlling the conduct of physical inventory. Reviewing variances and resolving discrepancies as necessary.

**Warehouse Duties and Responsibilities:**

1. **Personnel Management.** Assist Branch Operations Manager in hiring warehouse personnel and maintaining personnel records. Ultimate responsibility for ensuring that warehouse personnel are achieving warehouse goals.

2. **Expense Management.** Managing the temporary and overtime expense for the branch.

3. **Safety and Security.** Ensuring a friendly, clean, orderly, safe and secure warehouse environment. *[handwritten: → need to strap pallets all the way @ the top  → need to strap forklifts gas tanks together]*

*[handwritten: Responsibilities → Mike will set delivery routes  *Mike is going to start delegating and setting up what goes out and where when it goes out b/c that is the way most Branches handle it. The]*

*[handwritten (reversed/watermark): Lawrenceville  678-328-1696]*

✱ My rules will still apply, unless does not work out in the future

Signature: _Ann Cannon_

Branch Manager's Signature: _Chris Black_

___

# Lawrenceville, GA
# 678-328-1655