IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| AISE CANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: CV-07-900-WKW |
| | ) | |
| LANSING BUILDING PRODUCTS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## LANSING BUILDING PRODUCTS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Lansing Building Products, Inc.  ("Lansing") moves the Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Lansing is entitled to summary judgment based on the pleadings, the deposition of Aise Cannon (with exhibits) which is attached hereto as Exhibit A, and the applicable law.


/s/ William K. Hancock
William K. Hancock
Attorneys for Lansing Building Products


OF COUNSEL:

ADAMS AND REESE LLP
2100 3rd Avenue North
Suite 1100
Birmingham, AL 35203
Telephone: (205) 250-5000
Facsimile: (205) 250-5034


742902-1

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 30 day of June, 2008, served a true and correct copy of the above and foregoing document on all counsel and parties of record, by electronically filing this document through the Middle District's electronic filing system which will send notification of such filing to the following:

Deborah M. Nickson
2820 Fairlane Drive, Suite A-10
Montgomery, AL 36116

/s/ William K. Hancock
OF COUNSEL

742902-1

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA


AISE CANNON,            )

        Plaintiff,)

                       )

VS.                    )CIVIL ACTION NO:

LANSING BUILDING       )3:07CV900-WKW

PRODUCTS, INC.,        )

                       )DEPOSITION OF:

        Defendant.)AISE CANNON

    S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition

of:

            AISE CANNON,

may be taken before Dana Gordon,

Commissioner and Notary Public, State at

Large, at the Law Offices of Ingrum,

Rice & Parr, 410 Second Avenue, Opelika,

Alabama 36801, on the 28th day of May,

2008, commencing at approximately 8:58 a.m.

cc6b0fde-ca53-4ad1-89d0-a710b845c835

Page 2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and reading of
3    the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating
7    to the taking of depositions.
8
9        IT IS FURTHER STIPULATED AND
10   AGREED that it shall not be necessary for
11   any objections to be made by counsel to any
12   questions, except as to form or leading
13   questions, and that counsel for the parties
14   may make objections and assign grounds at
15   the time of the trial, or at the time said
16   deposition is offered in evidence, or prior
17   thereto.
18                    ***
19
20
21
22
23

Page 4

1              I N D E X
2              PAGE:
3    EXAMINATION BY MR. HANCOCK        5
4
5
6          E X H I B I T   L I S T
7
8    Defendant's Exhibit No. 1      8
9    Defendant's Exhibit No. 2      11
10   Defendant's Exhibit No. 3      15
11   Defendant's Exhibit No. 4      20
12   Defendant's Exhibit No. 5      21
13   Defendant's Exhibit No. 6      25
14   Defendant's Exhibit No. 7      24
15
16
17
18
19
20
21
22
23

Page 3

1        A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        DEBORAH M. NICKSON
5        Attorney at Law
6        2820 Fairlane Drive
7        Suite A-10
8        Montgomery, Alabama  36116
9
10   FOR THE DEFENDANT:
11       WILLIAM HANCOCK
12       Attorney at Law
13       Adams and Reese
14       2100 3rd Avenue North
15       Suite 1100
16       Birmingham, Alabama  35203
17
18   ALSO PRESENT:
19       Mr. Lynn K. Whyte
20
21
22
23

Page 5

1        I, Dana Gordon, a Court Reporter
2    of Birmingham, Alabama, and a Notary Public
3    for the State of Alabama at Large, acting
4    as Commissioner, certify that on this date,
5    as provided by the Federal Rules of Civil
6    Procedure and the foregoing stipulation of
7    counsel, there came before me on the 28th
8    day of May, 2008, at the law offices of
9    Ingrum, Rice & Parr, 410 Second Avenue,
10   Opelika, Alabama 36801, commencing at
11   approximately 8:58 a.m., AISE CANNON,
12   witness in the above cause, for oral
13   examination, whereupon the following
14   proceedings were had:
15       AISE CANNON,
16   being first duly sworn, was examined and
17   testified as follows:
18       THE COURT REPORTER:  Usual
19   stipulations?
20       MR. HANCOCK:  Yes.
21       MS. NICKSON:  Yes.
22   EXAMINATION BY MR. HANCOCK:
23   Q        Would you state your name for

Bain & Associates Court Reporting Service, Inc.  205-322-0592

Page 6

1   the record, please?
2   A       Aise Meke Cannon.
3   Q       What is your Social Security
4   number?
5   A       It's 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.
6   Q       Do you know what your driver's
7   license number is?
8   A       No, not by heart.
9   Q       You have an Alabama driver's
10  license?
11  A       Georgia.
12  Q       Georgia?
13  A       (Witness nods head).
14  Q       Have you ever filed bankruptcy?
15  A       No.
16  Q       Are you employed?
17  A       Yes.
18  Q       Where are you working?
19  A       At Ethan Allen, Inc.
20  Q       Where?
21  A       In Atlanta, Georgia.
22  Q       How long have you been at Ethan
23  Allen?

Page 7

1   A       Over a year.
2   Q       Do you know when you started
3   approximately?
4   A       In September of '06.
5   Q       How much do you make at Ethan
6   Allen?
7   A       About 33,000 a year.
8   Q       Do you get any benefits?
9   A       Yes.  Blue Cross Blue Shield.
10  Well, health care benefits, dental.  There
11  are other benefits, but I don't -- I don't
12  have those benefits.
13  Q       Are they comparable to or better
14  than the benefits you got while working at
15  Lansing?
16  A       They're probably about the same.
17  Q       How much were you making when you
18  were working for Lansing?
19  A       Lansing, about 28,000.
20  Q       You were fired from Lansing,
21  weren't you?
22  A       Yes.
23  Q       Do you remember what day you were

Page 8

1   fired?
2   A       It was June 6th, 2006.
3           (Defendant's Exhibit No. 1
4           was marked for identification.)
5   Q       Let me show what you I'm marking
6   as Exhibit 1.  Do you recognize that
7   document?
8   A       Oh, yes.
9   Q       What is that?
10  A       It was my termination paper,
11  letter.
12  Q       Did you work anywhere between the
13  time you were fired from Lansing and the
14  time that you went to work for Ethan Allen
15  in Atlanta?
16  A       No.
17  Q       Are you liking your job at Ethan
18  Allen?
19  A       Yes.
20  Q       Did you look for a job between
21  the time you were fired from Lansing and the
22  time you went to Ethan Allen other than the
23  Ethan Allen job?

Page 9

1   A       I did.
2   Q       Where did you look?
3   A       A lot of places.
4   Q       Where all did you look?
5   A       I can't give exact names at the
6   time.
7   Q       Do you know why you were fired
8   from Lansing?
9   A       It says it in the letter, based
10  on their reasoning for firing me.
11  Q       Do you disagree with the
12  statement in that letter?
13  A       Yes, I do.
14  Q       What do you disagree with?
15  A       I disagree with the complaints --
16  the numerous complaints from the customers
17  and associates.
18  Q       What else?
19  A       The difficulty in learning the
20  product and following corporate procedures.
21  Q       What else?
22  A       And also the disruptive,
23  unprofessional behavior at the branch

3  (Pages 6 to 9)

Page 10

1  meeting on Friday, June 2nd and
2  unwillingness to follow -- well, he says my
3  instructions.
4  Q      Do you recall being placed on
5  suspension on Friday, June 2nd, 2006?
6  A      They did suspend me.
7  Q      When you say they, who is they?
8  A      Chris, and he contacted the human
9  resources vice president at the time and
10 they suggested that he suspend me.
11 Q      How do you know that? How do you
12 know that that recommendation was made by
13 the human resources department?
14 A      Because Chris Black told me.
15 Q      But you were suspended; is that
16 correct?
17 A      I was suspended.
18 Q      And you were instructed not to
19 come back to work on Monday morning, June
20 5th?
21 A      Yes.
22 Q      And you came to work anyway,
23 didn't you?

Page 11

1  A      Yes.
2  Q      Do you know of any Lansing
3  employee who was ever suspended, instructed
4  not to come back to work, came back to work
5  and was not terminated?
6  A      I don't know of any.
7  Q      About a year earlier, Ms. Cannon,
8  you had made a complaint to the Lansing
9  human resources department; is that true?
10 A      Yes, I did.
11 Q      Do you know who you spoke with up
12 there?
13 A      Cindy Williams.
14 Q      Cindy Williams?
15 A      Yes.
16 Q      Are you familiar with Lansing's
17 employee handbook?
18 A      Yes, I am.
19 Q      Are you fairly conversant with
20 it? I mean, you read it and understood it?
21 A      Yes, I did.
22         (Defendant's Exhibit No. 2
23         was marked for identification.)

Page 12

1  Q      I want to show you what I'm
2  marking as Exhibit 2. Is that the handbook?
3  A      It is.
4  Q      And I don't know what page it's
5  on. I think it's page eight. There's an
6  open door policy in that handbook, isn't
7  there?
8  A      Yes, there is.
9  Q      It says, "Chris' door is always
10 open"?
11 A      Yes.
12 Q      Who is Chris?
13 A      Chris Black was the branch
14 manager at the time I was there.
15 Q      Well, the employee handbook makes
16 reference to Chris. Do you think that's
17 making a reference to Chris Black?
18 A      What page did you say?
19 Q      I think it's about page eight or
20 so, the open door policy.
21 A      I don't see it on page eight.
22 Q      Maybe it's page 10. I'm sorry.
23 I haven't memorized it yet.

Page 13

1  A      Yes.
2  Q      You don't -- do you know who
3  Chris Lansing is?
4  A      Yes. Chris Lansing is the
5  president of the company.
6  Q      Do you think that the Chris that
7  the open door policy refers to is Chris
8  Lansing, the president of the company or
9  Chris Black, your supervisor?
10 A      Chris Black, branch manager, my
11 department head.
12 Q      Was it your understanding that
13 you could complain all the way up the
14 channels of the Lansing Building Products
15 company if you had an employee complaint?
16 A      Yes, it was.
17 Q      You felt comfortable raising
18 concerns that you had about your employment
19 all the way up the channels in the company,
20 didn't you?
21 A      Yes, I did.
22 Q      You have a military background,
23 don't you?

4  (Pages 10 to 13)

Page 14

1  A      Yes, I do.
2  Q      You understand procedures and
3  protocols?
4  A      Yes.
5  Q      And you understand that you
6  always have a recourse if you have a
7  complaint to go up --
8  A      Yes, I do understand that.
9  Q      -- a pecking order? Tell me
10 briefly about the complaint you made to
11 Cindy in May of 2005.
12 A      Okay. A position became open,
13 branch operations manager position, and
14 someone else was hired in that position
15 other than myself.
16 Q      Who was hired?
17 A      Mike -- Michael Haynes. And my
18 understanding was that since Chris, who was
19 the branch manager and also a white male --
20 he was promoted from sales manager to branch
21 manager. And Michael -- Tom Cleveland, who
22 was my supervisor before Michael Haynes
23 came, he was promoted from warehouse manager

Page 15

1  to branch operations manager before I came
2  and he was also a white male. So, my
3  understanding was that I would also be
4  promoted to the BOM position.
5        So, whenever I did not get the
6  position, I contacted Cindy Williams to
7  complain to her about me being passed over
8  for the position. And she suggested that I
9  make my concerns known to Chris Black and
10 then contact her back and let her know what
11 he said. And that is what I did.
12        (Defendant's Exhibit No. 3
13        was marked for identification.)
14 Q      I'm going to show you what I'm
15 marking as Exhibit 3. Is that the
16 information you sent to Cindy with regard to
17 the promotion we just discussed?
18 A      This was in August.
19 Q      2005.
20 A      Yes. This was in August. This
21 was after I was passed over for the
22 promotion.
23 Q      But that's a packet of

Page 16

1  information that you sent to Cindy Williams
2  who is with HR?
3  A      Yes, at the time.
4  Q      Where is that office located?
5  Where --
6  A      Richmond, Virginia. And this was
7  after --
8        MS. NICKSON: Wait until he
9  finishes.
10 Q      For Dana's benefit. Because she
11 can't type while we're both talking.
12 A      I'm sorry. I apologize.
13 Q      And Dana will tell you I do that
14 a lot.
15        So, after you spoke with
16 Ms. Williams in Richmond complaining about
17 being passed over, she recommended that you
18 sit down and discuss the promotion with
19 Chris and you did that, right?
20 A      Yes, I did.
21 Q      Did you tell Chris that you had
22 complained to Cindy, or did you just sit
23 down and talk to him about the promotion?

Page 17

1  A      I did tell him that I had talked
2  to Cindy Williams and she suggested that I
3  make my concerns known to him.
4  Q      Did you tell Chris what you
5  had -- what all you told Ms. Williams or
6  just that you were concerned about being
7  passed over?
8  A      I told her -- well, that's
9  basically what I discussed with
10 Ms. Williams, about being passed over in
11 May. And he -- and we discussed the concern
12 that I had about it.
13 Q      About being passed over?
14 A      About being passed over for that
15 position.
16 Q      Tell me exactly what you told
17 Chris about your conversation with Cindy
18 Williams.
19 A      I told him that I explained to
20 her that a position became available, that
21 it was my understanding that I would be
22 promoted to that position and that I was
23 overlooked for the position and someone else

Bain & Associates Court Reporting Service, Inc.  205-322-0592

cc6b0fde-ca53-4ad1-89d0-a710b845c835

Page 18

1   was hired in that position. And I explained
2   that to him.
3   Q      Did you tell him -- did you think
4   that failure to be promoted was unfair?
5   A      Yes, I did.
6   Q      Did you tell Chris that?
7   A      Yes, I did.
8   Q      Tell me what you told Chris about
9   that being an unfair decision.
10  A      Well, I told him that I had been
11  there for seven months at the time. And as
12  I had said previously, everyone within that
13  branch had been promoted to the position
14  above them once it became available. So, it
15  was my understanding that I would be
16  promoted also.
17  Q      So, you thought it was unfair
18  because you thought it was your turn?
19  A      Well, I also thought it was
20  unfair because of the statements that he
21  made during the meeting whenever I
22  questioned the promotion, why I was passed
23  over for it.

Page 19

1   Q      What did you tell him about that?
2   A      Well, the statements that he made
3   was that I was passed over because, first of
4   all, I need to have thick skin and that we
5   deal with rednecks and if they -- if he were
6   to put me in that position, they would look
7   at him like he's crazy and that a lot of the
8   customers think that I'm an airhead. And he
9   also said that to be frankly honest, your
10  customer service skills suck.
11         And then I asked him -- I asked
12  him, well, I had been there for seven
13  months. Why haven't you discussed this with
14  me previously as far as my customer service
15  skills? Because it was never mentioned.
16  Q      Is there anything else that you
17  told Chris about the conversation you had
18  with Cindy Williams?
19  A      The only conversation that Cindy
20  Williams and I discussed was about the
21  promotion. That was it.
22  Q      But what I'm asking you is is
23  there anything else that you told Chris

Page 20

1   Black about your conversation with Cindy
2   Williams?
3   A      The only thing I told Chris Black
4   about the conversation was regarding the
5   promotion. Because that's all Cindy
6   Williams and I discussed, me being passed
7   over for the promotion.
8   Q      Following your termination in
9   June of 2006, you wrote a letter to Chris
10  Lansing, didn't you?
11  A      I did.
12         (Defendant's Exhibit No. 4
13         was marked for identification.)
14  Q      Let me show you what I'm marking
15  as Exhibit 4. Is that the letter that you
16  wrote to Mr. Lansing?
17  A      That is.
18  Q      What was the purpose of that
19  letter?
20  A      The purpose of the letter was to
21  go over the harassment and the
22  discrimination that I endured while I was at
23  Lansing from Chris Black and just also the

Page 21

1   different types of retaliation tactics that
2   he used on me while I was there in a
3   management position.
4   Q      Did Mr. Lansing write you back?
5   A      He did respond.
6         (Defendant's Exhibit No. 5
7         was marked for identification.)
8   Q      Let me show you what I'm marking
9   as Exhibit 5. Is that Mr. Lansing's
10  response?
11  A      Yes, this was his response.
12  Q      Were you satisfied with his
13  response?
14  A      No, I was not.
15  Q      At that time you were already
16  terminated, right?
17  A      Yes, I was already terminated.
18  Q      What were you expecting to --
19  what different result other than the
20  response contained in Mr. Lansing's letter
21  did you expect?
22  A      Well, first of all, in the second
23  paragraph whenever he said that you were

6 (Pages 18 to 21)

Page 22

1  terminated because you refused to accept the
2  counseling form from your supervisor, at
3  that -- at that time at that meeting, as I
4  said, he verbally attacked me and
5  disrespected me in front of everybody within
6  that branch.
7  Q      Was that on Friday, June 2nd?
8  A      That was Friday, June 2nd. And
9  so --
10      MS. NICKSON: Can I ask
11  something? When you say -- when she's
12  referring to he, could you ask her to
13  identify who he is?
14      MR. HANCOCK: Yeah. We're
15  talking about Chris Black.
16  A      Chris Black. Chris Black
17  verbally attacked me at the meeting. So,
18  whenever he says you were terminated because
19  you refused to accept a counseling form from
20  your supervisor, it -- I'm trying to think
21  of the verbiage I want to use.
22      But he -- he provoked what
23  occurred at the meeting because he verbally

Page 23

1  attacked me and disrespected me at that
2  meeting. So, I didn't agree with that at
3  all.
4      And I also didn't agree with
5  where he says we were aware early in your
6  employment with us that there were some
7  concerns about your mastery of product
8  knowledge and about the way that you
9  interacted with customers. Because, as I
10  said before, that was never mentioned to me
11  the first seven months until I questioned
12  the promotion about my customer service
13  skills.
14      And then also one more thing,
15  when he says we hoped to suspend you
16  temporarily during a cooling off period so
17  we could discuss these issues with you in a
18  less stressful environment. I did contact
19  the human -- the vice president of human
20  resources at that time after the
21  suspension. And what he told me was that he
22  didn't really know of any of the
23  circumstances that occurred and that they --

Page 24

1  Q      Who are you talking about now?
2  A      The vice president of human
3  resources at the time was --
4  Q      Maurice?
5  A      Maurice Stocks. I e-mailed him
6  and he said that they did not know of the
7  circumstances. He had just advised Chris to
8  give me a counseling statement based on
9  insubordination, but as I said, it was
10  provocation that provoked that. And when I
11  asked about the suspension, he could not
12  give me a time line as to when I was -- when
13  I was supposed to be suspended. And I
14  needed more of a time line. And no one ever
15  told me that they would contact me to let me
16  know. That was never mentioned.
17      (Defendant's Exhibit No. 7
18      was marked for identification.)
19  Q      Let me show you what I'm marking
20  as Exhibit 7. Do you recognize Exhibit 7?
21  A      Yes, I do.
22  Q      What is that?
23  A      This is the EEOC complaint.

Page 25

1  Q      Other than the EEOC complaint
2  that I've marked as Exhibit 7, have you ever
3  filed any other EEOC complaint?
4  A      I have never filed an EEOC
5  complaint.
6      (Defendant's Exhibit No. 6
7      was marked for identification.)
8  Q      Let me show what you I'm marking
9  as Exhibit 6. Do you recognize that?
10  A      Yes, I do.
11  Q      If you'll flip -- well, tell me
12  what Exhibit 6 is, please.
13  A      This is -- I believe this is the
14  letter that I wrote to the EEOC.
15  Q      Okay. Flip over a couple of
16  pages. That letter -- and the letter is
17  dated July 25, 2006 and it is three pages
18  long. I have a letter that's dated June 12,
19  2006 attached. Did you attach the June 12,
20  2006 letter to your July 25 letter?
21  A      I did attach it.
22  Q      Now, let's start with the June --
23  the June 25 letter is the same as what's

7 (Pages 22 to 25)

cc6b0fde-ca53-4ad1-89d0-a710b845c835

Page 26

1   marked as Exhibit 4; is that correct?
2   A      Yes, it is.
3          MR. HANCOCK:  For the sake of
4   paper, do you mind if I not attach that as
5   an exhibit just so it's --
6          MS. NICKSON:  No.
7          MR. HANCOCK:  But we know that
8   Exhibit 4 was attached to Exhibit 6.
9   Q      (BY MR. HANCOCK:)  Now, did you
10  have a lawyer at the time you sent the
11  letter to the EEOC on July 25th, 2006?
12  A      Not at the time.
13  Q      Tell me why you -- well, did you
14  file that July 25 letter with the EEOC for
15  information purposes, to put the EEOC on
16  notice of something, or why did you file
17  it?  Do you remember?
18  A      I was going through the process
19  of what -- when I called the EEOC, they gave
20  me a list of steps that I had to go through
21  and I was following their procedures.
22  Q      Did you go to an EEOC office?
23  A      Initially?  Is that what -- can

Page 27

1   you repeat?
2   Q      When was the first time you went
3   to the -- went physically to the EEOC?
4   A      The first time I went was for a
5   mediation.
6   Q      Do you know when that was?
7   A      I don't remember the date.
8   Q      Was it after you filed the EEOC
9   charge?
10  A      It was after I filed the EEOC
11  charge.
12  Q      Did you just talk to the EEOC on
13  the phone?
14  A      Yes, I did.
15  Q      And when was the first time you
16  talked to the EEOC on the phone?
17  A      I don't remember exact dates,
18  but --
19  Q      Well, was it before or after you
20  filed your EEOC charge?
21         MS. NICKSON:  Object to the form.
22  Q      If you recall.  Did you talk to
23  the EEOC before or after you filed your

Page 28

1   charge?
2   A      I talked to them before I filed
3   the charge.
4   Q      Do you know how long before?
5   A      As soon as I was terminated.
6   Q      You were terminated?
7   A      Yes.
8   Q      You talked to the EEOC on the
9   phone?
10  A      Yes.
11  Q      What all did you tell them?
12  A      I explained to them that I was
13  discriminated against and harassed at this
14  company, Lansing Building Products.
15  Q      And what did they tell you?
16  A      And they gave me the procedures,
17  the EEOC's guidelines that you have to
18  follow for EEO -- EEOC guidelines.
19  Q      Do you have a copy of those
20  guidelines?
21  A      Not on me right now.
22         MR. HANCOCK:  Ms. Nickson, we
23  haven't gotten any documents for disclosure

Page 29

1   purposes.  Do y'all have any?
2          MS. NICKSON:  The EEOC file.
3          MR. HANCOCK:  Other than the EEOC
4   file, do you have any documents?
5          MS. NICKSON:  No.  Have you sent
6   for discovery?
7          MR. HANCOCK:  Well, for
8   disclosures.
9          MS. NICKSON:  No.
10         MR. HANCOCK:  You have nothing to
11  disclose?
12         MS. NICKSON:  Do you have the
13  EEOC file?
14         MR. HANCOCK:  No, ma'am.
15         MS. NICKSON:  Okay.  Good.  I'll
16  be glad to give you that.
17         MR. HANCOCK:  The EEOC stopped
18  giving us files a long time ago.  We file an
19  employee request, they object and won't give
20  it to us.
21         MS. NICKSON:  But eventually they
22  will release it at the request of the
23  client.

8  (Pages 26 to 29)

cc6b0fde-ca53-4ad1-89d0-a710b845c835

Page 30

1        MR. HANCOCK:  She can get it, but
2   we can't.  So, if you'll send me a copy of
3   that --
4        MS. NICKSON:  I don't mind giving
5   you a copy, Counselor.
6   Q      (BY MR. HANCOCK:)  When you sent
7   the letter to the EEOC in July of 2006, you
8   weren't asking the EEOC to do anything yet,
9   were you?
10  A      Yes, I was.  But as I said, we
11  have to follow certain procedures.
12  Q      Well, show me in the letter where
13  you're asking the EEOC to take any action.
14  A      Now, in this letter it's not
15  directly asking for action taken.
16  Q      Now, referring -- well, before I
17  ask that, is there anything in that letter,
18  Exhibit 6, that makes reference to the
19  promotion that you didn't get in May of
20  2005?
21  A      Well, as I stated in the first
22  paragraph, when I started with this company
23  I was told that Lansing Building Products

Page 31

1   encouraged promotions within the company.
2   The disappointing reality is no matter what
3   I did Chris Black made it perfectly clear
4   that I was not welcome at Lansing and I
5   would not advance as long as he was over me.
6   Q      But you don't make reference --
7   A      And --
8   Q      I'm sorry.
9   A      And he -- let me see.  Chris --
10  Tom's position became available.  I didn't
11  have the opportunity to apply.  Chris gave
12  the position to a white male, Mike Haynes.
13  He told me Lansing had planned to hire Mike
14  a year ago.
15        I discussed with Chris why the
16  job was not posted in the office and why I
17  wasn't considered for the position.  He told
18  me to be perfectly honest with you, Mike has
19  better customer service skills than you do
20  and customers would rather deal with Mike.
21  He continued by saying, I have been meaning
22  to discuss this with you.  Customers think
23  you are a hard expletive and you do not joke

Page 32

1   around with them.
2   Q      I'm really not asking you to read
3   the letter.  I'm asking you if you'll point
4   to any discrete reference to the May 2005
5   promotion that you didn't receive.
6   A      Well, that is the discrete to me.
7   Q      Look at Exhibit 1 again, your
8   EEOC charge.
9   A      7?
10  Q      I'm sorry.  It looks like a one.
11  Exhibit 7.  Tell me why you filed that
12  charge.  Was it because at this point when
13  you signed it, January 7 of 2007, that you
14  were asking the EEOC to take action on your
15  complaint?
16  A      Well, as I continue to say, there
17  are certain protocols that you have to
18  follow before it even gets to this point.
19  And I --
20  Q      I'm sorry.  But at this point,
21  January 7, 2007 is when you're asking the
22  EEOC to step in and take action; is that
23  correct?

Page 33

1   A      Yes.
2   Q      On the form -- well, is there any
3   reference -- in the particulars of your
4   charge, is there any reference to the May
5   2005 promotion that you failed -- that you
6   did not receive?
7   A      No, there's not a direct
8   reference to it.
9   Q      And in the middle on this right
10  block it says, date or dates discrimination
11  took place.  Under earliest you typed in
12  June 6, 2006 as the earliest discrimination;
13  is that correct?
14  A      Well, they typed, the EEOC typed
15  that in.
16  Q      Yes, ma'am.  In the bottom left
17  box it says that you declare under penalty
18  of perjury that the foregoing is true.
19  A      Yes.
20  Q      So, you swore under oath to the
21  EEOC on January 7, 2007 when you first asked
22  them to take action that the earliest
23  discrimination took place on June 6, 2006;

9 (Pages 30 to 33)

cc6b0fde-ca53-4ad1-89d0-a710b845c835

Page 34

1   is that correct?
2         MS. NICKSON: Object to the form.
3   Q      That's what you swore to?
4   A      Well, as I said before, there was
5   proper procedure and proper protocol that
6   they -- that they went to. And according to
7   them, there are certain dates and times that
8   they -- that they give you time lines to do
9   certain things in.
10  Q      Did you talk to the EEOC while
11  they were typing this form up? They typed
12  this form for you?
13  A      They typed it.
14  Q      But that is your signature in the
15  bottom left-hand corner, though, isn't it?
16  A      Yes.
17  Q      And they typed this based on
18  information that you provided to them; is
19  that correct?
20  A      Yes, based on everything that I
21  sent to them before that time line.
22  Q      And you read this form before you
23  signed it under oath; is that true?

Page 35

1   A      Now, when you say under oath --
2   Q      Well --
3   A      Are you talking about right here
4   (indicating)?
5   Q      The form is not particularly
6   clear, but it says, "I declare under penalty
7   of perjury that the foregoing is true and
8   correct." Did you understand that you were
9   swearing -- did you understand when you
10  signed this form that you were swearing to
11  the EEOC under oath that the form accurately
12  portrayed your complaint?
13  A      I did sign it and I did -- it did
14  accurately -- it did accurately -- well,
15  based on the -- what they wrote, I did say
16  that it accurately identified my complaint
17  based on the -- the verbal attacks and the
18  harassment and discrimination that was
19  occurring during the time.
20  Q      Did you review this form before
21  you signed it?
22  A      Yes, I did.
23  Q      Did you have a lawyer at the time

Page 36

1   you signed this form on January 7, 2007?
2   A      No, I did not have an attorney at
3   the time.
4   Q      Do you have any recordings, any
5   tape recordings or anything?
6   A      No, I don't have any recordings.
7   Q      What documents do you have other
8   than what's been marked as an exhibit that
9   you claim supports the claims that you make
10  in this lawsuit?
11  A      I have more documents. And as
12  I -- I said, whenever I was terminated for
13  the position, on the -- on the dates that
14  I -- that I was terminated, it was racial --
15  racially motivated. And I do have --
16  Q      Your termination was racially
17  motivated?
18  A      Yes.
19  Q      How --
20  A      And -- because as I said, every
21  time I mentioned any type of concerns that I
22  had, it always came back to having thick
23  skin and me dealing with rednecks and good

Page 37

1   old boys.
2   Q      You're aware that a lawsuit, a
3   complaint was filed on your behalf to
4   initiate this lawsuit?
5   A      No, I'm not aware of that.
6   Q      You don't know what papers were
7   filed to start this lawsuit?
8   A      Based from my -- from my
9   Q      Have you ever seen the complaint
10  in this lawsuit (indicating)?
11  A      I knew of the complaint that I --
12  that I filed along with my attorney.
13  Q      And that's the complaint filed in
14  Court as opposed to a complaint filed with
15  the EEOC?
16  A      Yes, with my attorney.
17        MR. HANCOCK: Let's take a short
18  break.
19        (A break was taken at 9:35 a.m.
20        and the deposition concluded at
21        9:41 a.m.)
22        END OF DEPOSITION
23

10  (Pages 34 to 37)

Page 38

```
1          C E R T I F I C A T E
2
3    STATE OF ALABAMA )
4    JEFFERSON COUNTY )
5
6         I hereby certify that the above
7    and foregoing deposition was taken down
8    by me in stenotype, and the questions and
9    answers thereto were reduced to computer
10   print under my supervision, and that the
11   foregoing represents a true and correct
12   transcript of the deposition given by
13   said witness upon said hearing.
14
15        I further certify that I am
16   neither of counsel nor of kin to the
17   parties to the action, nor am I in
18   anywise interested in the result of said
19   cause.
20
21   _____
          Dana Gordon, Commissioner
22        ACCR #146
23
```

Bain & Associates Court Reporting Service, Inc.  205-322-0592

cc6b0fde-ca53-4ad1-89d0-a710b845c835

June 5, 2006

Ms. Aise Cannon
P. O. Box 1831
Opelika, Alabama 36801

Dear Aise:

As you requested, this letter is to inform you that you are terminated, effective immediately, from Lansing Building Products. Our decision to terminate you is based on numerous complaints from our customers and associates as well as your difficulty in learning our products and following corporate procedures. However, the specific catalyst for this action was your disruptive and unprofessional behavior at a branch meeting on Friday, 2 June, and your unwillingness to follow my instructions on Monday, 6 June.

We appreciate your service to Lansing Building Products, and we wish you every success in your future employment.

Sincerely,

Chris Black
Branch Manager



# Lansing Building Products

## Associate Handbook
**(Revised 2002:2005)**



## PURPOSE OF THE HANDBOOK

This Handbook will provide you with the information you need to become a successful member of the Ted Lansing team.  The confidential information in this handbook is meant for Ted Lansing Corporation team members only.

Neither this Handbook nor any provision herein constitutes an employment agreement or contractual relationship.  Nor does any provision of this Handbook or oral representation made to you by any other Ted Lansing Corporation associate guarantee employment for a specific period of time.

At any time, you or the company may terminate your employment with Ted Lansing, at will. Accordingly, the grounds for discharge stated in the Handbook are not exclusive, but are stated as examples of conduct that may result in disciplinary action, including discharge.

The Company must have flexibility in administering its policies and procedures, and reserves the right to change policies and procedures without notice.

# TABLE OF CONTENTS

Welcome from the President.................................................................1

Ted Lansing Corporation Mission Statement ...................................2

Company History...................................................................................3

Company Policies
    Americans with Disabilities Act...............................................6
    Charitable and Community Contributions ..............................6
    Code of Ethics ............................................................................6
    Company Computers/Telephones/Equipment Usage..............7
    Courtesy.......................................................................................7
    Dress ............................................................................................8
    Drug Testing................................................................................8
    Electronic Messages .................................................................9
    Employment Records .................................................................9
    Employment References ............................................................9
    Equal Employment Opportunity (EEOC) ................................9
    Inclement Weather ...................................................................10
    Open Door Policy .....................................................................10
    Orientation Period ....................................................................10
    Payroll Policies.........................................................................11
    Performance/Development Reviews .......................................11
    Resignations .............................................................................12
    Safety and Health .....................................................................12
    Sexual Harassment ..................................................................13
    Smoking Policy .........................................................................13
    Soliciting....................................................................................13
    Substance Abuse .....................................................................14
    Uniform Deposit .......................................................................14

Rules and Regulations ......................................................................15

Benefits
    Associates: Full- and Part-time..............................................17
    Credit Union...............................................................................17
    Flexible Spending Accounts ...................................................18
    Holidays .....................................................................................18
    Insurance ...................................................................................19
    Jury Duty....................................................................................19
    Military Leave ............................................................................20
    National Guard or Reserve ......................................................20
    Retirement Plan.........................................................................20
    Smoking Cessation Award ......................................................21
    Tuition Reimbursement ............................................................21

**Worker's Compensation Leave**.................................................................**21**

**COBRA**..............................................................................................**22**

**Leave Policy**
    **Sick/Administrative Leave**...............................................................**23**
    **Family Medical Leave Act**...............................................................**24**
    **Extended Sick Leave** .....................................................................**25**
    **Vacation** .......................................................................................**26**

## WELCOME FROM THE PRESIDENT

It is always a pleasure to welcome a new associate to Ted Lansing Corporation. We share a great deal of pride with all of the people at Ted Lansing Corporation. It is our firm belief that the exceptional growth our Company has enjoyed since it was founded in 1955 is directly due to the people and their dedication to the success of our Company.

We make every effort to provide our associates with a positive work environment. We are always interested in the happiness and health of each associate and his or her family.

We provide an outstanding Company Benefits Program and are pleased to provide this copy of our Ted Lansing Corporation Associate Handbook for you and your family to review. Please feel free to discuss with your Manager or Department Head any questions you may have regarding your employment or this Handbook.

We wish you success in your employment with our Company, and to this end, I will try to be available to discuss any personal matter with you.

With warm regards,


**TED LANSING CORPORATION**


Chris Lansing
President

1

# TED LANSING CORPORATION

# MISSION STATEMENT

**The Mission of Ted Lansing Corporation** is to provide superior service in supplying exterior building products to professional contractors while maintaining the highest ethical standards.

**We will accomplish this by:**

1) Showing **respect** for our associates, customers and suppliers.

2) Giving our customers the best possible **service**.

3) Achieving **excellence** in everything we do.

# COMPANY HISTORY

Looking at Ted Lansing Corporation today, it is hard to believe that it started as a three-man operation.

Ted Lansing's employer, CertainTeed transferred him to Richmond in 1947. As a territory salesman, he was responsible for the sale of all CertainTeed roofing products in the state of Virginia. His largest Richmond area customer was Southern States Iron and Roofing Company. They went out of business in 1955 and created a vacuum for roofing materials. Ted saw this as a great opportunity to start a new business. With the blessing from his management at CertainTeed, he began Ted Lansing Supply Company along with two former Southern States men, J. C. "Dike" Griffith and J. C. "Mac" McLane.

The three of them formed a partnership and started on a shoestring. Dike was "Mr. Inside" and took care of the office. Mac was "Mr. Outside" and took care of the warehouse and deliveries. Ted was involved in selling, and as President, the overall management of the Company. The partnership was changed to a corporation in 1957.

The Company grew slowly in the beginning. The first associate hired was John Watkins, who worked in the Richmond warehouse until 1992. The Company started expanding in 1967 with the opening of the Norfolk location. It continued to grow with the openings of Roanoke in 1969, Windjammer (storm window and door manufacturing plant) in 1971, Newport News in 1972, Raleigh in 1974 and Charleston in 1977. Over a period of 22 years, the Company had grown from a small three-man operation to an $8 million dollar business. In 1978 the Company deemed Windjammer as non-profitable and closed the doors of the manufacturing plant.

Ted was diagnosed with Amyotrophic Lateral Sclerosis (also known as ALS or Lou Gehrig's disease) in 1979. He died in March of 1980 at the age of 57.

Following his father's death, Chris, Ted's oldest son, who had been working in the Company for five years, was named President of the Company. Chris is a graduate of BYU. He is married to Erlynn Ensign Lansing, who is semi-active in the business. They have four children: Ted, Hunter, Lindsay and Chase. Chris is very active in the community, with church and Boy Scouts being at the top of his list. Under his leadership the Company has continued to prosper.

Catastrophe hit in 1981 when the Roanoke Branch was the victim of an arsonist. The warehouse was badly burned, and as workers were clearing debris it caught fire again. Although it was burned to the ground, we were back in business the very next day in a makeshift warehouse. This could not have been done were it not for the teamwork of Walter Assaid, the Manager, and the fine staff of people working for him.

3

It was decided in 1982 that a branch was needed to cover the area between Raleigh and Charleston. Wilmington was chosen for the next location.

By 1984 windows were becoming a very important factor for the future growth of our Company, so once again we opened a window manufacturing plant in Richmond. This plant's primary function was to make CertainTeed Solid Vinyl Replacement Windows using our branch locations as distributors of the product.

Following the opening of the window manufacturing plant in April of that year, expanded growth opportunities became available in SC. Columbia (August 1984) was selected as the ideal location for the next branch opening.

In 1987 an opportunity arose for the Company to purchase the assets of another distributorship in Chattanooga, TN, thus adding another state to our list of coverage. Since then we continued to grow with the openings of Charlotte, NC (1989); Atlanta, GA (1990); Greenville, SC (1991); Lanham, MD (1992); Greensboro, NC (1993); Baltimore, MD (1994); Dulles, VA (November 1994); Myrtle Beach, SC (March 1997); and Fredericksburg, VA (May 1997).

The company celebrated its 40th Anniversary in 1995. That year also saw the window manufacturing plant renamed Chesapeake Window Products and the opening of a new branch in Norfolk dedicated solely to roofing materials. The new branch was named Lansing Roofers Supply.

In June of 1997 Ted Lansing Corporation began an acquisition phase beginning with the acquisition of May Building Supply, now our Winchester, VA branch. That fall we acquired Shore Building Supply, which has become our Salisbury, MD branch. Triumph Building Products in Louisville and Lexington, KY became part of the TLC team in April 1998. With the next acquisition of Metal Rolling Inc. in June 1998, TLC moved westward into Memphis and Jackson, TN, Jonesboro, AR and Jackson and Tupelo, MS. In November 1998 Alabama Building Products and Knoxville Wholesale Building Products joined the family with branches in Birmingham, Dothan, Huntsville, Gadsden and Mobile, AL, Panama City, FL and Knoxville, Morristown and Nashville, TN. In order to focus on and expand the distribution side of the business, Chesapeake Windows Products was sold in June 1998 to CertainTeed Corporation.

The need was recognized for more branches in the Atlanta, GA area so TLC opened two new branches. The facilities in Buford, GA (July 1998) and Newnan, GA (November 1998) strengthened our Southern territory.

Ted Lansing established a foothold in the Mountain West with the acquisition of Rainbow Aluminum Distributors in August 1999. This acquisition provided branches in Salt Lake City, Ogden, Logan, and Pleasant Grove, Utah and Idaho Falls, Idaho. It also signaled our

change from a regional distributor to becoming a national distributor. To continue this growth, we opened a new branch in Denver, Colorado in April 2001.

Over the years we have moved several of the branches from one building to another. Each time we have never lost a day's business! This is due to the teamwork of our associates in keeping with the Ted Lansing tradition of Company spirit.

Today the Company is a multi-million dollar operation with distribution branch locations in thirteen states. Ted Lansing Corporation has always looked to the future, and will continue to look forward to further growth and development of the Company. As can be seen from the Company history, Ted Lansing Corporation was founded and has grown based on the principles of hard work and commitment. These are contributions that Ted Lansing Corporation expects from each and every associate in the Lansing family. It is the combined effort of many individual accomplishments that has built Ted Lansing Corporation into the Company it is today.

# COMPANY POLICIES

## Americans with Disabilities Act

In accordance with the Americans with Disabilities Act (ADA), Ted Lansing Corporation does not discriminate against disabled persons who can perform the essential tasks of a job with or without reasonable accommodation.

## Charitable and Community Contributions

The Company may make an exception to its "No Soliciting" policy for *The United Way* and Christmas season charitable funds.  This exception is based on the Company's desire to return, in some way, benefits that the Company and its associates derive from the communities in which we live.

Only the President of the Company is authorized to make any other charitable contribution on behalf of the Company.  These include, but are not limited to, bowling leagues, softball or other sponsorships.

## Code of Ethics

Ted Lansing Corporation seeks to conduct its business in accordance with the highest ethical standards.  For many years we have had a Business Code of Ethics that spells out the conduct we require.  A number of the Code's provisions deal with relationships between our associates and those who provide goods and services to us.

The Company expects all associates to comply with the following *Code of Ethics*:

*Associates should not give or receive, without approval from the Company President, a gift of more than a token value (exceeding $50) that is, in any way, connected with Ted Lansing Corporation's business. Associates should not entertain or be entertained beyond a level that is appropriate to his or her business responsibilities.*

*Associates should not benefit personally from any transaction involving Ted Lansing Corporation (including the purchase of goods and services).*

*Associates should not have an interest in, or receive income from, any enterprise doing business with Ted Lansing Corporation, excluding stock trading on the open market.*

6

*Associates should not give or receive anything that can be construed as a bribe, kickback, or other illegal or unethical payment. Any associate who receives such an offer must report it immediately to senior management.*

*Associates should not allow a transaction with a vendor, or others, to be structured or recorded in a way not consistent with normal business practice.*

*Associates should not make use of, or disclose, confidential Company information for the personal profit or advantage of the associate or anyone else.*

*Associates should not disclose or release to anyone (other than a Company associate having need of the information in the course of his or her employment) any data or decisions, plans or any other information that might be prejudicial to the Company.*

We need your cooperation in protecting our mutual interests by ensuring that our business relationship is open and honest.

Any associate found in violation of this policy is subject to disciplinary action up to and including discharge.

## Company Computers, Telephones, and Equipment Usage

Computers, telephones, and other office equipment are provided for the accomplishment of Company business and are therefore not to be used for personal use without prior authorization of the manager. The phones at work are for business and should, therefore, be used for business purposes only. Conversations should be brief and to the point so as not to tie up the phone lines. Personal phone calls may be made or received on Company phones as long as they are brief, important and cannot wait until the end of the business day.

## Courtesy

Regardless of which particular job you perform or in which area of the Company you work, as an associate of Ted Lansing Corporation you are also a representative of the company. You are expected to conduct yourself in a courteous and conscientious manner at all times. This involves, but is certainly not limited to, the following:

- **Courtesy Toward Our Customers** - This should be obvious. Without our customers, we are out of business.

- **Courtesy Toward Your Fellow Associates** - Treat co-workers as you would like to be treated. We are all part of the same team.

- **Courtesy Toward Company Property** - Nothing takes money away from the Company (and ultimately your paycheck) faster than the damage, misuse, and theft of Company property.

- **Courtesy Toward Homeowners (Our "Customers' Customers")** - Ted Lansing truck drivers represent not only Ted Lansing, but also our customer each time they deliver to a job site.

## Dress

Dress and personal appearance are important to project a professional image.  The following are recommendations of dress for various areas of the Company. These recommendations should be followed at all times except when special occasions warrant more casual dress (working Saturdays, extremely inclement weather, etc.).

- **Corporate Officers, Branch Managers, Department Heads, Corporate Personnel, Office Personnel and Outside Sales** - Proper business casual (professional) dress. Jeans, sneakers, shorts and beach thongs are not considered proper.

- **Inside Sales** – Neat and clean appearance at all times. Ties are not required for men, but a shirt with a collar should be worn. T-shirts and shorts are not considered proper attire for men or women.

- **Warehouse Personnel, Drivers** – A Company provided uniform (approved TLC shirt w/logo, pants, and TLC hat) only is considered proper attire. Proper safety shoes are also required. All personnel not in proper uniform and safety shoes may be sent home to change.

## Drug Testing

All new associates will be tested prior to the start of their employment and must sign a *Consent and Release for Testing* form indicating they understand and agree to be tested. Employment is contingent upon test results.  An applicant must receive a negative test result to be eligible for hire.

All associates are subject to Random Testing.  Associates, who are involved in a work-related injury or accident, deemed to have been caused by a negligent act may be required to submit to a drug test.  Reasonable suspicion testing may be performed when appropriate.

**This policy is <u>not</u> related to the DOT requirements for random testing of Commercially Licensed Drivers of trucks (CDL).**

Associates with a Commercial Drivers License (CDL) and other Ted Lansing truck drivers are subject to the DOT requirements.

If you test positive for an illegal drug or controlled substance, you will be terminated.

## Electronic Messages

The telephonic voice-mail system and the computer e-mail messaging system are both considered property of the Company. They are designed for conducting Company business and as such they are subject to monitoring by systems administrators and management. Associates should not utilize these resources for personal business. Any downloading or sharing of crude and sexually explicit materials will be subject to disciplinary actions that may include termination.

## Employment Records

Associates should notify immediately the Human Resources Department and their Branch Manager/Department Head of any change in their address, telephone number, marital status and dependents. Your cooperation in updating this information is necessary for the Company to keep accurate records for required reports and taxation.

All employment records are the property of the Company.

## Employment References

The Company limits references on former associates to verification of the following information:

> ➢ JOB TITLE
> ➢ DATE OF EMPLOYMENT
> ➢ DATE OF TERMINATION

## Equal Employment Opportunity Policy (EEOC)

The practice of Ted Lansing Corporation is to consider applicants for employment and all associates for placement, training programs, job assignments, transfers, promotions, compensation, benefits and any other status change without regard to race, color, religion, sex, age, national origin, disability or veteran status. The Company believes the principles of Equal Employment Opportunity are vital aspects of the employment relationship and represent good management practice.

## Inclement Weather

We will try to keep the branches and corporate offices open as much as possible during bad weather. Hourly associates, who are unable to make it to work when the branch is open during inclement weather, will be in a non-pay status unless they choose to use vacation leave. Associates who are on vacation or sick leave on a day when a branch or corporate office is closed due to inclement weather will continue to be charged for vacation or sick leave.

The decision to close a branch or corporate offices will be made by the management or officer of the Company.

## Open Door Policy

We believe that the best way to handle any misunderstanding is to communicate honestly about it as soon as it happens. That is why we have an "open door" policy for bringing associates' concerns to the attention of the people who can best do something about them.

If you have a concern regarding your employment, please talk with your Branch Manager or Department Head. He/she usually is closest to the problem, and is in the best position to assist. However, if the problem cannot be resolved at that level, ask your Branch Manager or Department Head to arrange a meeting with a member of the Executive Committee, and, Chris' door is always open.

## Orientation Period

The orientation period is defined as the first *90 days* of employment. It is a time for both the associate and the employer to get acquainted. During this period, the associate's performance growth and personal qualifications will be appraised to determine how well suited the new associate is for the position. If an associate is found to be deficient, an attempt to correct the condition may be made and the orientation period may be extended. If it is determined anytime during the orientation period or anytime thereafter that an associate is unsuited for the position, and that sufficient improvement, at the sole discretion of the Company, is not probable, the associate shall be discharged. Employment during and after the orientation period is at will.

## Payroll Policies

All associates are paid on a biweekly basis with payday being every other Friday. If the pay date falls on a holiday, the preceding workday will be the payday.

Whenever a new associate is hired, the manager will assist the associate in completing all required state and federal forms. Hourly associates will turn in the hours worked including vacation and sick leave on a biweekly basis. Salaried associates do not need to complete a time sheet unless instructed otherwise. However, they are required to report vacation and sick leave usage.

Associates are paid for hours worked during a two-week payroll cycle. The normal workweek runs from Sunday morning through Saturday evening. The normal work hours are Monday through Friday 8:00 a.m. to 5:00 p.m. with one-hour lunch assigned. Associates are expected to take their assigned lunch hour. A supervisor must approve any changes to this policy. Operating hours may change to accommodate seasonal changes.

**Overtime** - Hourly associates and non-exempt salaried associates receive overtime pay when the hours actually worked in a workweek exceed forty (40) hours. Vacation hours, sick leave hours, and holiday hours do not count towards the 40 hours actually worked.

**Payroll Withholding** - Any deductions from your paycheck are itemized on the stub. These deductions include, but are not limited to, the following:

- *mandatory* deductions such as Federal, State and Local Taxes including Social Security Taxes

- *optional* (requested by you) deductions such as Medical Insurance, Life Insurance, 401(k) contributions, Flexible Spending Accounts, Charitable Contributions, etc.

**Garnishments or Liens** - When a garnishment or lien is served on the Company, the Company is **required** to comply until the order is satisfied or superseded.

**Direct Deposit** - Direct deposit is an optional benefit available to all associates. If you are interested in this service, please complete the appropriate enrollment form.

## Performance/Development Reviews

Generally, performance/development reviews will occur annually in April for those associates who have been employed with the Company for more than 12 months. A review may result in a salary adjustment, and is in no way considered a guarantee of continuous employment.

## Resignations

The Company recognizes that for various reasons associates may choose to terminate their employment. The Company asks that an associate submit a proper notice of at least two-weeks before a resignation. All Company property: keys, automobile, samples, uniforms, telephone card, etc., must be returned prior to departure.

## Safety and Health

Ted Lansing Corporation strives to provide a safe work environment for all associates. In order to ensure a timely response in correcting hazardous conditions, the following procedures should be followed.

1.  If a hazardous condition is recognized, the associate should immediately inform his or her supervisor or department head.

2.  All accidents and injuries, no matter how minor, should be reported to the supervisor or department head immediately.

3.  All information relating to accidents or injuries should be given to the supervisor or department head. If documentation is required, all information should be complete and as accurate as possible. Report forms are available on the tlcassociates.net website.

While all accidents and injuries are not preventable, most can be avoided by being aware of the hazards associated with your job duties. Each associate has a personal responsibility in performing his or her job duties in the safest manner possible. If a task cannot be performed safely, the associate should notify his or her supervisor or department head prior to beginning work.

If associates have questions concerning safety and health, they should Contact the Corporate Safety & Compliance Manager.

Company Safety Rules: All company safety rules must be obeyed as follows:

*   Report all unsafe conditions or hazards to your immediate supervisor
*   Promptly report all accidents and/or injuries to your immediate supervisor
*   Use eye and face protection where there is danger from flying objects & particles
*   Never operate or repair machinery or equipment if you are not qualified to do so
*   Be alert and keep clear of overhead loads. Stay clear of forklift trucks handling loads
*   Practice good housekeeping at all times
*   Horseplay will not be tolerated
*   The use of or being under the influence of intoxicating beverages or drugs while on the job is prohibited

- Do not drive a Company vehicle unless authorized to do so.
- Do not operate a forklift unless trained and certified to do so.

Additional safety rules pertaining to your specific job tasks may have been implemented. Your immediate supervisor will explain these.

## Sexual Harassment

It is illegal and against the policies of this Company for any associate, male or female, to sexually harass another associate, vendor, customer or anyone we contact in the business environment. Un-welcomed sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature can constitute sexual harassment. Such activity is inappropriate and will not be tolerated. Any associate who believes he or she has been the victim of sexual harassment should report the incident immediately to his or her supervisor and/or the Human Resources Manager in the corporate office.

Management will treat complaints of harassment confidentially, perform any necessary investigation, and take appropriate action to stop any prohibited conduct.

***Any supervisor, agent or associate found in violation of this policy is subject to disciplinary action up to and including termination.***

## Smoking Policy

Ted Lansing Corporation provides a smoke-free workplace. Smoking by associates in the showroom, offices, and warehouse is not permitted. Smoking is strongly discouraged in all Company vehicles. Associates who do smoke should do so at the designated smoking areas located at all branches and corporate offices.

## Soliciting

Distribution of any literature, pamphlets, or other materials by associates during working time or in working areas on behalf of any individuals, organization, business, club or society is prohibited. Working time includes that of both the associate soliciting and the one being solicited. Please notify your supervisor of any violation of this policy. Solicitation and/or distribution by a non-associate is prohibited anywhere on Ted Lansing Corporation property.

## Substance Abuse

The purpose of this policy is to:

- Maintain a safe, healthy working environment for all associates.
- Ensure the reputation of the company and its associates within the community and industry-at-large.
- Reduce the number of injuries to people and property.
- Reduce absenteeism and tardiness and to improve productivity.
- Provide rehabilitation assistance.

When your use of alcohol, drugs or other substances affects your job performance, safety, or the safety of others, the Company has a justifiable concern. Job performance includes maintaining a favorable image of the Company in the community.

Ted Lansing Corporation prohibits the possession, sale or use of alcohol on Company premises at any time, day or night, or while in the commission of the Company's business. The Company also prohibits the consumption of alcohol during any work shift break, including lunch. Excessive drinking at any social function where you are a Company representative is unacceptable. Reporting to work while under the influence of alcohol is prohibited.

The unauthorized possession or sale of a dangerous drug is against the law. Therefore, the Company prohibits an associate's possession, sale or use of any illegal drug on Company property or while in the commission of the Company's business. Reporting to work while under the influence of drugs also is prohibited.

Any associate whose off-duty abuse of alcohol or drugs results in excessive absenteeism or tardiness, or is the cause of an accident or poor job performance, will be subject to disciplinary action up to and including discharge.

Failure to abide by the above-stated alcohol and drug policies will result in disciplinary action, which may include immediate discharge.

Prior to employment, all associates must sign a Certification of Receipt of Substance Abuse Policy and receive a negative result on the pre-employment drug test.

## Uniform Deposit

If an associate is required to wear a company uniform, a uniform deposit of $50 will be withheld from an associate's first full paycheck. The deposit will be refunded to the associate at the end of their employment upon the return of the uniforms.

# RULES AND REGULATIONS

At Ted Lansing Corporation, as in any organization, rules and regulations are necessary to ensure the organization functions in a smooth and effective manner.  As a general rule, an associate's act or omission that may result in harm to the Company or its associates, may subject the offender to disciplinary action including, but not limited to, immediate dismissal.

The following is a list of conduct that may subject an associate to disciplinary action.  This list is not all-inclusive, but cites some of the behaviors that violate the general rule stated above.

1. Misrepresentation  or  omission  of  facts  when  applying  for  employment,  or falsification of employment, security or medical records.

2. Punching the time card of another associate or allowing someone else to punch or falsify your time card or record, or falsifying a time card or record in any way.

3. Making or permitting to be made a false or untrue record, such as computer records, purchase orders, hand tickets, pick tickets, cash receipts or other Company records relating to materials or work.

4. Defacing, damaging or destroying property belonging to the Company or of another associate.

5. Interfering  with,  obstructing,  or  otherwise  hindering  production  or  work performance.

6. Causing a disturbance by running, yelling, playing practical jokes, horseplay, throwing things, or harassing associates or customers in any manner.

7. Assisting any person to gain unauthorized entrance to or exit from any portion of the Company's premises.

8. Fighting or causing bodily injury to another person including all other forms of disorderly conduct.

9. Immoral or indecent conduct at the workplace or while in the commission of Company business.

10. Leaving your work area without permission, loitering or sleeping during working hours.

11. Careless or inefficient performance of duties including failure to follow established procedures.

12. Refusal to accept or follow orders or directions from proper authority, or any other form of insubordination.

13. Reporting to work under the influence of intoxicants or narcotics. (See *Substance Abuse policy*)

14. Selling on Company premises at any time without prior management approval; soliciting on Company premises during work time or distributing literature during work time or in working areas. (See *No Soliciting Policy*)

15. Failure to comply with safety or health rules, instructions or practices.

16. Operating or using any piece of equipment or property without authorization.

17. Repeated tardiness or absence; failure to advise supervisors before scheduled reporting time of reason for absence; failure to report for work without satisfactory reason.

18. Theft, pilferage or unauthorized removal of property belonging to the Company or others.

19. Bringing to work, possessing or using dangerous items, including weapons, while on Company premises.

20. Conviction of a crime while a Company associate.

21. Posting documents of any nature on bulletin boards on Company premises without prior management approval.

22. Discussing compensation with coworkers.

# BENEFITS

Ted Lansing Corporation offers its associates a very competitive benefit packet. Please contact the Human Resources Department with any questions regarding benefits.

## Associates: Full-Time

An associate is considered full-time with Ted Lansing Corporation when they work a minimum of 32 hours per week on a regular basis (temporary help excluded).

For the purpose of determining your benefits (especially those benefits affected by the number of years of service), your full-time continuous service is computed as of the anniversary date of your employment.

A full-time associate, who leaves the employ of the Company, and is rehired by the Company within one year of the date of termination, the company provided benefits (with management approval) will be reinstated immediately based on your previous length of service accumulation rate.

## Associates: Part-Time

An associate is considered a part-time associate, when they are hired by the company, not a temporary employment agency, and work less than 32 hours per week on a regular basis. Part-time associates are not eligible for most company benefits. A part-time associate may be eligible for participation in the 401(k) plan.

If you are a part-time or temporary Ted Lansing Corporation associate who later becomes full-time, for the purpose of computing your eligibility for company benefits, you receive credit for one month of continuous service for every three months of part-time or temporary employment. If you work for the Company part-time while going to school, you are eligible for this benefit as long as you become a fulltime associate within six months of completing your education.

This does not apply to temporary associates hired from temporary agencies.

## Credit Union

All full-time associates and family members are eligible to join the Credit Union offered by Ted Lansing Corporation. The Credit Union is not a company program and being a TLC associate does not automatically make you a member of the Credit Union.

## Flexible Spending Accounts and Premium Conversion

This plan, known as a Section 125 Cafeteria Plan, is offered to all full-time associates. Participation in the Flexible Spending Accounts (FSA) and Premium Conversion allows associates to pay for their out-of-pocket medical and dependent care expenses and the medical insurance premium with pre-tax dollars.

FSA programs operate under the guidance of the Internal Revenue Service. Contributions to the FSA are limited and some restrictions apply.

## Holidays

Full-time associates are eligible for holiday pay during their tenure on all holidays recognized by the Company. In order to receive holiday pay, you must work the business day **before** and **after** a paid holiday. If you are absent due to illness on the business day before or after a holiday, your illness must be verified by a doctor's report in order to receive holiday pay. If you plan to take vacation during a holiday, you **must** receive approval, by your supervisor, prior to taking the time off. Without advance approval, you will not receive holiday pay.

If your employment is terminated for any reason, you are not eligible to receive holiday pay for holidays remaining in the year.

### Ted Lansing Corporation's Holiday Schedule

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Easter Sunday | Day After Thanksgiving |
| Memorial Day | Christmas Eve |
| Independence Day | Christmas Day |
| Labor Day | Your Birthday* |

Occasionally, designated holidays fall on the weekend. If a designated holiday falls on the weekend, Ted Lansing Corporation will remain open on Friday and Monday. You will be given either Friday or Monday off in coordination with your coworkers. Your supervisor will determine which day is assigned. (*exception for Utah locations)

## Insurance

Ted Lansing Corporation offers all eligible, full-time associates one of the finest employee benefits package. Benefits commence on the first day of the month following 30 days of continuous employment. Additional eligibility periods may apply to certain benefits and are therefore noted accordingly. The following is a list of our current benefits:

**Medical and Dental** - TLC offers a plan designed to cover both in-network and out-of-network providers and co-pays. Associates pay a small portion of the premium via payroll deductions with the company paying a majority of the cost. Enrollment forms must be completed and returned to Human Resources within thirty days of your eligibility date. Forms received after that time will be denied coverage.

**Group Life Insurance -** Ted Lansing Corporation provides life insurance, at no cost to the associate, at a rate of 100% of your Annual Base Salary* to a maximum of $50,000.
(*Annual base salary does not include overtime, bonuses or commissions)

**Long-Term Disability** - Long Term Disability is available to all active full-time associates who have been employed with the Company for at least one year. Associates are automatically enrolled in the program at no cost to them.

**Employee Assistance Program (EAP)** - Ted Lansing Corporation provides a free, confidential counseling service for associates and their family members on a wide range of personal problems such as financial, marital, and job-related problems. Contact the Human Resources Department or your supervisor for information.

**Supplement Insurance** - Company makes available through a leading insurance carrier optional insurance coverage, such as Short Term Disability, Accident, Cancer, Life, through payroll deduction.

**Travel Accident Insurance** – The Company provides travel accident insurance for all associates when traveling on Ted Lansing Corporation business.

## Jury Duty

If you are called for jury duty, Ted Lansing Corporation will pay the difference between the compensation you receive from the court and your regular full daily wages, for the <u>first three days</u> of jury duty. If your jury duty extends beyond three days, the Company may continue your compensation, depending on the circumstances. You should notify your supervisor as soon as you receive notice that you are to serve on a jury. You are expected to return to work as soon as your jury duty is completed.

## Military Leave

Associates who serve in the U.S. Armed Forces for periods of more than ten (10) working days (call-up in active duty, draft, etc.) will be placed on military leave.  Upon their return, they will be reinstated to a position of like seniority, status and pay under the following conditions:

1. The position held prior to entry into military service was not temporary and still exists.
2. The associate went directly into military service.
3.  The associate must have been honorably released and have a Certificate of Satisfactory Completion of military service.
4. The associate returns to work immediately after a release from military service.
5. The associate must be able to perform the duties of the former position.
6. The service with the Armed Forces does not exceed four years, or five years if the fifth year is at the request of and for the convenience of the federal government.


## National Guard or Reserve

Associates participating in two-week military reserve or guard summer camp training are not considered to be on unpaid military leave, but shall receive the difference between their regular base rate and their military pay (maximum of two weeks or ten working days per year).  Commission due to sales personnel will be on a pro-rata basis.


## Retirement:  401(k) PLAN

In 1987, Ted Lansing Corporation implemented a "401(k)" Plan.  The IRS-approved program enables qualified Company associates to save money for their retirement in a manner that features tax advantages even greater than those offered by individual retirement accounts.  The convenience of automatic payroll deductions, as well as loan provisions, makes this program even more attractive.

In order to qualify for participation in the Plan, you must be at least 21 years of age and have at least six months of service with the Company at the time of the enrollment periods. Once these requirements are met, you may elect, between 1% and 15% of your base salary, to be invested in the investment programs of your choice within the plan. Contribution levels may change based on laws and regulations.  Currently, the Company match program is 50% of the associates' contribution.  Participants are fully vested after three years of employment.

## Smoking Cessation Award

Any associate who is currently a "regular" smoker and who quits smoking completely for six months is eligible to receive a $250 Smoking Cessation Award. This award is given in the form of a cash payment and is given only once.  The award is not available to associates who presently are non-smokers.

## Tuition Reimbursement

The Company's Tuition Reimbursement Program can help share the cost of tuition and books should you decide to further your education through college courses, technical training programs, or to obtain an undergraduate or graduate degree.

In order to receive tuition reimbursement, you must be a full-time associate and completed at least six months of continuous employment.  The courses or degree program should have a direct relation to your position with the Company.  Approval by upper management must be received in advance of registration to be considered.  A grade of C or higher qualify for reimbursement.  Grades of D, F, or Incomplete are not eligible.  The following is the reimbursement structure per semester:

> 100% - First course
> 50% - Second course
> 25% - Third course
> 0% - Additional courses
>
> 50% - Dale Carnegie course

## Workers' Compensation Leave

All associates, who incur injuries as a result of work-related accidents, are subject to coverage by the provisions of the Workers' Compensation Act.  Benefits are provided through Company-paid worker's compensation insurance and may include lost time pay as well as related medical expenses. Associates must report all on-the-job injuries to their supervisors immediately.

# COBRA

The Consolidated Omnibus Budget Reconciliation Act (COBRA) is a federal law that enables associates and dependents to continue their group medical coverage after leaving the Company. COBRA was enacted to ensure that associates and their dependents do not lose their health insurance when workers lose their jobs. COBRA requires group health insurance policies to permit group members to continue their insurance after they leave the group for up to 18, 29 or 36 months, depending on the circumstances:

**18 Months**

- Voluntary resignation or retirement
- Involuntary termination (except for gross misconduct)
- Reduction in hours or Economic layoff

**29 Months**

- Associates and dependents who are disabled or become disabled (as determined by the Social Security Administration) within the first 60 days of COBRA coverage.

**36 Months**

- Associate's death
- Divorce or legal separation
- Entitlement to Medicare
- Child ceasing to be a "dependent child"

**Cost of Coverage**

COBRA allows employers to charge a premium equal to 102% of the cost of the plan. The extra 2% is for administrative costs. Participants are responsible for timely payments of premiums as determined by the insurance carrier and are subject to change.

**Early Termination of Coverage**

COBRA allows employers to stop coverage before the 18, 29 or 36-month period if:

- The employer abolishes all health plans for all associates.
- The beneficiary does not pay the premium on time.
- The beneficiary becomes insured under another group health plan or Medicare.

# LEAVE POLICY

## Sick Leave

Sick leave should be used when an associate is sick, has medical/dental appointments, and unable to come to work or to care for a sick spouse, child, or other family member. Taking sick leave under false pretenses is a violation of trust that is subject to disciplinary action including dismissal.

Hourly and Salary Non-Exempt associates may use their Sick leave for administrative use such as funerals, school appointments, legal/court appointments, or other official business that cannot be completed during after work hours. This administrative use does not apply to Salary Exempt associates.

The associate must notify his/her supervisor *immediately* on the initial day of absence and each day thereafter for the absence to be paid under this policy. If an associate is out for 3 or more days, the associate must provide a doctor's certification of illness. However, a supervisor may request a doctor's certification at any time. Sick leave cannot be used in conjunction with vacations and holidays unless the associate has a doctor's certification of illness. If an associate takes sick leave before or after a holiday or vacation and produces no doctor's certification, the holiday and vacation leave will be unpaid. Sick leave may be used in a minimum of one-hour increments. The amount of time the associate is absent is rounded up to the nearest hour.

Associates must submit a ***Request for Payment of Sick/Administrative Leave*** to his/her supervisor upon returning from leave. If a form is not submitted and approved, the leave will be unpaid. Associates are not paid for unused sick leave at termination.

The annual Sick Leave period is from January 1st through December 31st of each year. Unused sick leave is not carried over from year to year. During the 90-day orientation period associates are not entitled to utilize sick leave. Any exceptions require supervisory approval. The following is the sick leave based on employment classification:

**Hourly Associates** - regular full-time hourly associates, who have satisfied a 90-day orientation period, will receive up to 40 hours of Sick Leave. This leave is prorated based on the date of hire as outlined in the chart below. Sick leave is paid at 75% of the normal wage rate when utilized. Any unused sick leave remaining at the end of a calendar year is paid at 100% of the normal wage rate.

| Date of Hire | Number of Sick Leave Hours |
|---|---|
| January – March | 40 |
| April – June | 30 |
| July – September | 20 |
| October and November | 10 |
| December | 0 |

**Salaried Non-Exempt Associates** – regular full-time salaried non-exempt associates will receive up to 40 hours of Sick Leave. This leave is prorated based on the date of hire as outlined in the chart below. Salaried non-exempt associates are not compensated for unused sick leave at the end of the calendar year.

| Date of Hire | Number of Sick Leave Hours |
|---|---|
| 1st Qtr (January – March) | 40 |
| 2nd Qtr (April – June) | 30 |
| 3rd Qtr (July – September) | 20 |
| 4th Qtr (October – December) | 10 |

**Salaried Exempt Associates** - Salaried exempt associates receive 30 days of sick leave. Associates are not compensated for any unused sick leave at the end of the calendar year.

# Family and Medical Leave Act

Associates who work in areas where there are 50 company associates within a 75 mile radius, who have been employed for at least 12 months, and have worked at least 1,250 hours during the 12 months are generally covered by the federal Family and Medical Leave Act (FMLA). This Act supersedes and replaces the Company's Extended Sick Leave Policy for those associates working in a branch that is covered by the Act. The Act allows eligible associates to take up to twelve workweeks of unpaid leave during any twelve-month period for the following reasons:

- Associates serious health condition
- The birth of a child, or the placement of a child by adoption or foster care
- To care for an immediate family member (spouse, child, or parent) with a serious health condition

Any accrued sick leave or vacation will by applied to this twelve-week period. Employers must maintain all group health benefits currently utilized by the associate during the periods of FMLA leave at the same level and manner as if the associate was reporting to work. The associate is responsible for their portion of any premiums during this time.

*Associates must provide at least thirty days notice when the leave is foreseeable.* If the leave is not foreseeable, then notice must be given as soon as possible. Notice should be addressed to the immediate supervisor and the Corporate Human Resources Manager. In the case of an anticipated extended disability period, such as for maternity leave, you should advise the Company as soon as possible of your expected departure and return dates. The employer may require medical certification of a serious health condition from the associate's attending physician. Periodic medical reports during the period of leave may also be requested.

Upon the associate's return to work from FMLA leave, the associate is entitled to the same or an equivalent job. Associates are not entitled to accrue benefits, such as vacation and sick/administrative leave, during periods of unpaid FMLA leave.

## Extended Sick Leave

Associates who work at a location not covered by the Family and Medical Leave Act (FMLA) may be eligible for leave under the Company's Extended Sick Leave policy. This policy is administered like the Family and Medical Leave Act. If your illness or injury requires more time than your paid sick leave (as in the case of maternity leave or an extended illness), you may be eligible for an unpaid leave of absence of up to eight weeks during any twelve-month period. Any accrued sick leave or vacation will be applied to this leave.

*Associates must provide at least thirty days notice when the leave is foreseeable.* If the leave is not foreseeable, then notice must be given as soon as possible. Notice should be addressed to the immediate supervisor and the Corporate Human Resources Manager. In the case of an anticipated extended disability period, such as for maternity leave, you should advise the Company as soon as possible of your expected departure and return dates. The employer may require medical certification of a serious health condition from the associate's attending physician. Periodic medical reports during the period of leave may also be requested.

An associate whose total extended leave does not exceed eight weeks is guaranteed reemployment in his or her same position without loss of service credits. If an illness or injury requires an absence of more than eight weeks, you may request consideration for additional leave. Additional leave must be approved by Human Resources and your immediate supervisor. Re-employment upon his/her return and continuation of benefits or service credits during the additional leave may not be guaranteed and will depend upon the Company's anticipated employment needs during the extended period.

# Vacation

The vacation year is the period from January 1 through December 31 and is earned on an accrual basis determined by the years of service with the Company.    A written request to utilize vacation leave must be submitted and approved by the immediate supervisor before exercising the leave.    Associates are encouraged to use at least half of their accrued vacation leave during the winter months, which are normally slower business months.    If approved by a supervisor, associates may be advanced vacation hours if adequate hours are not available.  However, should an associate terminate employment before such hours are earned, a deduction will be taken from their final paycheck.

Associates, during their initial year of hire, are allowed to carryover up to 16 hours of accrued vacation leave into the next year.  All regular earned vacation time must be utilized by December 31st or it will be forfeited.  Hourly and salaried non-exempt associates can sell up to one-half of their accrued vacation time during a year.

Associates are paid for any accrued unused vacation time upon termination.

Vacation is accrued based on years of service and calculated based on a bi-weekly basis as indicated in the following chart:

| Years of Service | Days Earned | Hours Earned/ Biweekly |
|---|---|---|
| 0-5yrs | 10 | 3.077 |
| 6 yrs | 11 | 3.385 |
| 7 yrs | 12 | 3.692 |
| 8 yrs | 13 | 4.000 |
| 9 yrs | 14 | 4.308 |
| 10 yrs | 15 | 4.615 |
| 11 yrs | 16 | 4.923 |
| 12 yrs | 17 | 5.231 |
| 13 yrs | 18 | 5.538 |
| 14 yrs | 19 | 5.846 |
| 15+ yrs | 20 | 6.154 |

# Lansing
## BUILDING PRODUCTS

1200 Jeter Ave Unit A • Opelika, AL • 36801 • (334) 705-6471

FACSIMILE    FAX # 804-261-6743

TO:    CINDY WILLIAMS                    REPLY TO OUR FAX
FROM:    AISE CANNON                     (334) 705-6725

DATE:    08-05-2005

PAGES:    7_____ (including this sheet)

Good Morning Cindy,
This is the information that Chris, Mike
and I discussed regarding my job duties.
Thanks, Aise



Good Morning Cindy,

I did what you suggested to me yesterday. I told Chris that I would like it if He, Mike, and I sit down together and go over my responsibilities so I can know what lane I need to drive in. So, I am sending you a copy of the job descriptions that you sent to me with a few revisions that were made by Chris on August 5, 2005. I will make a copy of the front side and the back side of the paper, which has Chris's signature. That way if it changes again next week, I have documentation, and you have documentation that it was discussed previous and signed off on.

According to Chris, everything on this paperwork is my responsibility except that I will no longer be responsible for setting up delivery routes, deciding who goes where, nor will I set up when the deliveries go out or what order they will go out. Chris has given that responsibility to Mike because he said that at most Branches the BOM takes care of that. He also thinks that Mike knows the area better. Also, on July 27, 2005 Chris, Mike, and I had a meeting after work to discuss issues that were going on at the branch. Because of these issues I decided that it was time I set some ground rules to keep down the confusion. But after yesterday, I told Chris that I figured Rule #2 on the Warehouse Syllabus is obsolete now because it is now Mike's call. Chris said that it seems to be working out, and if the guys want to continue to follow that rule it was fine with him, just as long as it continues to work out in the future. My take on it is that I wrote these rules when I thought it was my responsibility to coordinate delivery routes, etc. Since it is not my responsibility anymore, I have told the Warehouse guys that Rule #2 is at Mike's discretion. In other words it may or may not change. So, as I said before I am sending all of this information to you so that if these rules continue to change consistently I have record of it here and at the Corporate office. Now keep in mind that when Mike is not in the office, I take on his responsibilities. But, until then in order to keep mess down and respect everyone's lanes I just want to make sure that I have a guide that I can follow.

Thanks,
Aise – Auburn Branch

*2 windows in
misordered windows* ⓜMike Keel←

←7 ladders and walkboards←

① Aise Cannon
② Mike Haynes
③ Chris Black

## Warehouse Manager
### Reports To: Branch Operations Manager

**Position Summary:**
The primary responsibility of a Ted Lansing Corporation Warehouse Manager is enhancing branch customer service through timely and accurate inventory management. The Warehouse Manager has ultimate responsibility for supervising warehouse personnel, but delegates day to day authority to the Warehouse Supervisor or lead warehouse person.   *Mike does part of this not telling them who goes where; I guess I just tell them what needs to be done in the warehouse.* The following lists the primary duties of the Warehouse Manager, to include any other duties assigned by senior management. *(Branch Manager- Chris Black   BOM - Mike Haynes)*

### Inventory Management Duties and Responsibilities:

1. **Order Management.** Ordering materials in coordination with the Branch Operations Manager. Coordinating the shipping of materials with outside freight companies. Coordinating transfers with other branches. Approving vendor billings and ensuring that the proper paperwork is processed and forwarded to Accounts Payable.

2. **Inventory Management.** Helping determine optimum stocking quantities. Working with other branch personnel to maximize inventory turns.   *Chris, Mike and myself take care of this*   ~~LOW FREQUENCY IS 678-328-1656~~

3. **Computer Maintenance.** Working to ensure the accuracy of the computer inventory counts. Completing hand tickets when necessary.

4. **Cycle Counting.** Directly supervising the branch cycle count program to improve inventory procedures and help maintain the accuracy of computer quantities. Approving inventory adjustments upon determining appropriateness. *(Bo did not complete it on Monday, I told him to ask Steven for assistance but that did not happen; Mike said it was too busy!)*   *Operations*   *Mike will do "it" gets too busy in here after hours*

5. **Physical Inventory.** Preparing for and controlling the conduct of physical inventory. Reviewing variances and resolving discrepancies as necessary.

### Warehouse Duties and Responsibilities:

1. **Personnel Management.** Assist Branch Operations Manager in hiring warehouse personnel and maintaining personnel records. Ultimate responsibility for ensuring that warehouse personnel are achieving warehouse goals.

2. **Expense Management.** Managing the temporary and overtime expense for the branch.

3. **Safety and Security.** Ensuring a friendly, clean, orderly, safe and secure warehouse environment. → need to strap pallets all the way @ the top → need to strap forklifts gas tanks together

Responsibilities → mike will set delivery routes

* Mike is going to start delegating and setting up what goes out where and when it goes out b/c that is the way most Branches handle it. The

✱ My rules will still apply, unless -oes not work out in
the future

Signature : _Avie Cannone_
Branch Manager's Signature: _Chris Black_

---

Lawrenceville, GA
678-328-1655

# WAREHOUSE SYLLABUS:

1. ) First, always use your chain of command when you have a problem:
   a. **Warehouse Manager/ Inside Sales – Aise Cannon – DIRECT SUPERVISOR**
   ~~b. BOM – Mike Haynes~~
   c. Branch Manager – Chris Black

\*\*\* If I cannot solve your problems then you are welcome to by pass me by going to my DIRECT supervisor, Mike Haynes, and vice versa. \*\*\*

\*\*\* If you feel I am being unfair, at least let me know so that I can be aware. **REMEMBER, I AM NOT A MIND READER**. Also, realize that I am your Supervisor and if I ask you to do something that is apart of your MAIN job description it is in my right to do so with no questions asked. \*\*\*

2.) It has come to my attention that I am favoring one Associate over the other. So, in order to avoid any unfairness, starting in the month of August I am going to alternate Main job responsibilities.

**August 1-5 –** Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

**August 8-12 -** Bo will take all out of town deliveries and Steven will take all local deliveries. Steven will conduct cycle count.

**August 15-19** - Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

**August 22-26 -** Bo will take all out of town deliveries and Steven will take all local deliveries. Steven will conduct cycle count.

**August 29-September 2 -** Steven will take all out of town deliveries, and Bo will take all local deliveries. Bo will conduct cycle count.

\*\*\* The only time this will change is if one of you is off, if it will interfere with your assigned time to get off, and, or if you need help when delivering big products. \*\*\*

\*\*\* On the days that you have local deliveries you will be the one responsible to make sure that you and I conduct cycle count together. \*\*\*

3.) Whatever you take down put back up in the rack.

**4.) <u>NO MORE OVERTIME, REGARDLESS OF ANY FAVORS THAT NEED TO BE DONE!!!!!!!!!!!</u>**

\*\*\* When I ask you to clock out, please clock out. If you do not clock out at your assigned time, (8 hours from when you come in), I will clock you out myself. \*\*\*

6.) I will give you a list of things to do in the warehouse at least once a week. Try as much as possible to work as a team so that we can get the job done, and, also try to limit the amount of complaints about who is doing more then the other. But also remember that the Warehouse Associate's job is to keep the warehouse in order!!!!!

\*\*\* Remember, I understand it gets hectic sometimes, and because we are humans we may not complete everything in a day. You are allowed to take breaks. But, monitor your time, pace yourself. If something needs to be done in the warehouse get it done before you start watching television. \*\*\*

**\*\*\* LEARN TO DIRECT YOUR PROBLEMS TO THE PERSON THAT YOU ARE HAVING THE PROBLEM WITH BECAUSE THAT IS WHERE THE TENSION AND RESENTMENT IS COMING FROM. \*\*\***

\*\*\* To be as **TACTFUL** as possible, I, Aise Cannon am your direct Supervisor, not Mike or Chris, and I do deserve and expect a level of respect, and in turn I will respect you. Please, when I ask you to do something I expect it to get done without the murmurings and complaining. **If it is illegal I will not ask you to do it!!!!!** \*\*\*

\*\*\* I do appreciate you guys for the great job that you are doing!!!!!!! To conclude we are a team, but each member on the team is not equal. Remember, each one of us applied to our particular position for whatever reason, and we need to learn to deal with the responsibilities that come along with our position. If you are not mature enough to deal with your responsibilities like men, and/ or women, you need to reconsider your future. That goes with anything in life. Life is a challenge, and everyday you should tackle each challenge with an aggressive and positive attitude. If not, you are doing yourself and your customers a disservice because wherever you go you will be miserable. \*\*\*

# Thanks,
# Aise Cannon

[handwritten top annotations]
*← ladder and walkboards ←→* *→ misordered windows* *
← Mike Keel →
① Nice Cannon
② Mike Haynes
③ Chris Black

## Warehouse Manager
### Reports To: Branch Operations Manager

**Position Summary:**

The primary responsibility of a Ted Lansing Corporation Warehouse Manager is enhancing branch customer service through timely and accurate inventory management. The Warehouse Manager has ultimate responsibility for supervising warehouse personnel, but delegates day to day authority to the Warehouse Supervisor or lead warehouse person. *Mike does part of this now, telling them who goes where, I guess I just tell them what needs to be done in the warehouse.* The following lists the primary duties of the Warehouse Manager, to include any other duties assigned by senior management. *(Branch Manager - Chris Black    BOM - Mike Haynes)*

### Inventory Management Duties and Responsibilities:

1. **Order Management.** Ordering materials in coordination with the Branch Operations Manager. Coordinating the shipping of materials with outside freight companies. Coordinating transfers with other branches. Approving vendor billings and ensuring that the proper paperwork is processed and forwarded to Accounts Payable.

   *Chris, Mike and myself will take care of this*

2. **Inventory Management.** Helping determine optimum stocking quantities. Working with other branch personnel to maximize inventory turns.

   *Lowrenceville, GA 678-828-1655*

3. **Computer Maintenance.** Working to ensure the accuracy of the computer inventory counts. Completing hand tickets when necessary.

   *Mike will do it if it "gets too busy" in here after hours*

4. **Cycle Counting.** Directly supervising the branch cycle count program to improve inventory procedures and help maintain the accuracy of computer quantities. Approving inventory adjustments upon determining appropriateness. *(Bo did not complete it on Monday. I told him to ask Steven for assistance but that did not happen; Mike said it was too busy.)*

   *operations*

5. **Physical Inventory.** Preparing for and controlling the conduct of physical inventory. Reviewing variances and resolving discrepancies as necessary.

### Warehouse Duties and Responsibilities:

1. **Personnel Management.** Assist Branch Operations Manager in hiring warehouse personnel and maintaining personnel records. Ultimate responsibility for ensuring that warehouse personnel are achieving warehouse goals.

2. **Expense Management.** Managing the temporary and overtime expense for the branch.

3. **Safety and Security.** Ensuring a friendly, clean, orderly, safe and secure warehouse environment. → *need to strap pallets all the way @ the top* → *need to strap forklifts gas tanks together*

[handwritten bottom annotations]
*Responsibilities → mike will set delivery routes*
*Mike is going to start delegating and setting up what goes out where and when it goes out b/c that is the way most Branches handle it. The BOM takes care of it @ most Branches*

1

June 12, 2006

Ms. Aise M. Cannon
P. O. Box 1831
Opelika, Alabama  36803

Mr. Chris Lansing
8501 Sanford Road
Richmond, Virginia  23228

Sir:

According to Lansing Building Product's Mission Statement on page two (2) of The Ted
Lansing Corporation's Associate's Handbook: Code of Ethics—Courtesy, page seven (7);
Dress, page eight  (8); Equal Employment Opportunity Policy (EEOC), page nine (9);
Open Door Policy, page ten (10); and the  Federal Equal Employment Opportunity Policy
(EEOC) which states:

## Discrimination by Type:  RACE

### Title VII protections include: Harassment/Hostile Work Environment

Title VII prohibits offensive conduct, such as racial or ethnic slurs, racial "jokes,"
derogatory comments, or other verbal or physical conducts based on an individual's
race/color.  The conduct has to be unwelcome and offensive, and has to be severe or
pervasive.  Employers are required to take appropriate steps to prevent and correct
unlawful harassment.  Title VII also prohibits employment decisions based on stereotypes
and assumptions about abilities, traits, or the performance of individuals of certain racial
groups.

## Discrimination by Type:  Retaliation

An employer may not fire, demote, harass or otherwise "Retaliate" against an
individual for filing a charge of discrimination, participating in a discriminatory
proceeding, or otherwise opposing discrimination.  The same laws that prohibit
discrimination based on race, color, sex, religion, national origin, age, and disability, as
well as wage differences between men and women performing substantially equal work,
also prohibit retaliation against individuals who oppose unlawful discrimination or
participate in an employment discrimination proceeding.  One term used to describe
retaliation is Adverse Action—an action taken to try to keep someone from opposing a
discriminatory practice, or from participating in an employment proceeding.  Examples
include employment actions such as termination, refusal to hire, and denial of promotion.
Also, other actions affecting employment such as threats, unjustified negative
evaluations, unjustified negative references, or increased surveillance.

Now, I will mention a "few of the incidents that happened to me during my employment
with your company.

When I started with the company, I was told that Lansing Building Products encouraged promotions from within. Just knowing this gave me enthusiasm and motivation to learn the business well so that when the opportunity became available for me to advance, I would qualify. I performed my duties well. The disappointing reality was that no matter what I did, Chris Black made it perfectly clear that I would not advance as long as he was over me.

**In May 2005**, I found out that Tom Cleveland was resigning from his position as the Branch Operations Manager. I just knew that this would be an opportunity to at least apply for the position. I knew that I was doing a great job. After all, I had not been confronted with any complaints nor write-ups. This was not the case according to Chris. Chris hired one of his acquaintances, Michael Haynes, a Citizens Hardware ex-employee. I was shocked. Mike was hired before I knew about it.

**On May 31, 2005**, I called Nikki Adams to explain to her how I felt when I discovered I was overlooked for the position. Nikki told me that she really could not advise me, but to call Cindy Williams, the Human Resources Manager, and she would be able to advise me on what I should do. I called Cindy, and she told me to talk to Chris and explain to him how I felt, and I did. At about 8:45 a.m., I went into Chris' office to discuss why I was not considered for the position of Branch Operations Manager. Chris told me even before he was hired, someone at the Ted Lansing Corporation wanted to hire Mike for more than a year ago because of his experience in the building industry and because he had far better product knowledge, (than whom?). I was thinking, if they were expecting to hire him this long, why not hire him for the Warehouse Manager/Inside Sales Associate before they hired me. In this way, the position of Branch Operations Manager would rightfully belong to him. Also, I was never given a chance for the position because the company already knew who they wanted to hire a year before the position became available. Anyway, Chris proceeded to say, "to be perfectly honest with you, Mike has better customer service skills than you do, and customers would rather deal with him." So, my next thought was that if my customer service skills were that bad for seven (7) months, why didn't my Branch Manager tell me, or tell my direct supervisor, Tom? According to the handbook, "We believe that the best way to handle any misunderstanding is to communicate honestly about it as soon as it happens." I think this would have been the proper way of handling things. Chris stated, "I have been meaning to discuss this with you. Customers think you are a hard a--, and you do not joke around with them. They say your customer service skills are bad and every time they order something, you have to ask Tom, and you never get back to them in a timely manner." I asked who the customers were. He responded by saying he could not tell me because of confidentiality. He continued to say, "and, Aise you know we are dealing with "RED NECKS" (my definition--white southern males) and you should know how they are. This is why Mike is in the position because he has better customer service skills, and if you were in that position, they, "the RED NECKS" would look at me like I was crazy." I asked myself the question, "am I really hearing this kind of stuff in the 21st Century? Chris went on to say, "Aise, you are a better warehouse manager because you are better at the paperwork, organizational, and operational end of the warehouse. As I searched for another definition of "RED NECKS," the American Heritage Dictionary defines the

phrase as a white person regarded as having a provincial, conservative, often bigoted attitude. I felt many emotions. I really cannot describe them. First of all, Chris did not feel the need to tell me about disgruntled customers complaining about my customer service skills, and secondly, it was insinuated that since I cannot appease "Red Necks" I cannot now nor ever advance in this company. Most of all, I felt like a "Chosen Token, used to fill a position, just to say Ted Lansing has filled two quotas—a black and a female. To add more flavor, "the first black female ever in the history of the company to hold a warehouse managerial position. Later that morning, I called Nikki back to tell her a little about the meeting, and she told me that she asked Tom if he thought I would get the promotion to the Branch Operation Manager's position, and he told her "no" because he did not think Chris would give the position to me. The disrespect, harassment increased from this date and until my termination.

**On July 26, 2005,** I saw Steven go into Chris' office and close the door. They were in the office together for a long time. While they were in Chris's office the Atrium window truck came. Mike offloaded the windows, while I checked the windows off. When Chris came out of the office, he said something about me having to pick up a window. I said to myself, "what is that all about?" He has never said anything to me about picking up a window before.

**On July 27, 2005,** Chris called a meeting, after work, with Mike and I, to discuss some issues at the branch. He said, "I've noticed tasks in the warehouse were not being divided up fairly between the guys, and the guys resent you, (Aise) for it because they think you are choosing favorites. I prefer the guys do everything together in the warehouse, so it will not cause discord. Aise, you have some dissatisfied customers with you. I have received six (6) separate complaints about you this month. This could be attributed to your poor product knowledge. You are very dry." Now, Mike takes his shot, by saying, "when you are on the phone, you leave a lot of empty space instead of more "small talk with the customer." Chris again, "I could not have put it better." Chris brought up overtime because Rick Johnson said earlier in the year, since the branch was so small, we should not be allowing so much overtime. **On October 14, 2004,** Steven had brought back some returns at the close of business. I told him to leave the returns until the next day because I was told to keep a close eye on overtime, by Elliott. Steven told me Chris told him to stay and put them up. I told Steven to clock out and I would tell Chris that I told him to do it. I told Chris, and he asked me why I told Steven to leave when he specifically told Steven to put the returns in the rack. On this date, I tried to deal with the overtime, but Chris took that responsibility away from me and said, "if something needs to be done in the warehouse or an order needs to go out to a customer, it will go out regardless of overtime." But now, all of a sudden, he and Mike are telling me to monitor overtime. Chris said, "if Bo and Steven do not clock out, I will start clocking them out." I said, "not a problem because that was what I was initially told to do." Chris said, "when both guys are out, you are directly responsible for having things put where they belong." He was happy that I helped Steven on Friday in the warehouse. Basically, Chris wants me to be a warehouse associate, not a manager. He wants me to stay in the warehouse all day and do what Bo and Steven should be doing. But, if Steven would stay out of the showroom long enough, he would be able to do what he was told. It was no

4

problem when I told Bo to do something, just when I told Steven to do something. Steven was a very lazy person, and was always complaining to his cousin, Chris. Bo did most of the warehouse work, plus he was the driver as well.

**On July 28, 2005**, I talked to Steven and Bo regarding what Chris, Mike and I talked about on July 27, 2005. I told them that Chris seemingly to think there was resentment. I discussed the chain of command because I did not like the fact that Steven bypassed me to complain about me without even letting me know that he had a problem with me. I was very upset with Chris because he should have asked Steven if he had talked to me about what was bothering him first. This would have given me an opportunity to deal with whatever problems he addressed with Chris. I told both Bo and Steven if either had a problem with me to let me know. If it is something I can change, I will. If not, we will take it to the next level. I believe in going to the source. I didn't feel, neither do I feel intimidated by either of the four men I worked with. I know who I am and I am very proud of whom I am. When I had something to tell Chris, Mike, Steven, Bo, and Derek, I went to them to tell them. I didn't sneak behind their back. Steven said, "I feel that you basically put all the work on me. Like when Bo is out on deliveries, you make me do more stuff in the warehouse." I told Steven, "you are only doing what you were hired to do. I will not apologize for that." I made a list of warehouse rules and gave them to each of them. A copy is enclosed, (ATTACHED). I alternated responsibilities for Bo and Steven. One week, Steven was the driver and Bo remained in the warehouse; the next week, Bo was the driver and Steven remained in the warehouse.

After the meeting, Mike tells Bo and Steven that Chris wanted to talk with them in his office, without my presence, of course. When they finished with the meeting, I was told that Chris told them I did not use tact with them and that he was keeping a file on me, and it was locked up in his file cabinet drawer attached to his desk. He told them that he was afraid to fire me because I might file a discrimination suit. Chris should not have been discussing me with these men. I do not discuss Chris with Mike. This is what caused the tension. This caused me not to be respected.

**On August 2, 2005**, Terry Washington, (a black man) came to the branch. I was filing papers in the filing cabinet. I asked him if I could help him. He said, "yes, I need to get some siding to match this panel." Mike yells out of Chris' office and said, "he wants HC wicker." Mr. Washington started mumbling about how they treated him yesterday when he walked in. I asked him if he wanted some samples, and I explained to him how the pricing works so I could see if he wanted to fill out an application for an account. He said, "thank you. They didn't ask me that yesterday when I came in. I would have bought my material on Monday, but they treated me like I was a thief." I keyed his order, and he paid and left.

**On August 4, 2005**, I e-mailed Cindy Williams so she could let me know what my job responsibilities were because sometimes what I thought was supposed to be my responsibility turned out to be what Chris said was Mike's responsibilities—this really confused me. I felt we were overlapping, and that caused communication problems. She suggested that I talk with Mike and Chris to discuss what my responsibilities were.

**On August 5, 2005,** I faxed a letter to Cindy Williams about what Chris, Mike and I discussed regarding my responsibilities. Chris signed the responsibility sheet. I told Cindy the reason I was sending her a copy because if the rules changed again the next week, I would have documentation, and she would have documentation that it was discussed. Also, On August 5, 2005, Steven drops Vinyl Master's material off in one spot because Mike told him to. Tom called and complained about it. I told Mike and Chris. There was no apology about it, nor correction. If I would have given Steven the wrong information that would have been a branch meeting topic, where only I would have been the subject.

**On August 8, 2005,** Steven did not show up for work. I was told later by Bo. He did not call me to let me know that he was not coming. Chris knew because they are cousins and roommates. Chris told Mike when he came in. Bo told me that Mike told him that Steven was sick, and was not coming to work. Why wasn't I told? Then Steven came in and left again without telling me.

**On August 16, 2005,** David Freeman brought back quite a few returns about 4:21 p.m. I was about to write up the returns so that I could make sure they were back in the rack before the close of the business day. Today, Chris and Mike told me not to worry about the returns. It was said by both of them, "we will take care of them tomorrow." Normally this is a big issue. But today, they did not want to affect quota because we were under our quota.

**On October 26, 2005,** Chris will still be interviewing probably for another two weeks for a new warehouse associate. While he was interviewing, it was just Willie and I doing the work in the warehouse. This was not a problem because I didn't mind. While I was helping Willie in the warehouse, Willie told me that Chris came in and told him that those returns that came in yesterday would just set there because Aise was supposed to put them up. I am a manager. Chris is a manager. Why didn't he come and tell me himself, instead of telling Willie to tell me. Better yet, why didn't Chris go out and get sales? Why did he just sit around and harass me all day? After all, he needed to do his job—go and get new sales. Chris is the troublemaker. He really wanted to get rid of me, but he could not say I didn't do my job. Now, he was trying to browbeat me enough so I would voluntarily quit.

**On November 7, 2005,** Chris told Mike and I to talk with the interviewer so that we could get a feel for the person. A returning interviewee, Derek Ellis, came back upon Chris' request for a second interview. Chris told Mike to go in and talk to the young man. Chris did not have the decency to allow me the opportunity to meet with Derek to see if I thought he would want to work under my supervision. Derek started the next week. A few weeks after he was hired, Derek often asked me, "when are you going to quit Aise?" This is speculation: Derek was hired for my job, but, after Derek came, he didn't work out the way Chris anticipated.

**On November, 2005,** one of our customers, Metal Roofing wanted to return 66 cartons of nailite and get the royal shake instead of the nailite. Mike and Chris did not want to key the return the same day Willie picked it up because it would mess up quota. They told me to wait until we had a good day to return the material. So, the nailite set on the warehouse floor until December 19, 2005, because that was a day when we met our quota, and the same customer ordered 36 cartons of royal shake. It came in December 5, 2005. We shipped the material and sent it out to the customer on December 19, 2005. The return was done on that same day because we met our quota.

**On February 7, 2006,** Mike was having an issue with his home. He was pretty upset and anxious during most of the day. He came up to me and I guess to ease his mind, he whispered in my ear, "Aise, I need to tell you something. I don't want to say it out loud, "my best friend is black and he said the reason why Black people stay in church so long is to figure out how to get rid of white people." I was so appalled that he would tell me this. I couldn't say anything. The only thing I could think was he was uncomfortable because I had the television on the coverage of Coretta Scott King's funeral. I mean sometimes he just says the most off the wall things about race. I can not imagine what would have happened to me if I had said something like this regarding the white race. Firing me would not have been good enough.

**On February 10, 2006,** Calvin Martin, the loop driver, and I were out in the warehouse talking. Mike comes out in the warehouse and Calvin said to Mike, "Mike, I want to work down here with y'all. Could I work down here?" Mike said to Calvin, "yeah, Calvin and you can stay at my house. You can sleep in the bed with my wife. I will sleep in our guest bedroom, because they say once they go black, they never go back." I was like maybe he was still upset about his home situation. Calvin was just as shocked as I was that he would say something like that.

**On February 24, 2006,** Chris needed some windows ordered. Calvin, our loop driver had just delivered some material off the loop truck. I went in the warehouse to receive all of the material in. Chris said to Derek, "Derek, I need you to key a window order." I told Chris that I would order the windows because Derek needed to be in the warehouse putting the material where it belongs. Before Chris gives any warehouse associate a job to do, he should have discussed it with me first to make sure I have not given them a task in the warehouse to complete. He always did this and then when something does not get done in the warehouse, he brings it up at a branch meeting. He needs to let the warehouse guys do there job. And frankly speaking, Chris needed something to do because he sure didn't do any sales like his job description stated. He was always trying to take care of the warehouse—my job. The reason why Mike and I are in the office is to take care of customer orders. Chris is always talking about responsibilities to me, but what he fails to realize is that the warehouse associates first priority is the warehouse. If Derek would stay out of the office, the work in the warehouse would get done the same day.

**On March 2, 2006,** a door came in wrong from the Jeld-wen Door Company. I put the purchase order on Mike's desk so when he came back from his errand, he could take care

of the issue, because Mike basically handles all door orders. Derek came in the office and told Chris about the door. Chris told Derek to call a Jeld-wen customer service representative. I told Chris that I was going to let Mike handle that situation when he came back since he ordered the door because Derek needed to be in the warehouse completing the task I assigned for him to do. Chris said to me, "well, I want this done." As I have told Chris before, the warehouse associate's job is to maintain the warehouse and when I ask them to complete a task in the warehouse, I expect that to be done before he gives them any assignment that he, Mike, or I can do.

<u>On, March 6, 2006,</u> Chris and Mike told Bo to pick up two windows because they were ordered wrong for one of our customers. Since we did not have much business today, Mike told me not to key the return up because it would have a negative affect on quota. Mike told me that he would do a return to the customer's account when we had more sales. Chris wanted the window credited to the customer when the replacement window came so the branch would not take a loss. Now we know what corporate policy is on returns. Today is another day that Chris's policy changed according to the profitability of the branch. It just seems Chris and Mike have the authority to make those calls.

<u>On May 9, 2006,</u> I am outside doing cycle count. There is a pallet of unlabeled elbows at the top of Bin I. I have told the guys if they put more than one product on a pallet to label it. Bo normally labels the pallets like I tell him to, Derek does not because it takes too much extra effort. I was very upset about this. I asked Bo and Derek if they were done with the forklift because I needed to take the pallet down so I could label and count the elbows. Bo said, "you know who put those up there." As I was taking the pallet down, since they were overly stacked on the pallet, some of the boxes fell at the top of the rack. That made me even angrier because the pallet should not have been stacked where they would fall, and the pallet should have been labeled. I called Derek and told him that he needs to stop stacking too much material on a pallet, and put the material where it belongs, and if the material did not fit in its designated area, put it on a pallet and label it. Derek said to me, "Aise, do not start with me." That is when I raised my voice to him and told him, "Derek you must have forgotten no matter what it seems like, I am your direct supervisor and I will write you up if you will not do what is asked of you regarding this warehouse. He is already lazy and "does not want to do the job he applied for." And, when I tell him to do what he was hired to do, he has problems with that.

<u>On May 10, 2006,</u> a new customer, Span Bros., called to get directions to our branch from Dothan, Alabama. When Mike got off the phone from explaining the directions, he was excited. I was like, "who is that?" He said, "that is a new customer that is coming to get a big gutter order, and buy a gutter machine." Bo and I were saying in our minds, "I hope they are not coming to get a 5" gutter machine." Mike continues, "they are, why?" I told him, "because we sent Newnan the 5" gutter machine last Friday, May 5 on the loop. They called last Monday, May 1, and asked if they could have it, and since we had not sold one in a long time, I told them yes." Mike told Chris. Chris said, "curse word, we have to get that back because this customer is coming all the way from Dothan, Alabama." He said, "you need to call Newnan because we need that back." I called Newnan and spoke to Joel, and of course they were not going to let us have it back.

Chris spoke to Joel also. When he got off the phone, another expletive. He then called Birmingham, and asked them if he could send Bo up there to pick up a gutter machine because we needed it for this customer. They said yes. Chris nor Mike did not say nothing to me about not selling this machine. I allowed Newnan to get it because it had been in our office for a very long time, and Newnan needed it immediately because it had been sold. I felt really bad because Chris was getting ready to sell it to a customer. I would have never let any branch have the machine if I had known. I told Mike, "this was not done intentionally." I did not think that we would have a customer to buy the machine. Mike said, "well, Chris should have said something because he had been talking to this customer for a while."

**On May 30, 2006,** I returned from military leave. I get to work at 6:30 a.m. for our weekly branch meeting. Bo, Derek, and I were waiting. At 7:02 a.m., Mike comes in. Derek said, "Mike, what happened to our meeting?" Mike told him, "Chris didn't tell y'all, he cancelled the meeting until tomorrow at 6:30 a.m. All of us were ticked off. Derek said, "he and Bo left the same time Friday, and told Chris and Mike they would see them Tuesday morning, and nothing was said about them changing the meeting time." I know I didn't get a phone call. They could have at least called. That was very unprofessional. Then I thought to myself, there was no need for a meeting. I just got back to work. I have not been at work for two weeks. If a meeting was called, what would we talk about? After all, all the meetings are about me. So, since I have not been to work in two weeks, there was no reason to have a meeting.

**On May 31, 2006,** at the branch meeting, we watched a training video. After the training video, Chris said he wanted to take us out into the warehouse to show us some things that he wants done and has questions about. He goes directly to Bin F and tells us he wants the bin to be neater so it will not be difficult to count. I told Chris, "I explained to everyone, (you, Mike, Derek, and Bo) that this Bin was supposed to be fixed while I was gone on military duty so that it could be ready to count for inventory. It is a mess, I agree." We walk back into the warehouse and Chris goes over some more topics. He also tells us that he does not want us to send anymore transfers to Gadsden because they "screwed" him more than once while I was gone. I told him, "I will still send them transfers because I think about the customer, and I do not want to burn my bridges with them because when one of our customers needs something, I want to be able to call any branch I choose and get it." Chris said, "you are right Aise. Let me change that by saying, if they call for a transfer, don't make their transfer a priority." That was the meeting. Later, Chris asked me to place an order for a new customer. He told me to do their order under Auburn Contractors, and he gave me a check to apply to the order once I placed the order. When I got ready to tender the order and run the check, the check machine says to call the authorization center. I asked Chris for the person's, (Kelli) DOB and license number because as I told him, "anytime you call the authorization center for a personal check they ask for this information." Chris responded by saying, "go on and tender the order because Mike was not going to deposit the check until the next day anyway." I told Chris, "if I did this, Corporate may call and I may get in trouble because I did not get the proper authorization number. Chris told me, "just go ahead and tender it. If Corporate calls, I will make sure I explain to them that I gave you the go ahead." Mike

said, "just call the bank and see if the money is in their account, I do it all the time." So I did call. This just proves that when they break policy, nothing is said. If I would have made this decision to just go ahead and tender the order without asking, it would've been a big issue.

**On June 1, 2006,** this afternoon, I am checking the OERR report. I see a recent order for one of our customers, CMC. I asked Mike about this. Mike said, "this was supposed to go out today." I told Mike that I checked Bo's truck before it left and I did not see this particular order on it. Mike went out into the warehouse and got the ticket. The next thing I knew, Derek comes into the showroom, and tells me that Chris just called another meeting for 6:30 a.m. tomorrow. I am like, why didn't Chris tell me that? Chris was in the office with me all day today, and he could have told me about another meeting in the morning. I called Chris on his cell phone and ask him, "if the meeting is just for Derek since he didn't tell me about it?" Chris was like, "no, the meeting is for everyone. I asked everyone if they could be there," (that is, except me). I am trying to figure out what this meeting is about. I go out into the warehouse and see Mike loading up CMC's order on his truck. I call Bo and ask, "Bo, why didn't you take CMC's order? Bo tells me that he called Mike on his way from a delivery in Columbus to tell him that he still had to go to the lake and there is no way he will be able to deliver CMC's order today. He continues by saying that Mike told him to come back to the warehouse before he heads to the lake and pick up another customer's order, Planters, and CMC's order can go out tomorrow. I went back out into the warehouse and told Mike what Bo said. Mike said, "I must have misunderstood what he meant." So, now I think we have another meeting because of miscommunication issues between Mike and Bo. When Mike leaves, Derek and I are at the office. Derek tells me that they did not have one meeting while I was on military leave. Then Derek comes near my desk and tells me, "you know when I saw Curtis (the BOM from the Atlanta branch), on the training video, you know what I thought." I was like, "oh you thought Curtis was young too." Derrick says, "no, with the Ebonics he speaks, I didn't know he was a white guy. I am not saying, he is Black or Asian, I just didn't think he was white. I did not say anything. There was just an uncomfortable silence. Derek goes back into the warehouse.

**On June 2, 2006,** Keep in mind, Chris has hired another white male perhaps the week I left for military duty. At the branch meeting this morning, Chris starts off by saying that John Reagan called him yesterday and told him that he needs to get things in the warehouse corrected. Now that I am back, the meetings start again. Mike, Bo, Chris, Derek, and I are present at the meeting. Chris said, "you need to have thick skin because some of the stuff I am going to go over is going to be touchy." He tells us that he wants Bin F fixed this morning after the meeting, no ifs, ands, or butts about it. I told Chris, "do you want them to fix Bin F first, or do you want them to put the products that came off of the truck in the racks first?" Chris angrily said, "you know Aise, I am tired of you saying stuff every-time I tell you something. You need to hush and let me finish saying what I need to say." I told Chris, "I just want to know what you want them to do because what is important to me is for the guys to put the stuff that came in off the truck yesterday in the racks first because the loop truck will be here this morning and I do not want the warehouse floors to get cluttered. As I told you earlier, Bin F was supposed to be fixed

before inventory. I have been gone two weeks, and it is still not done. Remember Chris, I told you, Mike, Bo, and Derek about this before I left for military duty." Chris said, "you said that before, but it couldn't get done while you were gone, it was too busy. I told you guys on Wednesday that I wanted it done." He tells me again, hush, and your attitude has got to change. With that attitude, you will never make it far. If this continues, you will need to look for something else. I do not have a problem putting someone else where you are sitting. As a matter of fact, maybe you need to look for another job."(while he was angrily talking, he was pointing towards my direction). I told Chris, "that Derek was the only person in the warehouse working so it was taking him a little longer to get stuff put up. Chris told me, "Aise, it is your responsibility to make sure the warehouse is straight. What is the matter with you going out there and fixing that bin? The corners are not that heavy." I told him, I know, but I still need some help. He said, "well, why don't you ask Mike or myself?" I told him, "because you and Mike are busy." Chris said, "well have you asked us?" I was like, "no." Then I said, "well after this meeting can you help me?" Chris said, "Yeah." I told him, "o.k., you can continue the meeting." Chris continued, "Aise, since you have been back, I have had two customer complaints already. Of course, I asked him who they were and what they were complaining about so that it could be corrected? He continued, "I can't tell you who the customer's are, just they complained about your lack of product knowledge. Don't take this the wrong way, but some customers say you are clueless and they wonder why I have you working here. When the customers complain, I take up a lot for you." I told him, " you do not have to take up for me, just let me know when it happens so that I can make corrections." He said, "my next step will be to have the customers forward their complaints to me, by e-mail, so I can forward them to the Regional Manager and so forth. You could have been fired a long time ago but, Mike and I have spoken up for you. John Reagan and John Witt have complained about you, and one of their biggest concerns is with your physical abilities because it takes you a longer time to pull orders and customers complain about that too. Aise, I do not like talking to you, nor does Mike. Tell her Mike, you know you told me that yesterday. We feel uncomfortable approaching you. You are very rude, and you are like a robot." Mike nods his head in agreement with Chris. I was just overwhelmed!!!!!!!!!!!!! I was really just overwhelmed!!!!!!!!!!!! All of this was said in the presence of everyone there.    Chris, you guys disrespect me too. Chris asked, "how I felt disrespected? Do the customers disrespect you?" I said, "it is not the customer's, it is my associates, who disrespect me and say offensive things." Chris is rolling his eyes and Mike is looking like, what? Mike, was like tell me when I have said anything offensive. So I tell Chris what Derek and Mike have said regarding race. Mike was like, I was raised around black people. I am far from racist. I was like, why do you always feel the need to refer to race? Chris was like, well Aise you were told that when you began working here that offensive things would be said and you need to have thick skin. We are dealing with Good Ole Boys. I was like, Tom also told me when I was hired, if someone said anything offensive, it would not be tolerated no matter who that person is.

Chris then looks at a door order that I did the other day and said, "this is wrong and common sense would have made you catch your error. I am sure Derek and Bo both know what a 6-panel provincial door is supposed to look like. Chris said, "Mike and I

Later that afternoon, Chris called Derek into his office with Mike. Then after Derek comes out, he calls Bo into the office. After Bo comes out of the office, Chris told Bo to come to get me, and to stay as a witness. Chris said, "Maurice Stocks told me that the person with the next highest tenure, which was Bo, needed to be present when he talked to me, just not with Derek." Chris had a yellow pad on his desk, and he told me, I talked to Maurice Stocks earlier, after the first meeting, and Maurice told me because of the allegations that were alleged, he needed to discuss it more in-depth so Maurice could do an investigation. Chris asked for examples of racial comments. I told him about some of the comments. Mike interjected and said, "Chris, make sure you note it that my black friends told me this." Then Chris asked me what racial comments did he make. I told him about the Good Ole Boy comment and the Red Neck comment. He asked me how this made me feel. I told him that as long as I am in the south I will never move up with this company. It also made me feel that when a Good Ole Boy walks through the door, I need to bow to them, but if another race walks through the door, it doesn't matter how they are treated. Chris said, "you know that is not the reason why you didn't get the position. I told Chris, When we talked about the position, you told me that my customer service skills were bad, and that I knew I was dealing with Red Necks. I told Chris, this should not have been put in the same context because it made me feel like I needed a different personality to deal with what he called, "RED NECKS." Chris said, I partially agree with you. You do need the personality to be a Branch Operations Manager. Chris and Mike said, "I don't see how that is offensive. And Mike said, "my black friends do not find that offensive. We clown all the time. I am not racist. I am far from it. I was raised by a black woman. Do you think I am racist Aise?" I told Mike, "Mike, I don't know what to think. You do not need to make reference to race when you are talking. I told him, when I talk about my friends you will never know what race they are because I don't mention the race." After everything was said, Chris said, "Aise, you could have been fired a long time ago." Mike said, "yea, because John Reagan and John Witt told us." There had not been anything said about my dress code until Doc from Birmingham, told Derek that he was sloppy and he needed to tuck his shirt. Then, after almost two years, Chris told me, "I want you to dress more presentable because if Chris Lansing walked in, he would chew his butt because I had a t-shirt on with the khaki pants. Because of your insubordination, (interrupting him while he was talking) this morning, Maurice Stocks advised me to write you up. Read it and sign it." I told him I was not going to sign it. Chris told me, "if you do not sign it, Maurice told me to suspend you until he or I contacts you." I told him I still was not going to sign it. Chris told me not to return on Monday. I e-mailed Maurice, and he didn't have a clue about what the meeting was about. He told me the only thing he knew was Chris needed advice on what to do in case of insubordination. I told Maurice I was still going to go to work because I wanted to make sure I did not abandon my position. When I got there on Monday, June 5, 2006, at 6:59 a.m., I asked Chris if my position had ended. Chris told me, "I told you not to come in until I talk to Maurice Stocks and John Witt." I told him I would wait. He told me. "Maurice told me if you come in to call the police and have you removed from the premises." I told him to call them, because I needed the documentation. I was interested in knowing whether my position had ended, or how long the suspension was going to last. When Chris gave me the termination letter, I left.

in knowing whether my position had ended, or how long the suspension was going to last. When Chris gave me the termination letter, I left.

At 10:19 a.m., on the same day, one of the customers called and told me that Mike and Chris called him Friday, after the a.m. meeting, and asked if they could meet him at McDonald's in Dadeville, Alabama to talk with him. They asked him if he thought they were racist because of what I had told them at the meeting. He told them they had not said anything racial in his presence. And they also gave him Chris' business card and told him to e-mail them with mistakes I've made. He also said they are trying to set you up, and they have been trying to do it for over a year.

You can respond in ten business days, by letter.

Respectfully submitted,

Aise Meke Cannon
P. O. Box 1831
Opelika, Alabama 36803

Attachments



8501 Sanford Drive
P.O. Box 9489
Richmond, VA 23228
(804) 266-8893
FAX: (804) 262-7554

J. CHRISTOPHER LANSING
President



July 7, 2006

Ms. Aise M. Cannon
P. O. Box 1831
Opelika, Alabama  36803

Dear Ms. Cannon:

Thank you for providing the detailed package regarding issues relating to your employment with Lansing Building Products. Because we took your input very seriously, we have just completed a thorough review of the issues you raised and of your termination. In fact, I sent our Vice President for Human Resources, Maurice Stocks, to Opelika to interview our associates at the branch as well as to look into some related customer complaints. Maurice can discuss any areas of concern in more detail, if you desire.

In our investigation, we did not find any evidence of discrimination related to your termination or in your treatment while you were an associate. You were terminated because you refused to accept a counseling form from your supervisor. This is not behavior we would expect from a supervisor in one of our branches. The counseling form allows you to state your opinion of the counseling being provided, but, as you were told, we expect you to acknowledge the counseling, even if you do not agree with it.

As an executive team, we were well aware of you, and we were hoping that you would be successful in our company. However, we were aware early in your employment with us that there were some concerns about your mastery of product knowledge and about the way that you interacted with our customers. One of our senior executives was actually present when you asked a customer to write his order down, after he repeated it twice. This is clearly not good procedure in our opinion, but we were prepared to work with you on these issues, because we felt that you could be an asset to the company.

When you refused the counseling form, we had hoped to suspend you temporarily during a "cooling off" period, so that we could discuss these issues with you in a less stressful environment. Despite being told that you were temporarily suspended, you showed up for work on the following Monday and refused to leave until you were told that you were either terminated or allowed to go to work. At that point, we had no choice but to terminate you.



Aise Cannon
July 7, 2006
Page 2


These situations are never easy, but I have tried to be candid and forthright with you. I hope that you can understand our point of view. If you would like to discuss any specifics, please feel free to contact Maurice here at Corporate. You have a great deal of talent, and we wish you every success in your future endeavors.

Cordially,

LANSING BUILDING PRODUCTS

J. Christopher Lansing
President


JCL/vhr

July 25, 2006

Aise M. Cannon
P. O. Box 1831
Opelika, Alabama  36803

EEOC Intake
Ridge Park Place
1130 22nd Street South
Suite 2000
Birmingham, Alabama  35205



RE: TED LANSING BUILDING PRODUCTS

Sir/Madam:

On October 13, 2004, I was hired by Tom Cleveland from Ithaca, New York.  Tom left Ted Lansing Company in May, 2005. When I started with the company, I was told that Lansing Building Products encouraged promotions within the company.  This was enthusiastic enough for me to learn the business well so that when a position became available, I would apply.  The disappointing reality was no matter what I did, Chris Black made it perfectly clear that I was not welcome at Lansing, and I would not advance as long as he was over me.  The harassment escalated as soon as Tom left.  Tom let it be known that he was not going to tolerate any disrespect toward me from any customer, nor were we going to disrespect each other in the office.

Tom's position became available.  I didn't have the opportunity to apply.  Chris gave the position to a white male—Mike Haynes. He told me Lansing had planned to hire Mike a year ago.  I discussed with Chris why the job was not posted in office and why I wasn't considered for the position.  He told me, "to be perfectly honest with you, Mike has better customer service skills than you do, and customers would rather deal with Mike."  He continued by saying, "I have been meaning to discuss this with you.  Customers think you are a hard a—, and you do not joke around with them."  He also said, "the company deals with 'RED NECKS' (my definition—white southern males) and you should know how they are."  This is why Mike was hired for this position because he has better customer service skills, and if you were in this position, they, 'THE RED NECKS,' would look at me like I was crazy."

A while after Tom left, Chris started having meetings on Tuesday, at 6:30 a.m.  I would be the meeting.  He would say to me things like, "Aise customers think you are clueless, and they wonder why I have you working here."  "Customers don't like you." "Customers complain about you." Chris says, "Aise, I do not like talking to you, nor does Mike" (Mike nods his head.)  We feel uncomfortable approaching you."  You are very rude, and you are like a robot." "You are dry." "I thought you were made of 'thick skin.'" All of this was said in the presence of everyone.  Chris's life was centered around attempting to make me look bad, so people would complain because he had planned in



Lansing Bldg. Docs-00158

the beginning that I would not be working for Lansing Products. His aim was to defame my character, and belittle me to the point of making me feel inadequate about myself, but I still remained. Every meeting was to discuss me. If I gave instructions to the white guys, Chris would have a problem. However, it was alright if I gave Willie "Bo" (the black male) instructions. Chris' whole life was centered around disrespecting me, and talking down to me in the presence of everyone. Chris' behavior determined whether the white guys would respect me as their boss. I had no problem with Willie "Bo". When I would tell the white guys something to do, Steven would go to Chris, who was his cousin, and Chris would come back on me. If I told Derek something to do, Chris would tell Derek to order something, which was really my job. So, I really couldn't win. Chris didn't have a problem with me lifting boxes and putting things away. As a matter of fact, he told me before I was fired that two of the bosses, (Reagan and John Witt) had complained about me, and one of their biggest concern was with my physical abilities. Chris didn't mind if I worked in the warehouse, lifting, as long as I was not over the white guys. As Chris said, "this is 'RED NECK' territory." This said to me I was the wrong race and the wrong gender.

Race was a big factor in this office. For some reason, I had to be reminded that they liked black people. The day Coretta Scott King's funeral, Mike told me, "Aise, my best friend is black, and he said the reason why black people stay in church so long is to figure out how to get rid of white people." Another time Mike said, "a black woman raised me, some of my best friends are black." Another time Mike told a driver, in my presence, "Calvin, you can stay at my house. You can sleep in the bed with my wife. I will sleep in our guest bedroom, because they say once they go black, they never go back." I don't know why it was necessary for them to prove to me that they liked black people. I don't care who their friends are. I didn't ask any personal questions about any of them. Another time Derek said to me, "I don't know why white women date black men because where I am from this is not acceptable." He also said, Aise, when I saw Curtis, (Branch Operation Manager from Atlanta,) on the training video, you know what I thought?" I was like, "oh you thought Curtis was young too?" Derek said, "no, with the Ebonics he speaks, I didn't know he was a white guy." "I am not saying he is Black or Asian, I just didn't think he was white." I am still trying to figure out where these guys came from.

I went on military duty May 11, 2006 thru May 27, 2006. The week that I left, I was told that Chris hired another white male—Derek's friend. Now Derek was wondering when Chris fired me which one of them would get my job. Before I left I gave Derek and Willie "Bo" instructions what to do while I was gone. I also told Mike and Chris what I had left for these guys to do. I was gone two weeks and no meetings took place. When I returned on that Tuesday, a meeting was already scheduled. I reminded Chris what I had left to be done. He told me, "you said that before, but it couldn't get done while you were gone, it was too busy." I said to the guys, "I told you guys on Wednesday I wanted it done. Chris tells me to hush, and your attitude has got to change. With that attitude, you will never make it far. If this continues, you will need to look for something else. I do not have a problem putting someone else where you are sitting. You can be replaced. As a matter of fact, maybe you need to look for another job." (while he was angrily talking, he was pointing in my direction.) Chris said, "Aise, it is your responsibility to

make sure the warehouse is straight. What is the matter with you going out there and fixing that bin? The corners are not that heavy. This was the same job left undone for two weeks while I was away for military duty. This was the same job I distinctly told Mike and Chris about before I left. This job was unimportant for two weeks and all of a sudden, as soon as I return, it becomes top priority. This is what I was attempting to do—my responsibilities. On the same day I was fired, one of the customers called and told me Mike and Chris called him Friday, after the a.m. meeting, and asked if they could meet with him at McDonald's, in Dadeville, Alabama to talk with him. They asked him if he thought they were racist because of what I had told them at the meeting. He told them they had not said anything racial in his presence. And they also gave him Chris' business card and told him to e-mail them any mistakes I've made. He also said, "they are trying to set you up, and they have been trying to do it for over a year.

Respectfully submitted,

*Aise M. Cannon*

.Aise M. Cannon

RECEIVED

JUL 2 6 2006

BIRMINGHAM DISTRICT OFFICE

Lansing Bldg. Docs-00160

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form | ☐ FEPA<br>☒ EEOC | 420-2006-04087 |

and EEOC

_____
State or local Agency, if any

| Name (Indicate Mr. Ms. Mrs.)<br>**Aise Cannon** | Home Phone No (Incl Area Code)<br>**(334) 444-5131** | Date of Birth<br>**06-23-1979** |
|---|---|---|
| Street Address<br>**P. O. Box 1831, Opelika, AL 30803** | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**LANSING BUILDING PRODUCTS** | No. Employees Members<br>**15 - 100** | Phone No (Include Area Code)<br>**(800) 868-8779** |
|---|---|---|
| Street Address<br>**1200 Jeter Avenue, Unit A, Opelika, AL 36801** | City State and ZIP Code | |
| Name | No. Employees Members | Phone No (Include Area Code) |
| Street Address | City State and ZIP Code | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below) | Earliest — Latest<br>**06-06-2006**   **06-06-2006**<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired to perform the duties of Warehouse Manager/Inside Sales by this employer. I had prior experience in performing this type job because I had performed the duties in the Military for three years. Shortly after I was hired, Chris Back, Branch Manager, made it clear that I was not wanted there. I was suppose to supervise two employees. One employee was Black the other White. I was only allowed to give instructions to the Black employee. I was the first and only Black Female, Manager in the position and I was reminded of that on more than one occasion. I complained about being disrespected and was told on a regular basis that I worked with "Red Necks" and that I needed to be "thick skinned". I always experienced conflict whenever I attempted to manage my white employee. If I was working in the warehouse helping out physically there was never a problem.

I was terminated while in a meeting which included Chris Black, Branch Manager, Michael Haynes, Supervisor, Willie Flournoy and Derek Ellis, both Warehouse Associates. I was verbally attacked by Chris Black, after I complained of disparate treatment as it related to being allowed to supervise without interference and being respected as a manager. I also complained that I was not allowed to supervisor my White subordinate. Chris then stated that I could be replaced anytime and that as a matter of fact, I can just go find another job.

I believe I have been discriminated against because of my Race, Black and my Sex, Female in violation of Title VII of the 12964, Civil Rights Act, as amended. I was terminated in retaliation for complaining of disparate treatment.

(AMENDED CHARGE-ORIGINAL CHARGE FILED JULY 26, 2006)

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY – When necessary for State and Local Agency |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief<br>SIGNATURE OF COMPLAINANT |
| ✓ 01 07 2007   _Aise M Cannon_<br>Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

